**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| THE HOSPITAL AUTHORITY OF METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, d/b/a NASHVILLE GENERAL HOSPITAL,<br><br>                Plaintiff,<br><br>v.<br><br>MOMENTA PHARMACEUTICALS, INC. and SANDOZ, INC.,<br><br>                Defendants. | Civil Action No.<br><br>**COMPLAINT--CLASS ACTION**<br><br>**JURY DEMAND** |

## COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT

Plaintiff The Hospital Authority of Metropolitan Government of Nashville and Davidson County, Tennessee, d/b/a Nashville General Hospital, alleges as follows on behalf of itself and all those similarly situated:

### INTRODUCTION

1.　　Enoxaparin is a generic life-saving anti-coagulant drug used in clinical settings to treat blood clots. It is a blockbuster drug, meaning it has annual sales of over one billion dollars. Also known under the brand name Lovenox® and developed by Sanofi-Aventis, the federal courts invalidated patent protection for the drug in 2008. This should have led to a healthy competitive market for generic enoxaparin and massive savings for patients and other health care stakeholders.

2.　　It did not. Instead, unbeknownst to anyone, Defendants manipulated the generic approval process to bring within the scope of Defendant Momenta Pharmaceuticals, Inc.'s patents the testing of enoxaparin that is required to ensure every batch meets FDA standards. In

other words, although Momenta had no claim to having developed or patented enoxaparin, it tried to prevent any and all other generic drug manufacturers from selling it. Specifically, it did so by pushing the United States Pharmacopeial Convention ("USP") to adopt a specific form of polysaccharide testing as a requirement for any manufacturer of enoxaparin to show compliance with FDA standards. Indeed, one of Momenta's directors, Dr. Zachary Shriver, sat on the USP body that fixed this standard. However, neither Dr. Shriver nor Momenta ever told the USP that Momenta was even then prosecuting a patent that would cover this very test, and potentially enable it to monopolize and control the market for generic enoxaparin if the USP chose this standard over others.

3.     Momenta and its collaborator Sandoz hatched this plan in secret in 2003, long before the adoption of the testing method in question. They jointly agreed to divvy up profits realized from dominating the market from generic enoxaparin, so long as Momenta could use its patent to block other generic entrants. They succeeded until mid-2013, when a federal district court found their use of the patent to be contrary to the safe harbor provisions of the Hatch-Waxman Act. In the interim, however, they reaped hundreds of millions of dollars in wrongful monopoly overcharges.

## JURISDICTION AND VENUE

4.     Plaintiff and Defendants are engaged in interstate commerce and in activities substantially affecting interstate commerce. They are engaged in a regular, continuous, and substantial flow of interstate commerce. Defendants are suppliers of generic enoxaparin to Plaintiff in interstate commerce. The drug enoxaparin is sold in all fifty states and has a substantial effect upon interstate commerce.

5.     This Court has federal question subject matter jurisdiction over the claims of this Complaint under the Clayton Act, 15 U.S.C. §§ 12-27, 29 U.S.C. §§ 52-53, because they arise

under federal law, 28 U.S.C. § 1331, and as a civil action relating to regulation of monopolies, 28 U.S.C. § 1337.

6.     This Court also has jurisdiction over the instant matter pursuant to 28 U.S.C. § 1332(d) and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1711, *et seq.*, which vests original jurisdiction in the district courts of the United States for any multi-state class action where the aggregate amount in controversy exceeds $5 million and where the citizenship of any member of the class of plaintiffs is different from that of any defendant. The $5 million amount-in-controversy and diverse citizenship requirements of CAFA are satisfied in this case.

7.     This Court has personal jurisdiction over Defendants pursuant to the Clayton Act, 15 U.S.C. § 22; Federal Rule of Civil Procedure 4(m); and the Tennessee Long Arm Statute, Tenn. Code Ann. § 20-2-214, because Defendants do billions of dollars of business in the United States and have substantial officers and personnel in the United States.  Defendants also deliberately targeted the United States market for generic enoxaparin by their manipulation of the USP standards-setting process to wrongfully give preclusive effect to Momenta's United States-issued patent.  Defendants intended their monopoly to extend to every State, and for its effects to be felt in every State.

8.     Venue is proper under the Clayton Act because Defendants knowingly transact a large volume of business in Tennessee in the form of sales of pharmaceuticals, including generic enoxaparin.  15 U.S.C. § 22.

9.     Venue is also proper in this Court because, among other things, Defendants' conduct injured Plaintiff in this District and because Plaintiff's purchases of enoxaparin in this

District constitute a substantial part of the events giving rise to Plaintiff's claims. 28 U.S.C. § 1391(b).

## THE PARTIES

10.     Plaintiff is the hospital authority of the consolidated municipal government of the city of Nashville, Tennessee, and the county of Davidson, Tennessee. Among its many governmental functions, Plaintiff operates the Nashville General Hospital ("NGH").

