IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


THE HOSPITAL AUTHORITY OF      )
METROPOLITAN GOVERNMENT OF    )
NASHVILLE AND DAVIDSON        )
COUNTY, TENNESSEE, d/b/a/        )
NASHVILLE GENERAL HOSPITAL,     )
                                 )
v.                                  )       No. 3:15-1100
                                 )
MOMENTA PHARMACEUTICALS,     )
INC. and SANDOZ, INC.           )


TO: The Honorable Waverly D. Crenshaw, District Judge


## REPORT AND RECOMMENDATION

This matter was referred to the Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72. *See* Order at Docket Entry No. ("DE") 71. Presently pending are Defendants' Motion to Transfer Case to the District of Massachusetts (the "Motion to Transfer") (DE 58), Defendant Momenta Pharmaceuticals, Inc.'s Motion to Dismiss or Transfer for Improper Venue (the "Rule 12(b)(3) Motion") (DE 62), and, Defendants' Motion to Dismiss (the "Motion to Dismiss") (DE 65). For the reasons stated below, the Magistrate Judge recommends that each of these motions (DE 58, 62, 65) be DENIED.

## I. Background[1]

Nashville General Hospital ("Plaintiff" or "NGH") is a hospital that is part of the consolidated municipal government of Nashville and Davidson County, Tennessee. DE 1 at ¶ 10. As part of its operation, Plaintiff buys pharmaceutical drugs that are either dispensed to patients in the hospital or resold through the hospital pharmacy. *Id.* at ¶ 11. Momenta Pharmaceuticals, Inc. ("Momenta") and Sandoz, Inc. ("Sandoz") (collectively referred to as "Defendants") are part of a corporate structure that provides pharmaceutical drugs to buyers such as Plaintiff. DE 59 at 6.[2] Momenta, a Delaware corporation with a principal place of business located in Massachusetts, is a biotechnology company that engages in the "analysis, characterization, and design of complex pharmaceutical products," (DE 1 at ¶ 12; DE 77 at ¶ 3), while Sandoz, a Colorado corporation with a principal place of business located in New Jersey, is a distributor of pharmaceutical products. DE 1 at ¶ 13.

In 1995, non-party Sanofi-Aventis ("Aventis"), a pharmaceutical company, brought a drug called Lovenox® to market in the United States and was eventually awarded a patent for the drug. *Id.* at ¶ 20. Momenta and Sandoz subsequently entered into an agreement to produce and sell a generic version of Lovenox®, called enoxaparin, which is used to treat deep vein thrombosis. *Id.* at ¶¶ 19, 26. Plaintiff does not buy enoxaparin directly from Defendants, but instead purchases

---

[1] For purposes of a motion to dismiss, the allegations of the Complaint must be accepted as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1938, 1949, 173 L.Ed.2d 868 (2009). In determining whether to transfer venue, the court must draw all reasonable inferences and resolve factual conflicts in favor of the plaintiff. *United States v. Gonzales Bonds and Ins. Agency, Inc.*, 677 F.Supp.2d 987, 991 (W.D. Tenn. 2010) (internal citations omitted). For purposes of the pending motions, the following facts are recited consistent with these standards.

[2] References to page numbers in Docket Entries (DE) are to the page number(s) stated in the ECF footer, which may not necessarily correspond to the pagination in the document itself.

2

enoxaparin from McKesson Corporation ("McKesson"), a drug wholesaler, which obtains the drug from Sandoz. DE 1 at ¶ 11.

Also relevant to the pending motions is non-party Amphastar Pharmaceuticals, Inc. ("Amphastar"), a separate pharmaceutical company located in California. DE 1 at ¶ 14. Like Defendants, Amphastar manufactures and sells a generic version of enoxaparin.

On March 4, 2003, Amphastar filed an Abbreviated New Drug Application ("ANDA") with the Food and Drug Administration ("FDA"), which represents a "fast-track method" of bringing generic drugs, such as enoxaparin, to market. *Id.* at ¶¶ 21-22. Plaintiff succinctly describes the process:

> The drug maker must in general demonstrate that its drug is the "same" in all relevant respects as a brand name drug already on the market, and that the drug maker will otherwise comply with all necessary laws and FDA regulations. In addition, the ANDA process includes what is known as "Paragraph IV" certification. This specific regulatory pathway allows the generic drug maker to declare that the patent protecting the brand-name drug is invalid or otherwise unenforceable and immediately force the issue to litigation in federal court, without having to first enter the market and risk being held liable for patent infringement.

*Id.* at ¶ 21. By way of the ANDA, Amphastar successfully established that Aventis' patent for Lovenox® was invalid and unenforceable, thus opening the door for the marketing of generic enoxaparin by other pharmaceutical companies. *Id.* at ¶¶ 22-23.

In November of 2003, prior to receiving approval to sell enoxaparin, Sandoz entered into a Collaboration and Licensing Agreement with Momenta (the "Collaboration Agreement") to develop and sell enoxaparin sodium injections in the United States. *Id.* at ¶ 26. Plaintiff claims that Defendants, via this collaborative agreement, intended to create a monopoly in the market with respect to enoxaparin. *Id.* at ¶ 27. Plaintiff alleges that the Collaboration Agreement provided that Momenta would receive at least 45% of all profits earned by Sandoz's future sales of enoxaparin as long as Defendants remained the only supplier of enoxaparin in the United States. *Id.* at ¶ 27-

3

28. Plaintiff claims that this agreement was intended to incentivize Momenta to prevent any other providers from selling enoxaparin in the United States.[3] *Id*. at ¶ 28.

As part of the Collaboration Agreement, Momenta's patents were licensed exclusively to Sandoz, including what would later become Patent No. 7,575,886 (the "#886 Patent"), which, as discussed below, was issued in April of 2009.[4] *Id* at ¶29. The #886 Patent describes a method for controlling the commercial production of enoxaparin by "ensur[ing] that each batch includes the structural features that are characteristic of enoxaparin—including the presence of a 1,6-anhydro ring structure at the reducing end of 15-25% of the enoxaparin oligosaccharides." DE 59 at 7. One of the named inventors of this process is Dr. Zachary Shriver, a former Momenta employee. DE 1 at ¶ 29.

The United States Pharmacopeial Convention ("USP") is a scientific nonprofit organization that sets the standards for testing, among other things, the quality and purity of globally distributed pharmaceuticals. *Id*. at ¶ 32. The standards set forth by the USP are enforced by the FDA. *Id*.

While Momenta's #886 Patent application was still pending, non-party Aventis requested that the USP adopt a process that it had developed, known as Method <207>, which, like the #886 Patent, was used to ensure that 15-25% of the carbohydrate chains in each batch of enoxaparin had a 1,6-anhydro ring structure on one of the terminal ends. *Id*. at ¶ 39. Dr. Shriver, then a Momenta employee, served on a USP panel that oversaw the development and approval of the USP's enoxaparin standards. *Id*. at ¶ 40. While the USP was considering whether to adopt Method <207>,

---

[3] Plaintiff quotes Momenta's president and CEO, who stated, "if you look at the structure of the deal, [Momenta] is heavily, heavily incentivized to be a sole generic in the marketplace." DE 1 at ¶ 28.
[4] Momenta filed the application for the #866 Patent in March of 2003. DE 1 at ¶ 29.

Defendants learned that Aventis had a pending patent application that, if issued, would read on USP Method <207>, which would make the use of Method <207> by any other manufacturers a potential infringement on Aventis' patent. *Id.* at ¶ 42. After learning of Aventis' patent application, Defendants encouraged the USP to require Aventis to abandon its patent application, which, Defendants argued, would ensure that Method <207> would be free for anyone to utilize. *Id.* In November of 2008, the USP announced that Aventis had abandoned its application for the patent that included Method <207>. *Id.* at ¶ 44.

Despite encouraging the USP to facilitate Aventis' abandonment of its pending patent application, and thus ostensibly securing the free use of Method <207> by all manufacturers, Defendants and Dr. Shriver failed to disclose to the USP that they too had a pending application (the #886 Patent) that read on Method <207>, which, if issued, would allow Defendants to block anyone else's use of Method <207>. *Id.* at ¶ 45. In other words, Defendants advocated before the USP that Aventis not be allowed to gain patent protection regarding Method <207>, while simultaneously attempting to gain precisely such patent protection.

Plaintiff claims that Defendants therefore deceived the USP into adopting a standard (Method <207>) that they knew would soon be protected by the #886 Patent, which was eventually issued in 2009, thereby ensuring that anyone who utilized Method <207> would be infringing on Defendants' patent rights. DE 1 at ¶ 92. Plaintiff notes that such conduct violated the USP's Code of Ethics, which requires all members of USP committees, including the panel on which Dr. Shriver served, to disclose any potential conflicts of interest to the USP, such as a pending patent application that would have bearing on a decision by the USP. *Id.* at ¶¶ 34-35. Plaintiff claims that this deception allowed Defendants to monopolize the generic market and charge inflated prices for enoxaparin. *Id.* at ¶ 77.