11.     Plaintiff, through NGH, buys pharmaceuticals, including Lovenox® and generic enoxaparin. NGH then dispenses the drugs to hospital patients or re-sells them through the NGH pharmacy. During the relevant period, Plaintiff bought these pharmaceuticals, including Lovenox® and enoxaparin made by Sanofi-Aventis and Defendant Sandoz Pharmaceuticals, Inc., from McKesson Corporation, a drug wholesaler. Plaintiff bought all its pharmaceuticals from McKesson pursuant to a "cost-plus" contract, whereby Plaintiff paid McKesson whatever its costs were per drug, subject to a fixed percentage adjustment. Plaintiff therefore has standing to seek damages under the Sherman Act. *See Ill. Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977).

12.     Defendant Momenta Pharmaceuticals, Inc. ("Momenta") is a Delaware corporation with a principal place of business at 675 West Kendall Street, Cambridge, Massachusetts 02142. Momenta is the assignee of at least one United States patent that Momenta alleges relates to methods of analyzing enoxaparin.

13.     Defendant Sandoz, Inc. ("Sandoz") is a Colorado corporation with a principal place of business at 506 Carnegie Center, Princeton, New Jersey 08540. Sandoz is the distributor of a generic enoxaparin product that it markets and sells throughout the United States. Sandoz and Momenta have entered into a collaboration to produce and sell generic enoxaparin, as described herein.

## RELEVANT NON-PARTY

14.     Amphastar Pharmaceuticals, Inc. ("Amphastar") is a pharmaceutical company located in Rancho Cucamonga, California.  Amphastar develops, manufactures, and markets proprietary and generic drug products and active pharmaceutical ingredients ("APIs"). Amphastar, either directly or through its distributors, has long-standing relationships with all the major group purchasing organizations ("GPOs") and drug wholesalers in the United States, which enables Amphastar to rapidly introduce new products and quickly establish significant market share.  Amphastar currently manufactures and sells a generic version of the drug enoxaparin.

## RELEVANT MARKETS

15.     A relevant market in this case is generic enoxaparin sold in the United States. Generic drugs have unique appeal to price-sensitive buyers.  A price-sensitive buyer will always choose the lower priced generic over the brand-name drug.  Consequently, generic drug makers do not view themselves as principally competing against the brand; they mainly compete against each other.  A sole generic supplier can therefore charge a price just marginally below the price of the brand-name drug and capture all price-sensitive buyers.

16.     Specifically, according to the FDA, on average, the first generic competitor prices its product only slightly lower (about 94%) than the brand name manufacturer.  However, market entry by a second generic manufacturer reduces the average generic price to nearly half the brand name price (about 52%).  As additional generic manufacturers enter the market with their competing products, prices continue to fall, but more slowly.  For products that attract a large number of generic drug makers, the average generic price falls to 20% (and sometimes even lower) of the branded price.

17.     Thus, the sole generic supplier can charge prices well in excess of cost and wield significant market power, the very definition of monopoly.

18.     Another relevant market in this case is branded Lovenox® sold in the United States.  Branded Lovenox® has a sufficiently different supply chain and core customer base that Sanofi-Aventis has substantial market power with respect to buyers of its branded Lovenox®.  Hence the market for branded Lovenox® is a separate antitrust market from generic enoxaparin.  But while Sanofi-Aventis's market power is substantial, it is not unlimited.  At a certain point, competition in the related market for generic enoxaparin will sufficiently reduce prices of the generic alternative to discipline the pricing of branded Lovenox®.

## FACTS COMMON TO ALL CLAIMS

### Background

19.     Enoxaparin is a low molecular weight version of heparin ("LMWH"), a naturally occurring molecule.  In medicine, enoxaparin is used in the prevention and treatment of deep vein thrombosis ("DVT") (including inpatient treatment of acute DVT with or without pulmonary embolism, and outpatient treatment of acute DVT without pulmonary embolism), and in the treatment of myocardial infarction, including certain specific myocardial infarction treatments (*e.g.*, acute ST-segment elevation myocardial infarction).  Other LMWHs are prepared by different processes than enoxaparin and have distinct physical, chemical, and biological properties, and they are not considered as clinically equivalent to enoxaparin.  Enoxaparin is the most popular and widely prescribed LMWH due mainly to its physical, chemical, and biological properties, and it generates the largest sales.  No other anticoagulant drug is a close substitute for enoxaparin.

20.     Sanofi-Aventis ("Aventis") originally brought enoxaparin to market in the United States in or around 1995 under the brand name Lovenox®.  Lovenox® became a huge

commercial success for Aventis, generating billions in revenue in the United States. Prior to entering the United States market, Aventis filed an application on June 26, 1991, for a United States patent purporting to cover Aventis's Lovenox® product. Aventis's patent eventually issued on February 14, 1995 as United States Patent No. 5,389,618 (the "'618 patent").