5

Defendants ultimately obtained approval from the FDA to sell generic enoxaparin in July of 2010, while non-party Amphastar received such approval in September of 2011. *Id.* at ¶¶ 50-51. Shortly after Amphastar obtained approval from the FDA to sell enoxaparin, Defendants filed a patent action against Amphastar (the "Patent Action") in the United States District Court for the District of Massachusetts (the "Massachusetts District Court"), alleging that Amphastar's process for manufacturing enoxaparin, which included Method <207>, infringed upon Momenta's #886 Patent. *Id.* at ¶ 51; DE 59 at 8-9. In October of 2011, the Honorable Nathaniel Gorton, United States District Judge for the District of Massachusetts, issued a temporary restraining order and preliminary injunction that enjoined Amphastar from selling generic enoxaparin. DE 59 at 9. In August of 2012, the Court of Appeals for the Federal Circuit vacated the preliminary injunction, at which point the Patent Action was remanded to Massachusetts District Court. *Id.* After the parties conducted discovery, Amphastar filed a motion for summary judgment, which was granted by the Massachusetts District Court. *Id.* Defendants appealed this ruling, however, and the Federal Circuit ultimately reversed and remanded for further proceedings. *Id.* At this time, the Patent Action remains pending in the Massachusetts District Court. *Id.* at 9-10.

In addition to the Massachusetts Patent Action, there is a separate lawsuit that is relevant to the Court's analysis. In September of 2015, Amphastar filed an antitrust action against Defendants in California (the "Amphastar Antitrust Action"). *Id.* at 10. Similar to Plaintiff's claims, Amphastar alleged that Momenta and its then-employee, Dr. Shriver, deceived the USP by convincing the USP to approve the process known as Method <207> without disclosing that Momenta's application for the #886 Patent was pending, and by further failing to disclose that the #886 Patent, if issued, would be infringed by any manufacturers that chose to utilize Method <207> to meet the aforementioned 15-25% requirement. *Id.* Defendants claim that the Amphastar

6

Antitrust Action is "simply an extension" of the Massachusetts Patent Action, and therefore filed a motion to transfer that action to the District of Massachusetts. *Id*. at 10-11. On January 26 2016, the United States District Court for the Central District of California (the "California District Court") granted this motion to transfer, and the Amphastar Antitrust Action was subsequently assigned to Judge Gorton, the same judge presiding over Defendants' pending Patent Action against Amphastar. DE 89 at 2. On May 20, 2016, the Court of Appeals for the Ninth Circuit denied Amphastar's petition for writ of mandamus regarding the California District Court's decision to grant the motion to transfer. DE 102. On July 27, 2016, Judge Gorton granted Defendants' motion to dismiss the Amphastar Antitrust Action. DE 105-1.[5]

It is against this backdrop that the pending motions are considered. The Motion to Transfer, filed jointly by Defendants, requests transfer of the case to the District of Massachusetts pursuant to 28 U.S.C. § 1404(a), contending that the allegations offered by Plaintiff in support of its claims implicate the same evidence, witnesses and legal arguments that are being litigated in the Patent Action. Defendants also jointly assert in their Motion to Dismiss that dismissal under Rule 12(b)(6) is appropriate because Plaintiff cannot maintain an antitrust action. Finally, Momenta also seeks dismissal for improper venue under Rule 12(b)(3) of the Federal Rules of Civil Procedure[6], or, in the alternative to transfer this case to the District of Massachusetts under 28 U.S.C. § 1406(a). For the reasons that follow, the Magistrate Judge recommends that all three motions be denied.

---

[5] While Amphastar's complaint contains similar allegations as those found in Plaintiff's complaint, Judge Gorton's decision to dismiss Amphastar's complaint is not inconsistent with the Court's findings in this case, as discussed in more detail below.

[6] Unless otherwise noted, all references to rules herein are to the Federal Rules of Civil Procedure.

7

## II. Analysis

### A. Joint Motion to Transfer Case to the District of Massachusetts

Defendants contend that there is substantial overlap between the issues, claims, and witnesses in this case and the pending Patent Action brought by Defendants against Amphastar in Massachusetts, which compels transfer of this case. Defendants present three arguments in support of their motion: (1) that the District of Massachusetts is a proper forum for the instant case; (2) that the District of Massachusetts is a more convenient forum for the parties and witnesses in the instant case; and (3) that public interest factors and the interests of justice favor transfer of the instant case to the District of Massachusetts. DE 59 at 15-21. The second and third of Defendants' arguments are sometimes referred to respectively as the private interests and the public interests.

The Court's analysis of Defendants' motion to transfer is governed by 28 U.S.C. § 1404(a), which provides:

> For the convenience of the parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might been brought or to any district or division to which all parties have consented.

28 U.S.C. § 1404(a). District courts have broad discretion in making determinations under Section 1404(a) and notions of convenience and fairness are considered on a case-by-case basis. *Stewart Organization, Inc. v. Ricoh*, 487 U.S. 22, 108 S.Ct. 2239, 2244, 101 L.Ed.2d (1988). *See also Phelps v. McClellan*, 30 F.3d 658, 663 (6th Cir. 1994). The burden of proving that transfer of a case is warranted under 28 U.S.C. § 1404(a), that is, that the plaintiff's choice of forum is unnecessarily burdensome, rests with the moving party, and the burden is a substantial one. *Smith v. Kyphon, Inc.*, 578 F. Supp. 2d 954, 958 (M.D. Tenn. 2008) (internal citation omitted). *See also Hefferan v. Ethicon Endo-Surgery, Inc.*, 828 F.3d 488, 498 (6th Cir. 2016).

8

In ruling on a motion to transfer under § 1404(a), a district court must consider the private interests of the parties, including the convenience of the parties and potential witnesses, as well as public-interest concerns, including systemic integrity and fairness, which fall under the rubric of "interests of justice." *Moses v. Bus. Card Exp., Inc.*, 929 F.2d 1131, 1137 (6th Cir. 1991) (citing *Stewart Organization, Inc. v. Ricoh Corp.,* 487 U.S. 22, 108 S. Ct. 2239, 101 L. Ed. 2d 22 (1988)). The private interests of the parties include:

> (1) the convenience to the parties; (2) the convenience of witnesses; (3) the relative ease of access to sources of proof; (4) the availability of process to compel attendance of unwilling witnesses; (5) the cost of obtaining willing witnesses; [and] (6) the practical problems indicating where the case can be tried more expeditiously and inexpensively...

*Smith v. Kyphon, Inc.*, 578 F. Supp. 2d at 962 (internal citations omitted). Public interest factors include:

> (1) the enforceability of the judgment; (2) practical considerations affecting trial management; (3) docket congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable … law.

*Smith*, 578 F. Supp. 2d at 962.

### (1) Private Interest Factors

A plaintiff's choice of forum "should be given weight when deciding whether to grant a motion to change venue, [but] this factor is not dispositive." *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 413 (6th Cir. 1998). However, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Dowling v. Richardson-Merrell, Inc.*, 727 F.2d 608, 612 (6th Cir. 1984) (internal citation omitted).

Defendants contend, and Plaintiff does not dispute, that the District of Massachusetts is a proper forum for this case, as that district has subject matter and personal jurisdiction over both

9

Defendants. DE 59 at 15-16. Although this is accurate, it is simply a threshold inquiry under 28 U.S.C. § 1404(a), establishing that Plaintiff could have filed its complaint in Massachusetts, and for that reason, transfer of this case to the District of Massachusetts would be appropriate. Indeed, a motion to transfer venue presupposes the availability of at least two forums in which the defendant may be sued. For the reasons discussed below, however, the Court does not find that the balance of considerations in this case strongly favor Defendants. Accordingly, substantial deference must be accorded to Plaintiff's choice of forum.

### (a) Convenience of the Parties

Defendants' second argument focuses on the convenience of the parties and witnesses. Defendants contend that Massachusetts is a more convenient venue for the parties to this case, noting that Momenta's principal place of business is in Massachusetts. DE 59 at 18. Defendants also emphasize that they are already "actively litigating" the issues involved in this case in the Patent Action currently pending in the District of Massachusetts, and that transfer of this case would be "immeasurably more convenient to litigate these overlapping claims in a single tribunal rather than traipsing back and forth across the country[.]" *Id.*

The Court is not persuaded by Defendants' argument. It is true that the District of Massachusetts would be substantially more convenient for Momenta in this matter, but would conversely be substantially more inconvenient for Plaintiff. "Merely shifting the inconvenience from one party to another does not meet Defendant's burden … [t]he movant must show that the forum to which he desires to transfer the litigation is the more convenient one vis a vis the Plaintiff's initial choice" *B.E. Tech., LLC v. Facebook, Inc.*, 957 F. Supp. 2d 926, 930-31 (W.D. Tenn. 2013) (internal citations omitted).

10

Defendants attempt to discount this by noting that in class actions, such as this one, a plaintiff's choice of forum "*may* be entitled to little deference." *Oakley v. Remy Int'l, Inc.*, No. 2:09-0107, 2010 WL 503125, at *6 (M.D. Tenn. Feb. 5, 2010) (emphasis added). While this statement standing alone is not inaccurate, the Court in *Oakley* did in fact give some level of deference to the plaintiff's forum selection, but ultimately granted transfer due to the selected forum's "lack[] [of] any significant contact with the underlying cause of action[.]" *Id*. In fact, the motion to transfer was granted "notwithstanding the deference given to the Plaintiff's choice of forum," based on the fact that only one plaintiff out of the putative class of sixty-seven was a resident of Tennessee, and even that individual had only relocated to Tennessee after retiring. *Id*. at *7.