21. The Hatch-Waxman Act establishes a fast-track method to bring bioequivalent generic drugs to market. A generic drug manufacturer may do so via an Abbreviated New Drug Application ("ANDA") filed with the FDA. The drug maker must in general demonstrate that its drug is the "same" in all relevant respects as a brand name drug already on the market, and that the drug maker will otherwise comply with all necessary laws and FDA regulations. In addition, the ANDA process includes what is known as "Paragraph IV" certification. This specific regulatory pathway allows the generic drug maker to declare that the patent protecting the brand-name drug is invalid or otherwise unenforceable and immediately force the issue to litigation in federal court, without having to first enter the market and risk being held liable for patent infringement.

22. Amphastar filed an ANDA to sell a generic version of enoxaparin in the United States on March 4, 2003. In its ANDA, Amphastar included a "Paragraph IV" certification that Aventis's patent was invalid and unenforceable.

23. Amphastar was the first to file with the FDA for the FDA's approval to sell a generic version of enoxaparin in the United States, and Amphastar was the first generic applicant to receive acknowledgement of "sameness" by the FDA for generic enoxaparin, dated November 2, 2007. On August 4, 2003, Aventis sued Amphastar (and another drug maker, Teva), alleging infringement of the '618 patent. On February 8, 2007, Amphastar cleared the way for generic

competition by successfully establishing that Aventis's '618 patent was unenforceable due to inequitable conduct. The Federal Circuit affirmed that decision on May 14, 2008.

24.     Amphastar received FDA approval to sell enoxaparin on September 19, 2011.

25.     Defendant Sandoz filed an ANDA on August 26, 2005. Sandoz received FDA approval to sell enoxaparin on July 23, 2010. *See* Docket No. FDA-20030P-0273.

## The Agreement

26.     On or about November 1, 2003, Defendants signed a Collaboration and License Agreement ("Collaboration Agreement") to develop and sell enoxaparin sodium injection in the United States.

27.     The Collaboration Agreement was designed around the goal that Sandoz would be the sole supplier of generic enoxaparin—*i.e.*, a monopolist—in exchange for sharing approximately half the profits with Momenta. The Collaboration Agreement is rife with proof of the parties' intent to monopolize. It included milestone payments triggered if Defendants were the sole provider of generic enoxaparin in the United States. For example, on or about July 23, 2011, Momenta received a $10 million milestone payment from Sandoz in recognition of completing a full year of sales without an additional generic enoxaparin product entering the market.

28.     The Collaboration Agreement also provided that Momenta would receive no less than a 45% share of all profits earned by Sandoz's sales of its generic enoxaparin so long as Defendants were the sole source of generic enoxaparin in the United States—and a significantly lower royalty in the event of entry by any generic competitors. As Momenta's President and CEO, Craig Wheeler, put it: "if you look at the structure of the deal, the company is heavily, heavily incentivized to be a sole generic in the marketplace."

29.     The Collaboration Agreement also exclusively licensed Momenta's patents to Sandoz, which were intended to be used by Defendants to exclude competition.  Among the licensed patents was United States Patent No. 7,575,886 (the "'886 patent").  Momenta filed the application that matured into the '886 patent on March 11, 2003, and the '886 patent issued on August 18, 2009.  Among the named inventors was Momenta's Dr. Zachary Shriver.

30.     Sandoz, for its part, also enjoyed significantly higher revenues and profits under a profit sharing arrangement rather than a royalty payment for the simple reasons that during the time there were no other generic enoxaparin competitors on the market, Sandoz commanded a much higher price for its generic enoxaparin, and no competing sales were diverted to any competitors.  Sandoz, in fact, did maintain a high price for Defendants' generic enoxaparin product—a price that was very close to Aventis's price for its Lovenox® brand product—for the entire duration of time that Defendants marketed the sole generic enoxaparin product.  During the first year, sales of Defendants' generic enoxaparin product exceeded one billion dollars.  Sandoz's ability to maintain a high price for Defendants' generic enoxaparin was of paramount importance to Sandoz, and it was critical to Sandoz to ensure generic competitors were blocked from entering the market.

## USP Method 207 and the '886 Patent

31.     Defendants' plan depended on making sure that every one of Sandoz's potential competitors would be hamstrung by lack of access to the '886 patent.  The value of that patent depended, in turn, not on its intrinsic innovative value, but on the privileged place that Momenta and Dr. Shriver secretly secured for it in the regulatory structure.  They did this through the USP.