In contrast, Plaintiff is the "hospital authority of the consolidated municipal government of the city of Nashville, Tennessee," which purchases enoxaparin for disbursement to patients in the hospital or resale through the hospital's pharmacy. DE 1 at 4. Defendants concede that, at a minimum, testimony will likely be required as to Plaintiff's purchasing practices and its use of enoxaparin (DE 59 at 18), which occurred in this district. Indeed, the antitrust injury alleged by Plaintiff, which forms the basis of its complaint, involves the inflated prices NGH paid for Lovenox® and enoxaparin in this district. DE 1 at ¶¶ 11, 77. The fact that NGH will not be the only plaintiff to this action, if class certification is granted, does not negate the existence of this significant contact with this district.  Because transfer of this case to Massachusetts would simply result in shifting inconvenience from one party to another, Defendants have not demonstrated that their desired forum is a more convenient one.  Giving appropriate deference to Plaintiff's choice of forum, the Court finds this factor weighs against transfer.

11

## (b) Convenience of the Witnesses

Defendants correctly state that the convenience of witnesses is considered to be an especially significant factor to a court's analysis. *See Oakley*, *supra*, at *4. Defendants note that many of the likely witnesses in this case reside in or around Cambridge, Massachusetts, including Dr. Shriver, one of the named inventors of the #886 Patent in question, and Leda Trivinos, former patent counsel to Momenta. DE 59 at 17.

This Court has previously held that while the convenience of all witnesses is a factor, the convenience of non-party witnesses is given the most weight when deciding a motion to transfer. *See Smith,* 578 F. Supp. at 963 ("Convenience of *non-party* witnesses, as opposed to employee witnesses, is one of the most important factors in the transfer analysis.") (emphasis in original). Following oral arguments on this motion, the parties were directed to submit their initial disclosures, which included numerous non-party witnesses. Plaintiff listed twelve individuals it deemed likely to have discoverable information relating to its claims, including five current NGH employees, four former NGH employees, and three individuals whose connection to the current case is not specified. DE 91 at 3-5. Of the seven non-party witnesses identified by NGH, one such individual's address is known, with that individual residing in Memphis, Tennessee. *Id*. at 5. Each of the proposed non-party witnesses is purported to have knowledge with respect to NGH's agreements to purchase Lovenox® and enoxaparin. *Id*. at 4-5.

Defendant Sandoz's initial disclosures identify eight potential witnesses, including Dr. Shriver and Ms. Trivinos. DE 92-1 at 3-5. The remaining individuals appear to be current employees for either Sandoz or Momenta. *Id*.[7] Defendant Momenta lists fifteen potential witnesses

---

[7] Notably, not all of the party witnesses identified by Sandoz reside in Massachusetts; some reside in New Jersey, and one resides in Colorado.

(including some who are also party witnesses identified by Sandoz), eight of whom are non-party witnesses, including Dr. Shriver and Ms. Trivinos. DE 93-1 at 1-4. The other six non-party witnesses include USP employees for whom the address provided was Rockville, Maryland, and four who are affiliated with Amphastar in California.

The determination of whether one forum is more convenient for witnesses involves more than simply comparing the number of witnesses identified by each party; the court must additionally consider the "importance of each witness," including "both non-party witnesses outside the scope of the Court's subpoena power and the geographic location of any witnesses likely to testify in the case." *Oakley*, at *4 (internal citation and quotations omitted). One non-party witness who will likely be critical to this case is Dr. Shriver, the named inventor of the #886 Patent. The Plaintiff's antitrust claims hinge largely on the conduct of Dr. Shriver during his employment at Momenta and his overlapping position on a USP panel, including his alleged failure to disclose the existence of Momenta's application for the #886 Patent at issue. *See* DE 1 at ¶¶ 2, 31, 40, 42-43, 45, 48-49. Dr. Shriver, who is no longer a Momenta employee, resides in Cambridge, Massachusetts (DE 59 at 17), thus making him subject to the subpoena power of the Massachusetts District Court, but beyond the subpoena power of this Court.

Like Dr. Shriver, Ms. Trivinos is also a former Momenta employee who currently lives in Cambridge, Massachusetts (DE 61 at 3; DE 93-1 at ¶ 9), thus making her beyond this Court's subpoena power as well. As Momenta's former patent counsel, Ms. Trivinos will also likely be important to any court's analysis of Momenta's conduct with respect to the #886 Patent. Defendants argue that the presence of these essential non-party witnesses who are outside of this Court's subpoena power heavily favors transfer.

Although Dr. Shriver and Ms. Trivinos are beyond this Court's subpoena power, Defendants have not indicated that either individual is unwilling to testify in this case. While this is not dispositive, it plays a role in the Court's analysis. *See Smith*, 578 F. Supp. 2d at 964 ("Neither party has presented proof that [two former employee] witnesses are *not* willing to travel to testify.") (emphasis in original). More importantly, unlike Dr. Shriver and Ms. Trivinos, the other identified non-party witnesses are not subject to the subpoena power of the Massachusetts District Court.

As indicated in Plaintiff's initial disclosures (DE 91 at 3-5), those witnesses include individuals who will testify as to the contractual agreement between NGH and McKesson, the drug wholesaler from whom Plaintiff purchased generic enoxaparin, which is a critical issue in this case. Some of those witnesses will be local. Others may be affiliated with McKesson, which is, as Plaintiff notes, headquartered in California. Similarly, the non-party Amphastar witnesses identified by Momenta are also located in California. The identified USP witnesses are located in Rockville, Maryland, which is also beyond the subpoena power of the Massachusetts District Court. Transfer of this case from Tennessee to Massachusetts would be at least equally inconvenient for all of these non-party witnesses.

Defendants cite an unreported case from the Southern District of Illinois in support of their position that the availability of Dr. Shriver, as an essential non-party witness, "weighs heavily" in favor of transfer of this case. *See George v. Kraft Foods Glob., Inc.*, No. 06-cv-798, 2007 WL 853998, at *7 (S.D. Ill. Mar. 16, 2007). There are, however, important distinctions between that case and the current matter. Although the *George* court granted the defendants' motion to transfer, the case remained in the state of Illinois. *Id.* at *8. Indeed, the court noted that litigating in the

14

Southern District of Illinois, as opposed to the Northern District of Illinois, where the subject defendant was headquartered, would not impose a significant burden on the defendants. *Id*. at *6.[8]

Notably, the court in *George*, which involved a dispute over participation in a 401(k) retirement plan sponsored by the defendants, granted the defendants' motion to transfer based on "substantial concerns about the availability of non-party witnesses to testify at trial." *Id*. at *7. While there are similar concerns in this case regarding the availability of Dr. Shriver and Ms. Trivinos, those concerns are counter-balanced by the unavailability in Massachusetts of multiple other non-party witnesses, including ones who are essential witnesses.

Furthermore, unlike the instant case, the court in *George* found that the defendants had provided "uncontroverted evidence that none of the third-party service providers to the [401(k) plan] are located in [the Southern] District and that in fact half of those providers, including one of the largest … are located in the Northern District of Illinois." *Id*. at *8. While the location of Dr. Shriver and Ms. Trivinos appears to favor transfer, witnesses from the Nashville-Davidson County Metropolitan Government and Meharry Medical College, also located in Nashville, would undoubtedly be inconvenienced by a transfer to the District of Massachusetts. Plaintiff also identifies four former employees and three other individuals with knowledge of NGH's agreements for purchase of Lovenox® and enoxaparin. None of these non-party witnesses are listed as residents of Massachusetts, and thus none are presumed to be within the subpoena power of the Massachusetts District Court. DE 91 at 3-5.

_____

[8] Additionally, and significantly, the parties in *George* had conducted discovery specifically to evaluate the appropriateness of transfer, with the Court ultimately determining that the plaintiffs had failed to demonstrate an adequate connection between the Southern District of Illinois and the case's subject matter. *See id.* at *5 ("Even after conducting discovery with respect to transfer, Plaintiffs simply have not been able to show very much of a nexus between this District and this case.").

Defendants also cite a decision from a Michigan District Court in which the court transferred a pending case from the Eastern District of Michigan to the Eastern District of Wisconsin. *See Wayne Cty. Employees' Ret. Sys. v. MGIC Inv. Corp.*, 604 F. Supp. 2d 969 (E.D. Mich. 2009). However, as Defendants concede in their brief, the court in that case granted transfer because "*all* key witnesses" were employed in the defendant's Wisconsin office, which included more than ten named individuals as well as numerous unnamed accountants. *Id.* at 975 (emphasis added). In contrast, Plaintiff has listed seven potential non-party witnesses who were involved in contract negotiations regarding the purchase of enoxaparin, none of whom appear to reside in Massachusetts. DE 91 at 3-5. Momenta has also listed six potential non-party witnesses who do not reside in Massachusetts. Based on all of these considerations, the Court does not find that the balance of this factor strongly favors transfer to Massachusetts. *See Dowling*, *supra*.[9]

### (c) Other Factors

Defendants failed to present any argument or evidence that the cost of procuring willing witnesses at trial would be greater if this case is tried in this district than if this case is tried in Massachusetts. Nor did Defendants offer any proof that physical evidence, such as documents, is more accessible in Massachusetts, or cite any practical problems that might be alleviated by transfer of the case. The Court can however discern information about those factors from the record presented.

---

[9] At worst, the Court would decline to give any weight to this factor. As noted, while a transfer to Massachusetts would be more convenient for Dr. Shriver and Ms. Trivinos, it would be inconvenient for Plaintiff's witnesses, and would not create any less inconvenience for the other non-party witnesses located outside of Massachusetts.