32.     The USP is a scientific nonprofit organization that sets standards for identity, strength, quality, and purity of medicines, food ingredients, and dietary supplements that are manufactured, distributed and consumed worldwide.  USP's drug standards are enforceable in

the United States by the FDA. USP standards are recognized and required under federal law. For example, the FDA enforces USP standards by requiring that any pharmaceutical product comply with the USP monograph for that drug product. *See* 21 U.S.C. § 351(b).

33. The USP has an express policy about allowing insiders to manipulate the standards-setting process to favor one stakeholder over another. USP commits itself to "processes that are open, rigorous, science-based, and unbiased." USP Code of Ethics, "Standards-Setting Activities."[1] USP states as a goal that it will not "allow any stakeholder to have an undue advantage over another stakeholder." *Id.*

> "Consistent with and in furtherance of this mission, USP is committed to doing all it reasonably can to assure that USP-NF standards and related methods are developed through an objective, independent, science-based process, and that the resulting official compendial standards not have the effect of favoring any manufacturer over others or putting any FDA-approved product out of compliance. The USP attempts to maintain independence and impartiality, as it is critical to the integrity and credibility of its standard-setting activities."

*Id.* (emphasis added).

34. To ensure impartiality and its policy of not favoring any one manufacturer over another, the USP maintains a strict Code of Ethics that applies to all members and participants of USP committees. The USP develops these standards through "members" or "participants" of various expert panels and committees, often scientists in the field relevant to the standard being developed. Each member and participant agrees to the USP's Rules and Procedures of the Council of Experts, which include specific rules on conflicts of interest. Each individual or entity involved in the standard-setting process has a duty to ensure that they remain free of any actual or perceived conflicts of interest in the performance of their duties. The USP's rule is as

---

[1] *Available at* http://www.usp.org/sites/default/files/usp_pdf/EN/code-of-ethics/code-of-ethics-english.pdf.

simple as it is clear:  "It is your obligation to disclose any potential conflict of interest as soon as you become aware of it."  USP Code of Ethics, "Conflicts of Interest."

35. USP's conflict-of-interest rules thus require each member to submit to the USP a statement disclosing all interests that could result in a conflict of interest, including intellectual property rights.  In the event that a conflict of interest arises, it is the duty of the member to disclose the conflict of interest to the USP.  The USP will not permit a member to be present for the final discussion, deliberation, or vote on the issue on which he or she has a conflict of interest.

36. It is common practice for USP staff to review USP conflict of interest policies at the beginning of USP panel meetings.

37. Enoxaparin is a so-called "biologic" pharmaceutical.  This means that it is produced through an organic process using animal tissue—in this case, pig intestine—rather than through traditional chemistry.  Enoxaparin also has molecular diversity in the sense that its individual molecules are of different sizes.  This results from the fact that enoxaparin is essentially broken-down heparin—hence the moniker "low molecular weight heparin."  (Heparin is a polymer, meaning it is macro molecule of repeating subunits; the depolymerization process breaks heparin down into these different subunits.)

38. These aspects of enoxaparin make it more complicated than usual to determine whether a generic manufacturer has produced enoxaparin that is truly "bioequivalent" to Aventis's branded Lovenox®.  No two batches of enoxaparin will be the same down to every molecule; the question is whether what the generic manufacturer has produced can be shown to be equivalent to Lovenox® without re-performing all of the clinical trials that went into developing that drug—the whole point of the Hatch-Waxman Act.

39.     Thus, by at least 2007, Aventis had requested that the USP adopt criteria for enoxaparin that included a standardized test that Aventis had developed for determining such criteria, namely that 15 to 25% of the carbohydrate chains in enoxaparin had a 1,6-anhydro ring structure on one of their terminal ends.  In or around February 2007, or at least by that time, the USP had begun work on a proposed standard for enoxaparin, including work on a test method proposed by Aventis.  Aventis's proposed standard became known as USP Method <207>.

40.     Zachary Shriver, who was Senior Director of Research Analytics at Momenta during the relevant time period, served as Momenta's representative on USP's Heparin Ad Hoc Advisory Panel and Low Molecular Weight Heparins Expert Panel, which oversaw the development and approval of USP's enoxaparin standard.  Dr. Shriver—and Momenta whom he represented on the panel—owed the USP a duty to disclose any and all conflicts of interest relevant to the USP's adoption of the enoxaparin standard.  Dr. Shriver and Momenta were well aware of their duty to the USP and the USP's policy not to favor one manufacturer over another.  Dr. Shriver had the privilege of serving on the USP panel by virtue of his supposed commitment to represent the public interest, as opposed to the pecuniary interests of himself and Momenta.

41.     Sandoz also participated in panel discussions and owed the USP a duty to disclose any and all information relevant to the USP's adoption of USP Method <207>.

42.     During the USP's consideration of USP Method <207>, Defendants and Dr. Shriver learned that Aventis had a pending patent application, the claims of which, if issued, would read on USP Method <207>.  Defendants objected to Aventis having a patent that covered a standardized USP test, contending that the test, once adopted, should be free for anyone to use. Defendants insisted that the USP require Aventis to expressly abandon the patent application so that there would be no doubt that any member of the public could practice USP Method <207>.