16

Given that several of the witnesses identified by Plaintiff are either local or located somewhere other than Massachusetts, it is likely that the cost of procuring witnesses in Tennessee for both parties would be no more than for trial in Massachusetts. Similarly, while some documents will likely be located at Momenta in Massachusetts, particularly those related directly to the patent, others, such as the NGH contracts, will likely be located in Tennessee. There may also be relevant documents located at Amphastar in California, and perhaps even some located with the USP in Maryland. Defendants have not shown that there is a disproportionately larger number of documents located closer to Massachusetts than to Nashville. Nor do they assert that it would be more difficult for them to produce their documents in this district.[10]

The only specific practical problems even indirectly addressed by Defendants are the economy of discovery and possibility of consistent results if this case is transferred to Massachusetts. For the reasons discussed below, the Court gives no weight to the prospect of inconsistent results. Regarding discovery duplication, the Court is confident that the experienced trial attorneys in the two cases can manage discovery to minimize duplication and costs. The Court therefore finds that Defendants failed to demonstrate that trial in the District of Massachusetts would be any less expensive or any more efficient. The Court therefore assigns minimal weight to this factor. Overall, these additional factors weigh against transfer.

## (2) Public Interest Factors

### (a) Practical Considerations Affecting Trial

Defendants additionally claim that transfer to the District of Massachusetts will "serve the interests of justice" by allowing a judge who is already familiar with the underlying facts to preside

---

[10] In this age of technology, production of documents is much less tied to a specific locale.

17

over this case. DE 59 at 19.[11] Defendants argue that, in light of the similarities between the allegations raised in Plaintiff's complaint and those involved in Defendants' Patent Action against Amphastar that is currently pending before Judge Gorton, transfer of this case to the District of Massachusetts will prevent the possibility of inconsistent rulings. *Id*. at 19-20. Defendants note that the parties to the Patent Action have already begun conducting discovery related to the issues that are largely at the heart of Plaintiff's complaint. *Id*. at 20.[12]

It is true that the Patent Action and the instant case appear to involve similarities with respect to the "relevant market for enoxaparin" (DE 59 at 20) and Method <207>, and Judge Gorton is undoubtedly familiar with the factual underpinnings of both cases. The Court is also aware that Amphastar's antitrust lawsuit against Defendants was transferred to the District of Massachusetts before being subsequently dismissed. DE 102; DE 105. However, Plaintiff is not a party to either of these two lawsuits, nor is Amphastar a party to the instant case, despite Defendants' attempt to juxtapose the arguments made by Amphastar and Plaintiff.

Defendants' lawsuit against Amphastar involves patent infringement, while the instant case involves a purportedly monopolistic scheme that ultimately led to NGH paying overcharges for Lovenox® and enoxaparin. The Massachusetts District Court's ruling as to whether Amphastar has infringed upon the #886 Patent has no bearing on this Court's determination of whether Defendants engaged in an illicit scheme to monopolize the market for enoxaparin by failing to disclose its application for the #886 Patent to the USP. As such, there is no danger of inconsistent rulings. With respect to Amphastar's Antitrust Action against Defendants, Judge Gorton

---

[11] Although not more specifically described, the Court construes this consideration as implicating the "practical considerations affecting trial."

[12] As discussed above, the Court is confident that counsel are capable of managing discovery in the two cases to avoid unnecessary duplication and cost.

18

specifically noted that Amphastar's complaint alleged injury only in the form of "damaged reputation, reduced financing upon IPO, and lost profits on sales," (DE 105-2 at ¶ 72) and failed to allege an injury that was not subject to the *Noerr-Pennington* doctrine:[13]

> Although the *Noerr-Pennington* doctrine would not bar antitrust claims for anti-competitive effects resulting from the Collaboration Agreement or the purported failure to disclose conflicts to the USP, the amended complaint does not claim federal antitrust injuries under those theories of antitrust liability.

DE 105-1 at 14-15. In this case, Plaintiff specifically alleges antitrust injuries based on such anticompetitive effects, including the payment of inflated prices for Lovenox® and enoxaparin. As such, Plaintiff could be successful in this case without conflicting with Judge Gorton's ruling. For these reasons, this consideration does not favor transfer of this case.

### (b) Other Factors

Defendants have not addressed or demonstrated any other public interest factors bearing specifically on the Court's transfer decision. Those considerations that are apparent to the Court from the record, on balance, weigh against transfer. Specifically, the Court is not aware of any docket congestion or enforceability issues that would make trial in Massachusetts more preferable than trial in Nashville. Conversely, there is a significant local interest and public policy consideration in this Court deciding a matter affecting NGH, as the hospital authority of the consolidated municipal government of the city of Nashville.[14] Overall, the public interest factors weigh against transfer.

---

[13] The Court discusses *Noerr-Pennington* in greater detail below.

[14] While Judge Gorton is undoubtedly familiar with the facts that are similar to both this case and the Patent Action, and by necessity is also likely familiar with some of the legal issues in this case,

19

Neither the balance of private interest factors nor the balance of public interest factors strongly favor transfer. Therefore, Plaintiff's choice of forum should not be disturbed. *See Reese v. CNH Am. LLC*, 574 F.3d 315, 320 (6th Cir. 2009) (citing *Dowling,* 727 F.2d at 612)).

## B. Joint Motion to Dismiss

A motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) is reviewed under the standard that the Court must "construe the complaint in the light most favorable to the plaintiff and accept all factual allegations as true." *Laborers' Local 265 Pension Fund v. iShares Trust*, 769 F.3d 399, 403 (6th Cir. 2014), *cert. denied*, 135 S. Ct. 1500, 191 L. Ed. 2d 452 (2015) (internal citation omitted). In order to survive a motion to dismiss, the complaint must provide the grounds for the entitlement to relief that is sought, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (abrogating *Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d. 868 (2009). The factual allegations supplied must be enough to show a plausible right to relief. *Twombly*, 550 U.S. at 555-61; *Schneid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436-37 (6th Cir. 1988). Merely positing a theory of legal liability that is unsupported by specific factual allegations does not state a claim for relief that survives a motion to dismiss. *See Iqbal*, 556 U.S. at 678-79. However, when evaluating a motion to dismiss for failure to state a claim, the standard applied "is very liberal in favor of the party

---

Defendants presented no argument that he is uniquely familiar with antitrust law. The Court therefore assigns no weight to this consideration.

opposing the motion." *Williams v. Sears, Roebuck & Co.*, 143 F. Supp. 2d 941, 943 (W.D. Tenn. 2001) (citing *Westlake v. Lucas,* 537 F.2d 857, 858 (6th Cir. 1976)).

Defendants contend that Plaintiff's complaint should be dismissed on three grounds: (1) Plaintiff purchased enoxaparin from drug wholesaler McKesson, not directly from Defendants, and therefore lacks standing to pursue recovery pursuant to federal antitrust law; (2) Plaintiff failed to plead a "cognizable antitrust claim" based on Defendants' enforcement of their patent rights, as the *Noerr-Pennington* doctrine bars any such claim unless the asserted patent was obtained through fraud or the infringement lawsuit was a "sham" lawsuit intended to interfere with a competitor's business; and (3) Plaintiff's complaint fails to specifically allege that Defendant Sandoz participated in any anticompetitive behavior or that it conspired to violate federal antitrust law. DE 66 at 7-8.

### (1) Whether Plaintiff has standing as an indirect purchaser.

Defendants' argument regarding standing requires an examination of relevant federal antitrust case law. In *Hanover Shoe Inc. v. United States Mach. Corp.*, the Supreme Court addressed the issue of whether an alleged antitrust violator was permitted to argue as a defense that its own direct customers (in this case, McKesson) had "passed on" some or all of the damages caused by the violation (i.e. excessive costs) to the subsequent buyer (here, Plaintiff). The Court barred this argument generally but carved out the exception that Plaintiff now asserts, known as the "cost-plus" exception:

> We recognize that there might be situations—for instance, when an overcharged buyer has a pre-existing "cost-plus" contract, thus making it easy to prove that he has not been damaged—where the considerations requiring that the passing-on defense not be permitted in this case would not be present.

*Hanover Shoe Inc. v. United States Mach. Corp.*, 392 U.S. 481, 494, 88 S. Ct. 2224, 2232, 20 L. Ed. 2d 1231 (1968). In this situation, the direct purchaser is shielded from damage by having a "cost-plus" contract with a subsequent buyer, as the subsequent buyer is thereby contractually obligated to buy a fixed amount of product regardless of any overcharge by the antitrust violator. The Supreme Court later revisited this scenario:

> In such a situation, the purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price. The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case.

*Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736, 97 S. Ct. 2061, 2069-70, 52 L. Ed. 2d 707 (1977).

The Sixth Circuit subsequently explained the rationale behind the "cost-plus" exception:

> In other words, because passing on the entire amount of the overcharge cannot decrease its sales, the direct purchaser has no incentive to absorb any of the overcharge itself. This being so, the problem of tracing the overcharge to the indirect purchaser is eliminated.

*Jewish Hosp. Ass'n of Louisville, Ky., Inc. v. Stewart Mech. Enterprises, Inc.*, 628 F.2d 971, 976 (6th Cir. 1980). As such, the cost-plus exception exists only when there is a pre-existing cost-plus contract, or its functional equivalent, which allows the direct purchaser to pass on the full amount of the overcharge to a subsequent buyer. *SDI Reading Concrete, Inc. v. Hilltop Basic Res., Inc.*, 576 F. Supp. 525, 530 (S.D. Ohio 1983).