43.     Specifically, on or about November 14, 2008, USP held a meeting of the Heparin Ad Hoc Advisory Panel that was considering the USP's adoption of USP Method <207>.  At the beginning of the meeting, USP Staff member, Mr. Van Hook, gave a presentation to those in attendance of USP's rules of conflict of interests.  The attendees were specifically advised that their "[p]osition as a member should not be used to benefit one's own interest, or the interest of his or her company." Defendant Momenta presented a detailed analysis of USP Method <207> including commenting on specific enzymes, columns, reagents and procedures used in the method.  Dr. Shriver was in attendance during the November 14, 2008 USP meeting.

44.     Also during the November 14, 2008 Heparin Ad Hoc Advisory Panel meeting, the USP Staff reported: "USP has had successful correspondence with the company [Sanofi-Aventis] that may have patents that may pertain to the test or related tests.  The company has reported that it will allow the one patent that may cover the method to lapse.  As such USP is not aware of any patent issue that may cover the test.  The AP may proceed with the use of the test as planned."

45.     Notwithstanding the USP Code of Ethics and their own participation in the process that stripped Aventis of its patent rights with respect to USP Method <207>, neither Momenta nor Dr. Shriver advised the USP of the pending '886 patent application.[2]  Other than Dr. Shriver, no one else serving on the USP panel for setting standards for enoxaparin knew that Defendants had a patent application that they would use to block the use of USP Method <207> upon issuance.  This mattered because the pending application claimed methods that covered USP Method <207>.  For instance, the pending application claimed a method of analyzing an enoxaparin sample "for the presence or amount of a non naturally occurring sugar" using digestion of an enoxaparin sample with a heparin-degrading enzyme—the basic process

---

[2] Dr. Shriver himself is the official applicant for the '886 patent, *i.e.*, the purported inventor.

contemplated by USP Method <207>. Indeed, this application was the whole basis of the collaboration agreement Momenta had signed with Sandoz many years before.

46. Had Defendants disclosed their application, the USP would have either required Momenta to abandon its patent rights regarding the USP Method <207> (as the USP required Aventis to abandon its patent rights); or chosen a different test among standard techniques over which Momenta would have had no patent rights, such as mass spectroscopy, NMR spectroscopy, modifying reagents, or modifying enzymes. Indeed, the FDA noted the equivalence of these alternative techniques to USP Method <207> in the very order that opened the market to Sandoz and Momenta; but this did not relieve suppliers of enoxaparin from complying with the USP standard. *See* Docket No. FDA-20030P-0273 (July 23, 2010 at pp. 16-17).

47. Having obtained Aventis's abandonment of Aventis' pending patent application—and being unaware of Momenta's pending application due to its non-disclosure by Defendants—in December 2009, the USP approved and adopted USP Method <207>. Once the USP adopted USP Method <207>, it became the official test method that the FDA required of Amphastar to test for its enoxaparin in order to obtain and maintain its generic enoxaparin approval.

48. On or about March 4, 2011, the USP held a meeting of the USP Low Molecular Weight Heparins Expert Panel. Dr. Ishan Capila appeared on behalf of Momenta as an Expert Panel member. Dr. Shriver also attended as an Expert Panel member. The USP staff once again reviewed USP's conflict of interest policy and informed the panel members that conflicts of interest must be disclosed. Again, neither Momenta, nor Dr. Capila, nor Dr. Shriver disclosed the then-issued '886 patent.

49.     On or about April 20-21, 2011 the USP held another meeting of the USP Low Molecular Weight Heparins Expert Panel. Again Dr. Capila and Dr. Shriver attended as Expert Panel members. Again, USP Staff reviewed the USP conflicts of interest policy including the requirement that Expert Panel members disclose any conflicts of interest. The USP Staff advised the Expert Panel members: "All Counsel of Expert members, those on either the EC or EP, must declare their conflicts of interest and must sign a confidentiality agreement. Due to the nature of work of the Council of Experts, especially in the biologics and biotechnology area there are potential antitrust and biosimilar issues that the EP should keep in mind throughout its work." Again, despite this warning, neither Momenta, nor Dr. Capila, nor Dr. Shriver advised the USP of Momenta's then-issued '886 patent.

### Defendants Block Competition

50.     Defendants were the first to obtain FDA approval for a generic version of enoxaparin. The FDA granted final approval for Defendants' ANDA on or about July 23, 2010, and immediately thereafter, Defendants began selling and shipping generic enoxaparin to customers in the United States. At the time, and until Amphastar received FDA approval, Defendants were the sole source of generic enoxaparin in the United States.