Defendants' argument that Plaintiff lacks standing in the current suit focuses on the statement in the complaint that Plaintiff "bought all its pharmaceuticals from McKesson pursuant to a 'cost-plus' contract, whereby Plaintiff paid McKesson whatever its costs were per drug, subject to a fixed percentage adjustment." DE 1 at ¶ 11. Defendant claims that because Plaintiff admits that it did not purchase enoxaparin directly from Defendants but instead bought the drug from the intermediary McKesson, it is not a "direct purchaser," which is generally required to

22

confer standing in a federal antitrust law case. DE 66 at 11-14. Here, Plaintiff alleges that it has standing pursuant to the "cost-plus" contract exception, which confers standing on an indirect purchaser who has a pre-existing, cost-plus contract with a "middleman" purchaser under which the indirect purchaser is committed to purchasing a fixed quantity of a product. *Id*. at 12-13 (citing *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736, 97 S. Ct. 2061, 2069, 52 L. Ed. 2d 707 (1977)).

Defendant notes that Plaintiff's complaint fails to allege that it had a "*pre-existing* contract to purchase a fixed quantity of a product[,]" but instead simply alleges that it bought enoxaparin pursuant to a cost-plus contract with McKesson. DE 66 at 14 (emphasis added). Plaintiff does not dispute this but confirms in its response that the cost-plus contract with McKesson pre-existed the date on which Defendants allegedly began to overcharge consumers for enoxaparin, with the cost-plus contract being signed on August 14, 2010 and the class period alleged in the complaint beginning on September 21, 2011. DE 74 at 17, n.3. Plaintiff concedes that it erred by failing to state in the complaint that the cost-plus contract predated the alleged overcharges but argues that supplemental allegations that clarify standing may be considered on a motion to dismiss. *Id*. (citing *Warth v. Seldin*, 422 U.S. 490, 501, 95 S. Ct. 2197, 2206-07, 45 L. Ed. 2d 343 (1975)). Plaintiff points to the declaration of John T. Spragens, counsel for Plaintiff, which was filed as a supplement to its response in opposition to Defendants' motion to dismiss. DE 77. This document indicates that the subject contract between NGH and McKesson, by which Plaintiff bought enoxaparin from McKesson, was effective as of August 14, 2010 (DE 77 at 4), while the complaint states that the instant action was brought on behalf of all persons allegedly harmed by their purchase of enoxaparin starting on September 21, 2011. DE 1 at ¶ 75. Defendant does not dispute that this contract pre-existed the alleged date of harm, rather that Plaintiff failed to plead such in the complaint.

23

The Court does not find that Plaintiff's initial failure to indicate that the cost-plus contract predated the alleged injury is fatal to its claim. As stated by the Supreme Court:

> [I]t is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing. If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed.

*Warth*, 422 U.S. at 501-02. This method of supplementation to support standing has been endorsed by the Sixth Circuit. *See, e.g., Friends of Tims Ford v. Tennessee Valley Auth.*, 585 F.3d 955, 965-66 (6th Cir. 2009) (affirming district court's decision to require parties to submit additional briefs on the issue of standing); *Haskell v. Washington Twp.*, 864 F.2d 1266, 1276 (6th Cir. 1988) (confirming validity of trial court's discretion to allow or require supplementation from plaintiff "[i]f standing cannot be determined from examination of the complaint[.]"). The Court finds that Plaintiff's supplemental filing cures its initial failure to allege the pre-existence of the cost-plus contract.

Nonetheless, Defendants additionally claim that Plaintiff's complaint must be dismissed because it fails to allege that the subject contract between NGH and McKesson required the purchase of a fixed quantity of enoxaparin. DE 66 at 14. Defendants point to the Supreme Court's reasoning in *Illinois Brick*, in which it found that a direct purchaser is insulated from any decrease in its sales due to the existence of the cost-plus contract because its customer is "committed to buying *a fixed quantity* regardless of price." *Illinois Brick*, 431 U.S. at 736 (emphasis added). Defendant emphasizes the "fixed quantity" language in arguing that Plaintiff has failed to plead the requisite facts to bring an antitrust action as an indirect purchaser. DE 66 at 14. The Court is not persuaded by this argument.

24

The Supreme Court explained the policy behind its allowance of the cost-plus contract exception by noting that, in contrast to the difficulties of determining how to apportion any alleged overcharge among a potential myriad of indirect buyers, the presence of a pre-existing cost-plus contract "makes easy the normally complicated task of demonstrating that the overcharge has not been absorbed by the direct purchaser." *Illinois Brick*, 431 U.S. at 732, n.12 (internal citation omitted). This is not insignificant, as the Supreme Court dedicated multiple portions of the opinion reiterating its concern that generally allowing indirect purchasers to bring antitrust claims would result in significant problems with little reward for those affected by the antitrust violator's actions:

> The apportionment of the recovery throughout the distribution chain would increase the overall costs of recovery by injecting extremely complex issues into the case; at the same time such an apportionment would reduce the benefits to each plaintiff by dividing the potential recovery among a much larger group. Added to the uncertainty of how much of an overcharge could be established at trial would be the uncertainty of how that overcharge would be apportioned among the various plaintiffs. This additional uncertainty would further reduce the incentive to sue. The combination of increasing the costs and diffusing the benefits of bringing a treble-damages action could seriously impair this important weapon of antitrust enforcement.

*Id*. at 745. The Court quotes this language to highlight the difference between such a scenario and the current case, in which Plaintiff can demonstrate by way of its pre-existing cost-plus contract that direct purchaser McKesson did not absorb the alleged overcharge by Defendants, but instead passed the overcharge on to its customers. As noted by Plaintiff:

> The fact that [Plaintiff] must purchase enoxaparin and that the amount it purchases is unaffected by the price of the product, but instead entirely dependent on the number of patients with deep-vein thrombosis the hospital treats, ensures that McKesson passes on 100% of the overcharge to [Plaintiff], and ensures that the quantity McKesson sells to [Plaintiff] remains the same.

DE 74 at 17. This situation fits the "functional equivalent" of a cost-plus contract that requires the purchase of a fixed quantity of goods because it confirms that direct purchaser McKesson passed on to Plaintiff any inflated prices charged by Defendants, thus eliminating the Supreme Court's

25

concern over the apportionment of recovery throughout the recovery chain. *See SDI Reading Concrete*, 576 F. Supp. at 530 (holding that cost-plus exception exists when there is a "functional equivalent" of a pre-existing cost-plus contract). As such, the Court finds that Plaintiff's cost-plus contract with McKesson sufficiently conforms to the exception delineated by the Supreme Court for an indirect purchaser to bring suit against an alleged antitrust violator.

### (2) Whether Plaintiff's claims fail under the *Noerr-Pennington* doctrine.

Defendants next argue that the complaint fails to allege that the underlying patent action against Amphastar was a sham, and therefore the *Noerr-Pennington* doctrine precludes antitrust scrutiny of the Massachusetts District Court's subsequent order in that case that enjoined Amphastar from bringing a generic version of enoxaparin to the U.S. market.[15] DE 66 at 16.

The *Noerr-Pennington* doctrine holds that genuine attempts to influence either the passage or enforcement of laws "are immune from antitrust scrutiny, regardless of the anticompetitive purpose behind such attempts." *Westmac, Inc. v. Smith*, 797 F.2d 313, 315 (6th Cir. 1986) (citing *United Mine Workers v. Pennington,* 381 U.S. 657, 669-71, 85 S. Ct. 1585, 1592-94, 14 L. Ed. 2d 626 (1965); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 137-39, 81 S. Ct. 523, 529-30, 5 L. Ed. 2d 464 (1961)). As Defendant notes, this means that "legitimate efforts to enforce intellectual property rights through litigation … are immunized from antitrust liability[.]" DE 66 at 15. The Supreme Court explained in *Pennington* that the legality of the conduct at issue in that case was not affected by any anticompetitive motives on the part of the defendant, "even though the sole purpose in seeking to influence the passage and enforcement of

---

[15] The Federal Circuit later stayed and vacated this injunction. DE 1 at 17.

26

laws was to destroy the [plaintiffs] as competitors …." *Pennington*, 381 U.S. at 669 (internal citation and quotations omitted).

Despite Defendants' well-articulated case for immunity pursuant to *Noerr-Pennington*, this argument is a red herring. Defendants correctly note that the complaint does not allege that Defendants' underlying patent action against Amphastar was a sham, which, if proven, would remove the patent action from the immunity afforded by *Noerr-Pennington* and open it up to antitrust scrutiny. *See Westmac*, 797 F.2d at 315 ("[T]he *Noerr-Pennington* doctrine does not protect against improper attempts to influence the government or the courts that are a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor.") (internal citation and quotations omitted). Had Plaintiff solely alleged that Defendants' suit against Amphastar was a sham in exception to *Noerr-Pennington*, the Court may have been inclined to grant Defendants' motion to dismiss, especially in light of Judge Gorton's recent dismissal of Amphastar's antitrust claims based on such reasoning. *See* DE 105-1 at 14 ("*Noerr-Pennington* immunity bars Amphastar's federal antitrust claims because they allege injuries which flow from government action."). However, Plaintiff's complaint in this case asserts that the patent action was part of a larger "monopolistic scheme," which included deception and failure to disclose relevant information to the USP. DE 74 at 20; DE 1 at ¶ 45. The Court notes that before concluding that otherwise protected litigation, such as Defendants' pending patent action, is part of a claim that alleges an anticompetitive scheme, it must first find that the "other aspects of the scheme independently produce anticompetitive harms." *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1097 (N.D. Cal. 2007) (citing *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 113 S. Ct. 1920, 123 L. Ed. 2d 611 (1993)).