51.     On September 19, 2011, the FDA approved Amphastar's ANDA to sell generic enoxaparin in the United States. As a condition for approval, the FDA specified that Amphastar needed to establish on a batch-by-batch basis that its generic enoxaparin contains between 15 and 25 percent of the 1,6-AS. Upon approval, the FDA instructed Amphastar to comply with the USP compendium for enoxaparin, including USP Method <207>. In particular, as required by the USP Monograph for enoxaparin, Amphastar was required to establish that: "About 20 percent of the material contains a 1,6-anhydro derivative on the reducing end of the chain, the range being between 15 and 25 percent."

52.     On September 21, 2011, two days after Amphastar received FDA approval to market generic enoxaparin in the United States, Defendants sued Amphastar, contending that it was essentially illegal for Amphastar to comply with USP Method <207> because it couldn't do so without infringing the '886 patent.

53.     In their complaint, Defendants represented to the court: "The FDA requires a generic manufacturer to include in its manufacturing process the analysis of each batch of its enoxaparin drug substance to confirm that its manufacturing process results in the production of oligosaccharides that include defined relative amounts of a non- naturally occurring sugar that includes a 1,6-anhydro ring structure."

54.     Defendants represented in other pleadings that the FDA also requires generic manufacturers of enoxaparin to ensure that each batch complies with the standards for identity enumerated in the USP Monograph for enoxaparin.

55.     Defendants further represented that the USP Monograph for enoxaparin is an official written standard that provides the definition of enoxaparin and the requirements that a maker of enoxaparin must satisfy in order to ensure the drug product's quality, strength, and purity.

56.     Still further, Defendants represented that the USP is the standard-setting body for drugs sold in the United States and that the USP monographs are enforced by the FDA.

57.     Defendants further contended that the claims of the '886 patent covered the USP Method <207>.

58.     Defendants admitted that Amphastar's market entry was certain to cause an immediate and substantial reduction in Sandoz's price for enoxaparin and Sandoz's market share.

59.     Upon filing their complaint against Amphastar, Defendants moved for a TRO and preliminary injunction.

60.     On October 7, 2011, the District of Massachusetts court issued a temporary restraining order ("TRO") enjoining Amphastar from selling enoxaparin pending a hearing on the motion for preliminary injunction. The court required Defendants to post a $50,000 bond for the TRO.

61.     On October 28, 2011, the court issued a preliminary injunction to the same effect. The court required the Defendants to post a $100,000,000 bond for the preliminary injunction.

62.     The Federal Circuit stayed the preliminary injunction on January 25, 2012 and vacated the wrongfully obtained preliminary injunction on August 3, 2012.

63.     On July 19, 2013, the United States District Court for the District of Massachusetts granted Amphastar's motion for summary judgment, finding that Amphastar did not infringe the asserted claims of the '886 patent under the Patent Act's safe harbor provision, 35 U.S.C. § 271(e)(1). As a result, Amphastar and a subsequent ANDA applicant, Teva, now have the ability to freely use the USP Method <207> for batch release testing for their generic enoxaparin.

**Monopoly Power**

64.     Defendants' lawsuit prevented Amphastar from selling generic enoxaparin in the relevant market. From the issuance of the TRO until the Federal Circuit stayed the preliminary injunction on January 25, 2012, Amphastar was completely prevented from selling the drug enoxaparin. Even after the Federal Circuit vacated the preliminary injunction on August 3, 2012, Amphastar's sales were considered "at risk" since final judgment based on the safe harbor provision of 35 U.S.C. § 271(e)(1) had not yet happened, which prevented or impeded Amphastar from obtaining sales contracts it would have otherwise obtained. There were no

other independent competitive suppliers during this time period; the only other supplier, Winthrop, was a subsidiary of Aventis selling an "authorized" generic enoxaparin. Winthrop did not have the ability or incentive to take market share from Momenta/Sandoz through aggressive pricing, which would have negatively impacted the price of Lovenox®. Thus, even during late 2012 and into 2013 Defendants continued to wield significant (monopoly-level) power over prices in the relevant market for generic enoxaparin.

65. This is borne out by market share statistics, reflecting the shares of prescriptions supplied by Momenta/Sandoz and Amphastar/Watson, according to publicly available Medicaid utilization data.

| Firm Name | 2011 | 2012 | 2013 |
|---|---|---|---|
| Momenta/Sandoz | 100% | 85% | 66% |
| Amphastar/Watson | 0% | 15% | 34% |

### Harm to Plaintiff and the Class

66. Defendants' wrongful conduct kept the prices of Lovenox® and generic enoxaparin higher than they otherwise would have been.

67. For example, a display of the average wholesale price of generic enoxaparin (published by Truven Health Analytics in its RedBook) shows that it began a significant decline in May of 2012, four months after the Federal Circuit stayed the preliminary injunction against Amphastar, and Amphastar began taking steps to try to enter the market. It reached a low point in July of 2013, shortly before Amphastar's final victory, and began plummeting in 2014.