27

Here, there are ample allegations that Defendants engaged in activities that independently caused anticompetitive injury. The complaint alleges that Sandoz, Momenta, and Dr. Shriver, then a Momenta employee, intentionally withheld information from the USP regarding the #886 Patent, which was issued in 2009 and licensed exclusively to Sandoz, in violation of the USP Code of Ethics. DE 1 at ¶¶ 40-49. Plaintiff alleges that Defendants persuaded the USP to convince Aventis to abandon its patent application for Method <207>, thereby making Method <207> free for any company to use, while cognizant of the fact that any subsequent use of Method <207> could be blocked by Defendants by way of the #886 Patent. DE 1 at ¶¶ 33, 40-49, 92-93. The complaint also alleges that Sandoz financially incentivized Momenta to carry out this plan, which included a $10 million payment for ensuring that Defendants remained the only supplier of generic enoxaparin in the market. *Id.* at ¶¶ 27-28. Plaintiff contends that this misconduct ultimately caused Plaintiff and the purported class to pay inflated prices for Lovenox® and enoxaparin, unlike Amphastar's antitrust complaint, which did not allege that it suffered this antitrust injury. *Id.* at ¶¶ 89, 94, 99, 104; DE 105-1 at 14-15.

Defendants correctly cite the well-established principle that a patent owner who commences a lawsuit to enforce its statutory right to preclude others from using the patented object is immune from antitrust scrutiny. In *Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061 (W.D. Wis. 2012), a case that includes similar allegations to those made by Plaintiff, a Wisconsin District Court held that even though the plaintiff ("Apple") claimed that it had suffered injury due to the defendant's "abuse of the standard-setting process," its claim was "necessarily based on [the defendant's] patent litigation," and was thus barred under *Noerr-Pennington*. *Id.* at 1076. In contrast to the instant matter, however, Apple failed to demonstrate that it had suffered any harm outside of the defendant's enforcement of its patent. *Id.* ("Apple has produced no evidence or

28

argument suggesting that [the defendant's] licensing demand caused Apple to change its product, delay the release of the iPhone, suffer from increased costs or lose any customers or market share. Instead, the only injury Apple suffered as a result of [the defendant's] alleged antitrust violation was the attorney fees and costs that it has incurred responding to the patent litigation initiated by [the defendant].")... Here, Plaintiff alleges antitrust injury beyond Defendants' enforcement of its patent, specifically in the form of overpayment stemming from Defendants' misconduct.

Defendants also rely on a Ninth Circuit decision that contains facts similar to the instant case. In *Sessions Tank Liners, Inc. v. Joor Mfg., Inc.*, 17 F.3d 295 (9th Cir. 1994), the president of a steel tank manufacturer ("Joor"), volunteered to work on a subcommittee for a private, nonprofit organization that issued a model code pertaining to fire safety procedures and standards. *Id*. at 296-97. During a period in which the subcommittee was considering revisions to the model code, the president circulated a letter to other subcommittee members that questioned the safety of steel tank lining and repair of leaking storage tanks, both of which were specialties of the plaintiff's ("Sessions") business. *Id*. at 297. The president encouraged other members to support a provision that required the complete removal of leaking storage tanks from the ground, which would cause harm to Sessions' business of repairing such tanks with lining, and help Joor's business by forcing those with leaking storage tanks to purchase new ones. *Id*. The subcommittee voted to approve the provision, which was subsequently adopted by many local municipal governments, and led Sessions to bring an antitrust suit against Joor. *Id*.

The Ninth Circuit ultimately found that Joor's actions were immune from antitrust scrutiny under *Noerr-Pennington*. There are, however, critical distinctions between *Joor* and the instant matter. For one, the nonprofit organization approving the provision that aided Joor and harmed Sessions was fully aware that the president of Joor had an economic interest in banning tank lining.

29

*Id.* In contrast, Plaintiff's complaint alleges that Defendants intentionally withheld from the USP information regarding the economic interest they had in Method <207> by way of the #886 Patent. DE 1 at ¶¶ 40-49. Additionally, the *Joor* court noted that Sessions had failed to prove that it suffered harm from anything other than the adoption of the tank lining ban by local governments:

> [S]essions has never proved that it sustained injuries from anything other than the actions of municipal authorities … Sessions has not shown that any potential tank lining customer in jurisdictions that were not enforcing the [tank lining ban] decided not to engage Sessions' services because of the [nonprofit organization's] adoption of [the tank lining ban]. Nor has Sessions adduced any evidence that Joor's actions caused independent marketplace harm in jurisdictions that continued to permit tank lining.

*Joor*, 17 F.3d at 299. In contrast, here Plaintiff alleges that an entire class of purchasers of Lovenox® and enoxaparin paid overcharges based on Defendants' misconduct. DE 1 at ¶¶ 40-49, 77, 89.

The Court finds more persuasive, and applicable to this case, the Supreme Court's reasoning in *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 108 S. Ct. 1931, 100 L. Ed. 2d 497 (1988), a case cited by both parties in their respective briefs. In that case, the defendant company "packed" a meeting before a private organization that published relevant product standards and fire codes and defeated a proposal that would have listed the competing plaintiff company's product in the organization's publications as an approved product.[16] The plaintiff filed suit claiming antitrust injury, while the defendant argued that its actions were protected by *Noerr-Pennington*. The Supreme Court held that although "[c]oncerted efforts to

---

[16] The defendant company did so by recruiting 230 individuals to join the organization, attend the annual meeting at which the proposal was discussed, and vote against introduction of the competing company's product. *Allied Tube*, 486 U.S. at 496-97.

30

restrain or monopolize trade by petitioning government officials" receive immunity under *Noerr-Pennington* (*id*. at 499), such actions are not protected in all circumstances:

> The scope of this protection depends, however, on the source, context, and nature of the anticompetitive restraint at issue … In addition, where, independent of any government action, the anticompetitive restraint results directly from private action, the restraint cannot form the basis for antitrust liability if it is "incidental" to a valid effort to influence governmental action … The validity of such efforts, and thus the applicability of *Noerr* immunity, varies with the context and nature of the activity. A publicity campaign directed at the general public, seeking legislation or executive action, enjoys antitrust immunity even when the campaign employs unethical and deceptive methods … But in less political arenas, unethical and deceptive practices can constitute abuses of administrative or judicial processes that may result in antitrust violations.

*Id*. at 499-500 (internal citations and quotations omitted). The Supreme Court also found that the subject organization could not be treated as a "quasi-legislative" body, thus giving the subject defendant refuge under *Noerr-Pennington*, simply because legislators routinely adopted the standards promulgated by the private organization. *Id*. at 501. While Defendants in this case do not explicitly make this claim, their argument for immunity in response to Plaintiff's allegations of deception before the USP requires that the USP be treated as a quasi-legislative body. The Court declines to do so, however, pursuant to the *Allied Tube* opinion:

> [T]he activity at issue here did not take place in the open political arena, where partisanship is the hallmark of decision making, but within the confines of a private standard-setting process. The validity of conduct within that process has long been defined and circumscribed by the antitrust laws without regard to whether the private standards are likely to be adopted into law.

*Id*. at 506.

While organizations such as the USP may have some level of *de facto* authority based on the recognition of its standards under federal law, no government has conferred any authority on them, and the decision-making body of such organizations often consists of individuals who are financially incentivized to restrain trade. *Id*. Such is the case with Dr. Shriver, then a Momenta

employee, and his position on the USP panel that oversaw the development and approval of the organization's enoxaparin standard. DE 1 at ¶ 40. It is Defendants' alleged misconduct before this private organization, and not the subsequent patent lawsuit, that represent the crux of Plaintiff's antitrust claim. As such, the "context and nature" of Defendants actions to influence the USP's promulgated standards convinces the Court that the "validity of those efforts must … be evaluated under the standards of conduct set forth by the antitrust laws that govern the private standard-setting process" (*Allied Tube*, 486 U.S. at 509), thus making *Noerr-Pennington* inapplicable.

While Defendants' motions in this case were pending, the Massachusetts District Court issued an order on July 27, 2016 dismissing Amphastar's amended complaint in its antitrust action against Defendants. DE 105. In his order, Judge Gorton held that Amphastar failed to identify an antitrust injury that would not be barred by *Noerr-Pennington*. DE 105-1 at 14-15. Judge Gorton found that Amphastar's complaint claimed injuries arose from the FDA's "purported adoption of [Method <207>]," and not from Defendants' collaborative agreement or the USP's adoption of Method <207>:

> Although the *Noerr-Pennington* doctrine would not bar antitrust claims for anti-competitive effects resulting from the Collaboration Agreement or the purported failure to disclose conflicts to the USP, the amended complaint does not claim federal antitrust injuries under those theories of antitrust liability. The amended complaint thus fails to state a federal antitrust claim.

*Id*. at 14-15. Defendants implicitly ask this Court to adopt Judge Gorton's reasoning to dismiss Plaintiff's complaint. The Court declines to do so, however, and finds no incongruity with Judge Gorton's ruling.