68. Had Defendants not delayed competition, this decline would have started earlier, in September of 2011, when Amphastar could have first entered the market, and when generic enoxaparin cost $80 per dose, rather than $90 per dose.[3] It also would have accelerated faster, because Amphastar would have been a stronger competitor. By delaying competition, Defendants made buyers of generic enoxaparin—a billion-dollar drug—pay hundreds of millions of dollars in overcharges.

69. Similarly, the RedBook shows that the average wholesale price of branded Lovenox® plateaued at $100 per dose in May of 2012, four months after Amphastar entered the market on a limited basis, and at around the same time that the price of generic enoxaparin began a modest decline.

---

[3] There are other dosage strengths of enoxaparin; however they all follow the same price structure, despite the fact that they might individually be priced more or less than the common 80MG/0.8ML dosage. The same is true of branded Lovenox®.



70.     Had Defendants not delayed generic competition, this plateau would have

occurred months earlier, when the price of Lovenox® was a few dollars lower per dose.

71.     RedBook data for Lovenox® ends in 2013.  However, the Centers for Medicare

and Medicaid Services (CMS) provides data collected in its survey of drug acquisition costs paid

by retail community pharmacies from October 2012 to the present.  The survey provides the

national average drug acquisition cost (NADAC) for each drug and dosage form and strength in

the survey.[4]

72.     The Medicare data begins around October, 2012.  It shows that after this plateau

period, the price of branded Lovenox® began a steady decline.

---

[4] The RedBook and Medicare data do not show the same prices during the few months in which
they overlap because the average wholesale price self-reported by the drug manufacturer is not
the same thing as the average acquisition cost reported by retail pharmacies.



73.     Had Defendants not delayed competition, this decline would have started earlier, and from a lower price, and driven the price of branded Lovenox® to levels below those paid even today.

74.     By delaying competition Defendants thus made buyers of branded Lovenox®—a billion-dollar drug—pay tens if not hundreds of millions of dollars in overcharges.

**CLASS ACTION ALLEGATIONS**

75.     Plaintiff brings this action on behalf of itself and as a nationwide class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure seeking damages and equitable relief on behalf of the following class (the "Class"):

> All persons and entities residing in the United States that, during the period from September 21, 2011, through the present (the "Class Period"), purchased Lovenox® or generic enoxaparin directly from Sanofi-Aventis or Defendants, or pursuant to a cost-plus contract with a wholesaler that purchased directly from Sanofi-Aventis or Defendants.

76.     Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' conspiracy, which was applicable to all of the

members of the Class, thereby making appropriate relief with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

        a.      Whether Defendants agreed to restrain competition in the market for generic enoxaparin;

        b.      Whether Defendants exercised monopoly power in the market for generic enoxaparin;

        c.      Whether Defendants conspired to monopolize the market for generic enoxaparin;

        d.      Whether Defendants had a dangerous probability of achieving monopoly power in the market for generic enoxaparin;

        e.      Whether Defendants' conduct raised the price of generic enoxaparin above what it otherwise would have been absent their conduct;

        f.      Whether Defendants' conduct raised the price of Lovenox® above what it otherwise would have been absent their conduct;

        g.      Whether the Collaboration Agreement and Defendants' related conduct and agreements violated Section One of the Sherman Act;

        h.      Whether Defendants' exclusionary practices violated Section Two of the Sherman Act;

        i.      The appropriate injunctive and related equitable relief; and

        j.      The appropriate class-wide measure of damages.

    77.    Plaintiff's claims are typical of the claims of the members of the Class, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of

the Class are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic enoxaparin and Lovenox®.

78.     Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust, consumer protection and class action litigation.

79.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

80.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

## COUNT 1

### Violation of Section One of the Sherman Act:<br>Agreements in Unreasonable Restraint of Trade

81.     Every paragraph above and in the following counts is incorporated herein by reference.

82. Defendants' anticompetitive conduct set forth in this Complaint has violated Section One of the Sherman Act. *See* 15 U.S.C. § 1.

83. Defendants are separate and distinct entities; neither is a subsidiary or agent of the other. Apart from their agreements discussed herein, Defendants are economically independent from each other.

84. Defendants acted in concert during the proceedings before the USP.

85. Defendants' conspiracy, including the Collaboration Agreement, was made with the purpose and effect of restraining competition in the market for generic enoxaparin.

86. During the Class Period, Defendants had significant pricing (i.e., market) power in the market for generic enoxaparin.

87. Defendants' conspiracy had no pro-competitive benefits; it did nothing to increase competition in the market for generic enoxaparin. It instead inflicted substantial competitive harms, namely by preventing entry by other generics and raising prices of both generic enoxaparin and Lovenox® during the Class Period.