While Amphastar did not claim injuries flowing from the Collaboration Agreement or Defendants' failure to disclose conflicts to the USP, Plaintiff's complaint does allege such injuries. Plaintiff contends that the allegedly monopolistic scheme caused Plaintiff and the purported class

32

to pay inflated prices for Lovenox® and enoxaparin. DE 1 at ¶¶ 89, 94, 99, 104. Although Amphastar referenced inflated prices due to Defendants' conduct before the USP and elsewhere in its complaint, such discussion was ancillary to its actual alleged injuries of "damaged reputation, reduced financing upon IPO, and lost profits on sales," which were the result of the "injunction in the patent infringement case [that] precluded it from selling generic enoxaparin." DE 105-1 at 14. In this case, Plaintiff alleges that the patent case is only a piece of Defendants' larger plan to monopolize the market.

Additionally, Judge Gorton dismissed Amphastar's "conclusory assertion" that Defendants' actions were disqualified from *Noerr-Pennington* immunity based on the sham exception. DE 105-1 at 15. This is a crucial distinction, as Plaintiff in this case does not rely on the sham exception, but instead alleges that Defendants participated in "manipulative conduct before an SSO that itself restrains trade," beyond the parameters of *Noerr-Pennington* scrutiny. DE 74 at 29. In other words, the sham exception applies to Defendants' patent action against Amphastar, but it does not apply to the larger monopolistic plan, which allegedly included execution of the Collaboration Agreement and misconduct before the USP.

The Court finds the case law cited by Plaintiff to be persuasive in this regard, including the Ninth Circuit's finding that *Noerr-Pennington* does not apply when an otherwise protected lawsuit is part of a greater monopolistic scheme. *See Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1263 (9th Cir. 1982) ("When … the petitioning activity is but a part of a larger overall scheme to restrain trade, there is no overall immunity."). *See also Kobe, Inc. v. Dempsey Pump Co.*, 198 F.2d 416, 425 (10th Cir. 1952) ("The [patent] infringement action and the related activities, of course, in themselves were not unlawful, and standing alone would not be sufficient to sustain a claim for damages which they may have caused, but when considered with

33

the entire monopolistic scheme which preceded them we think, as the trial court did, that they may be considered as having been done to give effect to the unlawful scheme.").

Plaintiff's complaint asserts that Defendants embarked on a monopolistic conspiracy that caused specific antitrust injury, with the patent action constituting just a portion of the scheme. Accordingly, the Court finds that Plaintiff has sufficiently alleged facts indicating that Defendants' actions are not entitled to protection under the *Noerr-Pennington* doctrine.

### (3) Whether the complaint plausibly alleges that Defendant Sandoz entered a conspiracy or violated antitrust law.

Defendants finally argue that the complaint should be dismissed because Plaintiff has failed to "sufficiently allege Sandoz'[s] participation in a conspiracy." DE 66 at 28. Defendants note that although Plaintiff accuses them of working in concert to deceive the USP with respect to Method <207>, it was actually Aventis that developed the method and requested that the USP adopt its criteria. *Id*. at 27. Defendants claim that because the complaint fails to include any allegations that Sandoz participated in a plausible antitrust conspiracy, Plaintiffs' claims against both Defendants must fail based on the Sherman Act's requirement that alleged violators participate in concerted action. *Id*. at 28.

The Court is again unpersuaded by Defendants' argument. The complaint alleges that Sandoz and Momenta executed a Collaboration Agreement under which the parties would work to ensure that Sandoz was the "sole supplier of generic enoxaparin[.]" DE 1 at ¶ 27. Defendants do not deny the existence of this agreement, nor do they deny Plaintiffs' description of its purpose. They instead state that "there is nothing inherently suspect or illegal about a collaboration agreement." DE 66 at 27. Even if this is true, the complaint specifically alleges that the agreement

34

marked the beginning of Defendants' execution of a greater monopolistic scheme. DE 1 at ¶ 3, 27-30.

Under *Twombly*, the complaint must contain enough factual matter, taken as true, to suggest that an illegal agreement between conspirators was made. *Twombly*, 550 U.S. at 557. Here, the complaint alleges that per the terms of the Collaboration Agreement, Sandoz paid $10 million as reward for "completing a full year of sales without an additional generic enoxaparin product entering the market." *Id*. at ¶ 27. It also notes that Momenta's president and CEO admitted that Sandoz, by way of the Collaboration Agreement, "heavily, heavily incentivized" Momenta to maintain Defendants' status as the sole supplier of generic enoxaparin in the market. *Id*. at ¶ 28. The complaint further alleges that based on this anticompetitive arrangement, Sandoz helped Momenta block other companies from entering the generic enoxaparin market. *Id*. at ¶ 3. Plaintiff also alleges that Sandoz was aware of the pending #886 Patent during the USP's consideration of Method <207>, but failed to disclose this information. *Id*. at ¶¶ 41, 45-47. These allegations provide "further factual enhancement" with respect to Sandoz that more than "nudge[s] [Plaintiff's] claims across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 557, 570 (internal citations omitted).

Sandoz is not permitted to avoid antitrust scrutiny simply because the complaint fails to state that Sandoz "was even present at any of the various meetings cited" by Plaintiff. DE 66 at 28. Such allegations are unnecessary, as the complaint includes numerous allegations that Momenta *and* Sandoz collaborated to block entry to the generic enoxaparin market beginning with the Collaboration Agreement in 2003 and culminating with the filing of the pending patent action against Amphastar. As an alleged co-conspirator, Sandoz is jointly and severally liable for Momenta's actions, including Momenta's alleged misconduct before the USP. *See Burlington*

35

*Indus. v. Milliken & Co.*, 690 F.2d 380, 391 (4th Cir. 1982) ("From the earliest days of the Sherman Act, courts have treated antitrust violations as akin to torts, and have therefore applied … the common-law rule that tortfeasors who act in concert to commit a wrong are jointly and severally liable for the entire amount of the resulting damages.").

The Supreme Court has held that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal citation and quotations omitted). Based on the foregoing analysis, the Court finds that Plaintiff's complaint contains sufficient factual allegations to state a claim against Sandoz that is plausible on its face, and therefore survives Defendants' motion to dismiss.

### C. Momenta's Motion to Dismiss or Transfer

Defendant Momenta's separate motion to dismiss or transfer argues that the complaint should be dismissed because it fails to establish that venue is proper as to Momenta, which "made no sales, and conducts no business, in Tennessee." DE 63 at 5. Momenta cites Section 12 of the Clayton Act, 15 U.S.C. § 22 ("Section 12"), and 28 U.S.C. § 1391 in support of its argument that it is not subject to venue in this District.

Momenta's motion is governed by 28 U.S.C. § 1406(a), which states the following:

> The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.

28 U.S.C. § 1406(a). This statute was "designed to avoid the time consuming and justice defeating technicalities to which dismissal for improper venue necessarily give rise." *Allied Sound, Inc. v. Dukane Corp.*, 934 F. Supp. 272, 274 (M.D. Tenn. 1996) (quoting *Goldlawr, Inc. v. Heiman,* 369

36

U.S. 463, 467, 82 S. Ct. 913, 916, 8 L. Ed. 2d 39, 42 (1962)) (internal quotations omitted). Pursuant to this provision, any case filed in an improper venue is subject to dismissal unless the district court finds that it is in the interests of justice to transfer the case. *Id*. (internal citations omitted).

The Supreme Court has stated that motions to dismiss antitrust complaints filed before the plaintiff has had the opportunity to conduct discovery should be granted "very sparingly." *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746, 96 S. Ct. 1848, 1853, 48 L. Ed. 2d 338 (1976) (internal citation omitted). On a motion to dismiss under Rule 12(b)(3), it is the plaintiff's burden to "prov[e] that venue is proper. The Court may examine facts outside the complaint but must draw all reasonable inferences and resolve factual conflicts in favor of the plaintiff." *Gone To The Beach, LLC v. Choicepoint Servs., Inc.*, 434 F. Supp. 2d 534, 536-37 (W.D. Tenn. 2006) (internal citation omitted). The plaintiff must only make a *prima facie* showing of jurisdiction in order to overcome a motion to dismiss. *Intera Corp. v. Henderson*, 428 F.3d 605, 615 (6th Cir. 2005). *See also Zimmer Enterprises, Inc. v. Atlandia Imports, Inc.*, 478 F. Supp. 2d 983, 986 (S.D. Ohio 2007) ("If the plaintiff presents a prima facie case that venue is proper, after reading the pleadings and affidavits in the light most favorable to the plaintiff, the defendant's motion [to dismiss for improper venue] will be denied.") (internal citations omitted). The decision of whether to dismiss or transfer "is within the district court's sound discretion[.]" *Id*. (quoting *First of Mich. Corp. v. Bramlet*, 141 F.3d 260, 262 (6th Cir. 1998)).

Determination of proper venue in an antitrust action requires analysis of various statutes, rules, and legal principles. In *KM Enterprises, Inc. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718 (7th Cir. 2013), relied upon by Momenta, the Seventh Circuit provided a detailed explanation of the intersection of personal jurisdiction and venue with the provisions contained in Section 12. The power to assert personal jurisdiction in federal court, which involves service of process as outlined

37

in Rule 4(k), is subject to the due process limitations described in the "minimum contacts" test found in *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945). *KM Enterprises*, 725 F.3d at 723. Rule 4(k)(1)(C) states that personal jurisdiction is appropriate when authorized by a federal statute, but this is subject to due process limitations, thus giving personal jurisdiction a "constitutional dimension." *Id.* at 723-24.