88. Defendants affected interstate commerce by keeping the price of enoxaparin unreasonably high due to their wrongful restraint of trade.

89. As a result of Defendants' conspiracy, Plaintiff and the class suffered antitrust injury. Plaintiff and the class paid significantly higher prices for Lovenox® and generic enoxaparin than they would have paid had Defendants not blocked competition in the market for generic enoxaparin.

## COUNT 2

### Violation of Section Two of the Sherman Act: Monopolization

90. Every paragraph above and in the following counts is incorporated herein by reference.

91.     Defendants' anticompetitive conduct set forth in this Complaint has violated Section Two of the Sherman Act.  *See* 15 U.S.C. § 2.

92.     Defendants wrongfully acquired and unlawfully maintained monopoly power in the market for generic enoxaparin by deceiving the USP into adopting a standard test method that Defendants contended is covered by Defendants' patent rights.

93.     Defendants then used the wrongfully obtained monopoly to exclude other generic manufacturers from the relevant market for generic enoxaparin.

94.     As a result of Defendants' exclusionary conduct, Plaintiff and the class suffered antitrust injury.  Plaintiff and the class paid significantly higher prices for Lovenox® and generic enoxaparin than they would have paid had Defendants not blocked competition in the market for generic enoxaparin.

## COUNT 3

### Violation of Section Two of the Sherman Act: Conspiracy to Monopolize

95.     Every paragraph both above and in the following counts is incorporated herein by reference.

96.     Defendants conspired to monopolize the market for generic enoxaparin in violation of 15 U.S.C. § 2.

97.     Defendants are separate and distinct entities; neither is a subsidiary or agent of the other.  Apart from their agreement discussed herein, Defendants are economically independent from each other.

98.     Defendants had a specific intent to monopolize.  Defendants specifically intended and effected through their willful deception of the USP to create and maintain monopoly power by barring other generics from selling generic enoxaparin and did so by, inter alia, wrongfully

pursuing a patent infringement action regarding another generic company's use of USP Method <207>. This action resulted in court orders that temporarily barred generic entry.

99.     As a result of Defendants' exclusionary conduct, Plaintiff and the class suffered antitrust injury. Plaintiff and the class paid significantly higher prices for Lovenox® and generic enoxaparin than they would have paid had Defendants not blocked competition in the market for generic enoxaparin.

## COUNT 4

### Violation of Section Two of the Sherman Act: Attempt To Monopolize

100.    Every paragraph both above and in the following counts is incorporated herein by reference.

101.    Defendants attempted to monopolize the market for generic enoxaparin in violation of Section Two of the Sherman Act based on the anticompetitive conduct described herein.

102.    Defendants had a specific intent to monopolize the market for generic enoxaparin. As discussed in more detail above, Defendants specifically conspired to wrongfully block anyone else from selling generic enoxaparin in the United States. In doing so, Defendants attempted to control high prices in the relevant market, and to exclude competition.

103.    Through the anticompetitive and exclusionary acts described above, Defendants achieved a dangerous probability of success of monopolizing the relevant market. By excluding other generic entrants, Defendants maintained their huge market share and significant pricing power over generic enoxaparin in the United States. As a result, Defendants were able to charge a higher price for generic enoxaparin.

104.    As a result of Defendants' exclusionary conduct, Plaintiff and the class suffered antitrust injury. Plaintiff and the class paid significantly higher prices for Lovenox® and generic

enoxaparin than they would have paid had Defendants not blocked competition in the market for generic enoxaparin.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and Class members pray for relief as set forth below:

A.      Certification of the action as a class action pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiff as Class Representative and its counsel of record as Class Counsel;

B.      A declaration that Defendants' conduct constituted an unlawful restraint of trade in violation of the Sherman Act and that Defendants are liable for their own and each other's conduct;

C.      Restitution and/or damages to Class members for their purchases of Lovenox® and/or generic enoxaparin at inflated prices;

D.      Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

E.      Pre-judgment and post-judgment interest on such monetary relief;

F.      Equitable relief in the form of restitution and/or disgorgement of all unlawful or illegal profits received by Defendants as a result of the anticompetitive conduct alleged herein;

G.      An injunction against Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

H.      The costs of bringing this suit, including reasonable attorneys' fees; and

I.      All other relief to which Plaintiff and Class members may be entitled at law or in equity.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury on its claims.

Dated:  October 14, 2015                Respectfully submitted,


                                        s/ Mark P. Chalos
                                        Mark P. Chalos (19328)
                                        John T. Spragens (031445)
                                        LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
                                        150 Fourth Avenue, North, Suite 1650
                                        Nashville, TN  37219-2423
                                        (615) 313-9000
                                        mchalos@lchb.com
                                        jspragens@lchb.com

                                        *Attorneys for Plaintiff*