Venue in a federal civil case is determined by statute and is aimed at limiting the districts in which a defendant can be hailed to defend itself against legal action. This generally involves 28 U.S.C. § 1391, which states, in part, that venue is appropriate in: (1) a judicial district in which any defendant resides; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred; or (3) if there is no district in which the action can otherwise be brought under § 1391, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action. Moreover, the statute states that a corporate defendant, such as Momenta, is deemed to "reside" in "any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question[.]" 28 U.S.C. § 1391(c)(2).

Section 12 of the Clayton Act includes provisions for establishing both federal jurisdiction and venue in the case of a corporate defendant. Under this statute, an antitrust lawsuit against a corporation can be filed "not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process *in such cases* may be served in the district of which [the corporation] is an inhabitant, or wherever [the corporation] may be found." 15 U.S.C. § 22. The first part of this provision sets venue wherever the corporation is an "inhabitant," is "found," or "transacts business," while the second part provides for nationwide personal jurisdiction. *KM Enterprises*, 725 F.3d at 723-24 (emphasis added); *see also Carrier*

38

*Corp. v. Outokumpu Oyj*, 673 F.3d 430, 449 (6th Cir. 2012) ("[Section 12] authorizes service of process over an antitrust defendant 'wherever it may be found.' When Congress has enacted such nationwide service of process statutes, personal jurisdiction exists whenever the defendant has 'sufficient minimum contacts with the *United States*' to satisfy the due process requirements under the Fifth Amendment.") (emphasis in original).

The question addressed by Seventh Circuit in *KM Enterprises* was whether a plaintiff who relies on the nationwide personal jurisdiction provision of Section 12 must also establish venue under Section 12, or whether the plaintiff is permitted to "mix and match" by relying on Section 12 for personal jurisdiction and utilizing 28 U.S.C. § 1391 to establish venue. The language at issue is the "in such cases" portion found in the second clause of 15 U.S.C. § 22, which establishes personal jurisdiction. Momenta argues that "in such cases" refers exclusively to those cases identified in the first clause of the statute and thus only to instances in which venue has been properly established as to the defendant corporation. DE 63 at 7-8, 13-15.

Although the Sixth Circuit has not weighed in on this issue, decisions of other circuits provide guidance. While acknowledging a split among the circuits, the Seventh Circuit in *KM Enterprises* endorsed the interpretation argued by Momenta, finding that a plaintiff that relies on the nationwide personal jurisdiction provision of Section 12 must also establish venue under Section 12. *Id*. at 728. However, the Court declines to follow the Seventh Circuit's holding and concludes instead that Plaintiff may rely on Section 12 to establish personal jurisdiction and 28 U.S.C. § 1391 to establish venue in this matter.

In reaching this conclusion, the Court relies on the Ninth Circuit's approach to the relationship between personal jurisdiction and venue under the Clayton Act, as delineated in *Go-Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406 (9th Cir. 1989). The Ninth Circuit noted that cases

39

involving federal antitrust claims have commonly held that "the general federal venue statutes coexist … with the specific venue provisions contained in the various antitrust laws." *Id*. at 1409. Thus, specific venue provisions, such as that contained in Section 12, are not intended to replace general federal venue statutes, but instead "supplement" them. *Id*. The Ninth Circuit expressed its unwillingness to interpret Section 12 in a way that would limit a plaintiff's ability to bring an antitrust action. *Id*. at 1410-11. Instead, the Ninth Circuit determined that the "in such cases" portion of Section 12 refers to antitrust lawsuits in general and not solely to antitrust actions in which venue has been established under the first part of the statute. As a result, the Ninth Circuit interpreted Section 12 to allow process to be served on an antitrust defendant under that section, even where venue is not established by Section 12 but is instead established by 28 U.S.C. § 1391. *Id*. at 1413.

The Court follows this approach to Section 12 for many of the reasons provided by the Ninth Circuit in *Go-Video*. For one, this interpretation, while expansive, is "squarely within the dominant modern view that venue statutes are given liberal, rather than restrictive, interpretations unless specific evidence militates in favor of a contrary reading." *Go-Video*, 885 F.2d at 1409. The Ninth Circuit provided support from sister circuits for this view of venue under the Clayton Act. *See Delong Equipment Co. v. Washington Mills Abrasive Co.,* 840 F.2d 843, 855 (11th Cir. 1988) ("In a federal antitrust case, venue may be established under § 4 of the Clayton Act, 15 U.S.C. § 15, § 12 of the Clayton Act, 15 U.S.C. § 22, *or the general federal venue statute, 28 U.S.C. § 1391(b).*") (footnote omitted) (emphasis added); *Ballard v. Blue Shield of Southern W.Va., Inc.,* 543 F.2d 1075, 1080 (4th Cir. 1976) (15 U.S.C. §§ 15, 22 "are not exclusive" for venue; venue can also be satisfied under 28 U.S.C. § 1392(a)); *United States v. Scophony Corp.,* 333 U.S. 795, 806-08, 68 S. Ct. 855, 861-62, 92 L. Ed. 1091 (1948) (Section 12 substituted broad, practically-

founded venue tests for the older, "hair-splitting legal technicalities" of the Sherman Act). *See also* 15 Wright & Miller at 109-110 (venue provisions of Clayton Act were "clearly broadening in [their] effect").

The *Go-Video* opinion also included a detailed discussion of the legislative history predating the enactment of Section 12, which noted the Senate's decision to add the service of process provision "with no indication that it was intended to relate, let alone be subject, to the section's venue provision." *Go-Video*, 885 F.2d at 1410 (citing 51 Cong.Rec. 14324, 63d Cong., 2d Sess. (Aug. 27, 1914)). The Ninth Circuit therefore concluded that Congress had not intended for the service of process provision of Section 12 to be limited by the venue provision. *Id*. This Court similarly declines to adopt an interpretation of Section 12 that would "recast its venue provision as a restrictive, rather than a broadening, provision and might prevent plaintiffs from pursuing legitimate claims under the antitrust laws." *Id*. at 1410-11.

Given this conclusion, the Court turns to the question of whether venue is proper in this case under 28 U.S.C. § 1391. That statute states, in part, that a civil action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred[.]" 28 U.S.C. § 1391(b)(2). The Sixth Circuit has acknowledged that the legislative history of this statute demonstrates the intent of Congress to expand the scope of venue in federal cases. *See First of Michigan Corp. v. Bramlet*, 141 F.3d 260, 263 (6th Cir. 1998) (discussing replacement of the pre-1990 iteration of § 1391 that venue is proper "in *the* judicial district in which the claim arose," with provision stating that venue is proper "in *a* judicial district in which a *substantial part* of the events giving rise to the claim arose) (emphasis in original). Accordingly, the Sixth Circuit held that a plaintiff may file its complaint in "any forum with a substantial connection to the plaintiff's claim." *Id*.

41

The complaint in this case alleges that Defendants' conduct caused Plaintiff and the purported class to pay inflated prices for Lovenox® and generic enoxaparin. DE 1 at ¶¶ 3, 68, 74, 94. Plaintiff claims that the operation of its business, which involves the recurrent purchase of these products in this district, was damaged as a result of these overcharges. *Id*. at ¶ 9; DE 76 at 12. The Court finds that this transactional history sufficiently demonstrates that a substantial part of the events giving rise to this claim occurred here to establish jurisdiction under 28 U.S.C. § 1391(b)(2).

There is no dispute that the majority of the activity involved in Defendants' alleged scheme did not occur in this district, including execution of the Collaboration Agreement and Defendants' failure to disclose conflicts of interest to the USP. However, 28 U.S.C. § 1391(b)(2) does not limit venue to a single district, nor does it require the Court in this case to determine which of the viable districts is the best venue. *Bramlet*, 141 F.3d at 263 (citing *Setco Enterprises Corp. v. Robbins*, 19 F.3d 1278, 1280-81 (8th Cir. 1994)). The statute instead requires only that the chosen district include *a* substantial part of the events or omissions giving rise to the claim, which can involve more than one district. *See Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 410 F. Supp. 2d 592, 598 (E.D. Ky. 2006) ("The plain language of [§ 1391(b)(2)] makes clear that the district where the action is brought need not be the only district where such 'events or omissions' occurred, or even the district where *the* substantial part occurred, and that more than one district may have proper venue.") (citing *Bramlet*, 141 F.3d at 263) (emphasis in original). The Court finds that the Middle District of Tennessee represents one such district, and that venue is proper under 28 U.S.C. § 1391(b)(2), which sufficiently ends the inquiry.

For all of these reasons, the Court finds both personal jurisdiction and proper venue as to Momenta. The motion to dismiss or transfer for improper venue must therefore be denied.

42

### III. Recommendation

Based on the foregoing, the Magistrate Judge recommends that:

(1) Defendants' Motion to Transfer Case to the District of Massachusetts (DE 58) be DENIED;

(2)  Defendants' Motion to Dismiss (DE 65) be DENIED; and

(3) Defendant Momenta Pharmaceuticals, Inc.'s Motion to Dismiss or Transfer for Improper Venue (DE 62) be DENIED.

Any party has fourteen (14) days from receipt of the Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 47 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).

Respectfully submitted,

BARBARA D. HOLMES
United States Magistrate Judge