# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| THE HOSPITAL AUTHORITY OF METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, d/b/a NASHVILLE GENERAL HOSPITAL and AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES DISTRICT COUNCIL 37 HEALTH & SECURITY PLAN,<br><br>       Plaintiffs,<br><br>v.<br><br>MOMENTA PHARMACEUTICALS, INC. and SANDOZ INC.,<br><br>       Defendants. | Civil Action No. 15-cv-1100<br><br>**AMENDED COMPLAINT**<br><br>**CLASS ACTION**<br><br><br>**JURY DEMAND** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

JURISDICTION AND VENUE ....................................................................................... 2

THE PARTIES .................................................................................................................. 3

    A.    Plaintiffs ............................................................................................... 3

    B.    Defendants ............................................................................................ 5

RELEVANT NON-PARTY ............................................................................................. 5

RELEVANT MARKETS ................................................................................................. 6

FACTS COMMON TO ALL CLAIMS .......................................................................... 7

I.      Background .................................................................................................... 7

II.     The Agreement ............................................................................................. 8

III.    USP Method 207 and the '886 Patent ....................................................... 11

IV.    Defendants Block Competition .................................................................. 17

V.     Monopoly Power ......................................................................................... 21

VI.    Harm to Plaintiffs and the Classes ............................................................ 21

CLASS ACTION ALLEGATIONS ............................................................................... 24

    COUNT I Violation of Section One of the Sherman Act: Agreements in
    Unreasonable Restraint of Trade Violation Of State Antitrust Laws (On
    Behalf of Plaintiffs and the Nationwide Injunctive Relief Class) ................... 27

    COUNT II Violation of Section Two of the Sherman Act: Monopolization (On
    Behalf of Plaintiffs and the Nationwide Injunctive Relief Class) ................... 29

    COUNT III Violation of Section Two of the Sherman Act: Conspiracy to
    Monopolize (On Behalf of Plaintiffs and the Nationwide Injunctive
    Relief Class) .................................................................................................... 30

    COUNT IV Violation of Section Two of the Sherman Act: Attempt To
    Monopolize (On Behalf of Plaintiffs and the Nationwide Injunctive
    Relief Class) .................................................................................................... 31

    COUNT V Violation Of State Antitrust Laws (On Behalf of Plaintiffs and the
    Damages Class) ................................................................................................ 32

    COUNT VI Violation Of State Consumer Protection Statutes (On Behalf of
    Plaintiffs and the Damages Class) ................................................................... 54

    COUNT VII Unjust Enrichment (On Behalf of Plaintiffs and the Damages Class) ....... 67

PRAYER FOR RELIEF ................................................................................................. 70

# TABLE OF CONTENTS
(continued)

DEMAND FOR JURY TRIAL ................................................................................ 71

-ii-

## COMPLAINT

Plaintiffs The Hospital Authority of Metropolitan Government of Nashville and Davidson County, Tennessee, d/b/a Nashville General Hospital, and American Federation of State, County and Municipal Employees District Council 37 Health & Security Plan, individually and on behalf of others similarly situated, bring claims for violation of the Sherman Act, §§ 1 and 2, state antitrust and consumer protection statutes, and unjust enrichment common law as follows:

## INTRODUCTION

1.      Enoxaparin is a generic life-saving anti-coagulant drug used in clinical settings to treat blood clots.  It is a blockbuster drug, meaning it has annual sales of over one billion dollars. Also known under the brand name Lovenox® and developed by Sanofi-Aventis, the federal courts invalidated patent protection for the drug in 2008.   This should have led to a healthy competitive market for generic enoxaparin and massive savings for patients and other health care stakeholders.

2.      It did not.  Instead, unbeknownst to anyone, Defendants manipulated the generic approval process to bring within the scope of Defendant Momenta Pharmaceuticals, Inc.'s patents the testing of enoxaparin that is required to ensure every batch meets FDA standards.  In other words, although Momenta had no claim to having developed or patented enoxaparin, it tried to prevent any and all other generic drug manufacturers from selling it.  Specifically, it did so by pushing the United States Pharmacopeial Convention ("USP") to adopt a specific form of polysaccharide testing as a requirement for any manufacturer of enoxaparin to show compliance with FDA standards.  Indeed, one of Momenta's directors, Dr. Zachary Shriver, sat on the USP body that fixed this standard.  However, neither Dr. Shriver nor Momenta ever told the USP that Momenta was even then prosecuting a patent that would cover this very test, and potentially

- 1 -

enable it to monopolize and control the market for generic enoxaparin if the USP chose this standard over others.

3.      Momenta and its collaborator Sandoz hatched this plan in secret in 2003, long before the adoption of the testing method in question.  They jointly agreed to divvy up profits realized from dominating the market from generic enoxaparin, so long as Momenta could use its patent to block other generic entrants.  They succeeded until mid-2013, when a federal district court found their use of the patent to be contrary to the safe harbor provisions of the Hatch-Waxman Act.  In the interim, however, they reaped hundreds of millions of dollars in wrongful monopoly overcharges.

## JURISDICTION AND VENUE

4.      Plaintiffs and Defendants are engaged in interstate commerce and in activities substantially affecting interstate commerce.  They are engaged in a regular, continuous, and substantial flow of interstate commerce.  Defendants are suppliers of generic enoxaparin to Plaintiffs in interstate commerce.  The drug enoxaparin is sold in all fifty states and has a substantial effect upon interstate commerce.

5.      This Court has federal question subject matter jurisdiction over the claims of this Complaint under the Clayton Act, 15 U.S.C. §§ 12-27, 29 U.S.C. §§ 52-53, because they arise under federal law, 28 U.S.C. § 1331, and as a civil action relating to regulation of monopolies, 28 U.S.C. § 1337.

6.      This Court also has jurisdiction over the instant matter pursuant to 28 U.S.C. § 1332(d) and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1711, *et seq.*, which vests original jurisdiction in the district courts of the United States for any multi-state class action where the aggregate amount in controversy exceeds $5 million and where the citizenship of any member of the class of plaintiffs is different from that of any defendant. The

$5 million amount-in-controversy and diverse citizenship requirements of CAFA are satisfied in this case.

7.     This Court has personal jurisdiction over Defendants pursuant to the Clayton Act, 15 U.S.C. § 22; Federal Rule of Civil Procedure 4(m); and the Tennessee Long Arm Statute, Tenn. Code Ann. § 20-2-214, because Defendants conduct billions of dollars of business in the United States and have substantial officers and personnel in the United States.  Defendants also deliberately targeted the United States market for generic enoxaparin by their manipulation of the USP standards-setting process to wrongfully give preclusive effect to Momenta's United States-issued patent.  Defendants intended their monopoly to extend to every State, and for its effects to be felt in every State.

8.     Venue is proper under the Clayton Act because Defendants knowingly transact a large volume of business in Tennessee in the form of sales of pharmaceuticals, including generic enoxaparin.  15 U.S.C. § 22.

9.     Venue is also proper in this Court because, among other things, Defendants' conduct injured Plaintiffs in this District and because Plaintiffs' purchases of enoxaparin in this District constitute a substantial part of the events giving rise to Plaintiffs' claims.  28 U.S.C. § 1391(b).

## THE PARTIES

### A.     Plaintiffs

10.     Plaintiff Hospital Authority is the hospital authority of the consolidated municipal government of the city of Nashville, Tennessee, and the county of Davidson, Tennessee.  The Hospital Authority is established through legislative mandate pursuant to Tenn. Ann. Code §§ 7-57-101, *et seq*.  Among its many governmental functions, Plaintiff Hospital Authority operates the Nashville General Hospital ("Nashville General").

- 3 -

11.     Plaintiff, through Nashville General, buys pharmaceuticals, including Lovenox® and generic enoxaparin made by Sanofi-Aventis and Defendant Sandoz Inc. from McKesson Corporation, a drug wholesaler.  Because Nashville General is a city hospital that serves people from throughout the City and with varying income levels, some of the drugs the hospital dispenses to patients are provided at Nashville General's own cost.  Throughout the Class Period, Plaintiff Nashville General indirectly purchased, paid, and reimbursed for Lovenox® and/or generic enoxaparin intended for consumption by patients receiving medical care at its facilities. Given its patients' past purchases of Lovenox® and generic enoxaparin, Nashville General anticipates that it will continue to purchase and/or provide reimbursement for Lovenox® and/or generic enoxaparin in the future**.**

12.     Plaintiff American Federation of State, County and Municipal Employees District Council 37 Health & Security Plan is a non-profit health and welfare benefit plan covering public sector employees, retirees and their families.  Its principal place of business is in New York, New York. District Council 37 ("DC 37") is New York City's largest public employee union. DC 37's health and welfare benefit plan covers approximately 125,000 active union members as well as 50,000 retirees and their families.  DC 37 includes 51 local unions, representing public sector employees serving in thousands of job titles from Accountants to Zoo Keepers. Members covered by DC 37's benefit plan work in almost every agency in New York City including but not limited to the City's police and fire departments, hospitals, schools, libraries, social service centers, water treatment facilities, and city colleges.  DC 37 provides supplemental health benefits, including a prescription drug benefit to its members, retirees, and their families.  Throughout the Class Period and throughout the United States, DC 37 indirectly purchased, paid, and reimbursed for Lovenox® and/or generic enoxaparin intended for

consumption by its members, retirees, and their families, including but not limited to, in Alabama, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Kentucky, Massachusetts, Maryland, Minnesota, North Carolina, New Jersey, New Hampshire, New York, Nevada, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Virginia, Vermont, and Washington. Given its plan members' past purchases of Lovenox® and generic enoxaparin, DC 37 anticipates that it will continue to purchase and/or provide reimbursement for Lovenox® and/or generic enoxaparin in the future.

**B.** **Defendants**

13.  Defendant Momenta Pharmaceuticals, Inc. ("Momenta") is a Delaware corporation with a principal place of business at 675 West Kendall Street, Cambridge, Massachusetts 02142. Momenta is the assignee of at least one United States patent that Momenta alleges relates to methods of analyzing enoxaparin.

14.  Defendant Sandoz Inc. ("Sandoz") is a Colorado corporation with a principal place of business at 506 Carnegie Center, Princeton, New Jersey 08540. Sandoz is the distributor of a generic enoxaparin product that it markets and sells throughout the United States. Sandoz and Momenta have entered into a collaboration agreement to produce and sell generic enoxaparin, as described herein.

**RELEVANT NON-PARTY**

15.  Amphastar Pharmaceuticals, Inc. ("Amphastar") is a pharmaceutical company located in Rancho Cucamonga, California. Amphastar develops, manufactures, and markets proprietary and generic drug products and active pharmaceutical ingredients ("APIs"). Amphastar, either directly or through its distributors, has long-standing relationships with all the major group purchasing organizations ("GPOs") and drug wholesalers in the United States, which enables Amphastar to rapidly introduce new products and quickly establish significant

market share.  Amphastar currently manufactures and sells a generic version of the drug enoxaparin.

## **RELEVANT MARKETS**

16.     A relevant market in this case is generic enoxaparin sold in the United States. Generic drugs have unique appeal to price-sensitive buyers.  A price-sensitive buyer will always choose the lower priced generic over the brand-name drug.  Consequently, generic drug makers do not view themselves as principally competing against the brand; they mainly compete against each other.  A sole generic supplier can therefore charge a price just marginally below the price of the brand-name drug and capture all price-sensitive buyers.

17.     Specifically, according to the FDA, on average, the first generic competitor prices its product only slightly lower than the brand name manufacturer (about 94%).  However, market entry by a second generic manufacturer reduces the average generic price to nearly half the brand name price (about 52%).  As additional generic manufacturers enter the market with their competing products, prices continue to fall, but more slowly.  For products that attract a large number of generic drug makers, the average generic price falls to 20% (and sometimes even lower) of the branded price.

18.     Thus, the sole generic supplier can charge prices well in excess of cost and wield significant market power, the very definition of monopoly.

19.     Another relevant market in this case is branded Lovenox® sold in the United States.  Branded Lovenox® has a sufficiently different supply chain and core customer base that Sanofi-Aventis has substantial market power with respect to buyers of its branded Lovenox®. Hence the market for branded Lovenox® is a separate antitrust market from generic enoxaparin. But while Sanofi-Aventis's market power is substantial, it is not unlimited.  At a certain point,

competition in the related market for generic enoxaparin will sufficiently reduce prices of the generic alternative to discipline the pricing of branded Lovenox®.

## FACTS COMMON TO ALL CLAIMS

### I. Background

20.    Enoxaparin is a low molecular weight version of heparin ("LMWH"), a naturally occurring molecule.  In medicine, enoxaparin is used in the prevention and treatment of deep vein thrombosis ("DVT") (including inpatient treatment of acute DVT with or without pulmonary embolism, and outpatient treatment of acute DVT without pulmonary embolism), and in the treatment of myocardial infarction, including certain specific myocardial infarction treatments (*e.g.*, acute ST-segment elevation myocardial infarction).  Other LMWHs are prepared by different processes than enoxaparin and have distinct physical, chemical, and biological properties, and they are not considered as clinically equivalent to enoxaparin. Enoxaparin is the most popular and widely prescribed LMWH due mainly to its physical, chemical, and biological properties, and it generates the largest sales.  No other anticoagulant drug is a close substitute for enoxaparin.

21.    Sanofi-Aventis ("Aventis") originally brought enoxaparin to market in the United States in or around 1995 under the brand name Lovenox®.  Lovenox® became a huge commercial success for Aventis, generating billions in revenue in the United States.  Prior to entering the United States market, Aventis filed an application on June 26, 1991, for a United States patent purporting to cover Lovenox®.  That patent eventually issued on February 14, 1995 as United States Patent No. 5,389,618 (the "'618 patent").

22.    The Hatch-Waxman Act establishes a fast-track method to bring bioequivalent generic drugs to market.  A generic drug manufacturer may do so via an Abbreviated New Drug Application ("ANDA") filed with the FDA.  The drug maker must in general demonstrate that its

- 7 -

drug is the "same" in all relevant respects as a brand name drug already on the market, and that the drug maker will otherwise comply with all necessary laws and FDA regulations. In addition, the ANDA process includes what is known as "Paragraph IV" certification. This specific regulatory pathway allows the generic drug maker to declare that the patent protecting the brand-name drug is invalid or otherwise unenforceable and immediately force the issue to litigation in federal court, without having to first enter the market and risk being held liable for patent infringement.

23. Amphastar filed an ANDA to sell a generic version of enoxaparin in the United States on March 4, 2003. In its ANDA, Amphastar included a "Paragraph IV" certification that Aventis's patent was invalid and unenforceable.

24. Amphastar was the first to file with the FDA for the FDA's approval to sell a generic version of enoxaparin in the United States, and Amphastar was the first generic applicant to receive acknowledgement of "sameness" by the FDA for generic enoxaparin, dated November 2, 2007. On August 4, 2003, Aventis sued Amphastar (and another drug maker, Teva), alleging infringement of the '618 patent. On February 8, 2007, Amphastar cleared the way for generic competition by successfully establishing that Aventis's '618 patent was unenforceable due to inequitable conduct. The Federal Circuit affirmed that decision on May 14, 2008.

25. Amphastar received FDA approval to sell enoxaparin on September 19, 2011.

26. Defendant Sandoz filed an ANDA on August 26, 2005. Sandoz received FDA approval to sell enoxaparin on July 23, 2010. *See* Docket No. FDA-20030P-0273.

## II. The Agreement

27. On or about November 1, 2003, Defendants signed a Collaboration and License Agreement ("Collaboration Agreement") to develop and sell enoxaparin sodium injection in the

- 8 -

United States. Defendants agreed in writing to keep secret the terms of, and their activities pursuant to, the Collaboration Agreement.

28. The Collaboration Agreement was the culmination of months of work by Momenta, which had been seeking a business partner to "execute on a joint regulatory strategy to appropriately influence/direct FDA discussions and actions on enoxaparin (and biogenerics)," according to Momenta's notes from a March 12, 2003 meeting in Cambridge, Massachusetts with another company. At that meeting, Momenta revealed its intent to use its "novel, proprietary technology platform" in a scheme to monopolize the generic enoxaparin market.

29. From its inception, the partnership between Momenta and Sandoz, executed through the Collaboration Agreement, was designed around the goal that Sandoz would use Momenta's proprietary technology and the FDA approval process to become the sole supplier of generic enoxaparin—i.e., a monopolist—in exchange for sharing approximately half the profits with Momenta. An April 30, 2004 slide presentation by Defendants reveals that they sought to use their "patent protected technology" to secure sole generic supplier status and were prepared to "direct/influence FDA actions" in order to gain approval. Specifically, Defendants sought to use their "patented technology" to "help set criteria" for the FDA's then-undetermined standards for chemical equivalence to Lovenox®.

30. Defendants knew that developing a scheme to monopolize the generic enoxaparin market would lead to record profits. A September 12, 2010 email from Momenta CFO Rick Shea to Momenta CEO Craig Wheeler indicated that Momenta's market valuation was $120 million higher with sole generic status—and that Momenta was willing to use its patents to prevent competitors from entering the market: "As you note, keeping Teva from approval, or sending a message that we have the ability/IP to keep them from launching, could significantly

boost our price."  Talking points sent to Wheeler around the same time similarly demonstrate the

importance of securing sole generic status: "Profitability will depend on whether and for how

long we are the sole provider of generic Lovenox. If we move quickly in to a multiple approval

scenario, then no, the M-Enox launch will not make us profitable."

31.    Similarly, another Momenta presentation discusses the "significant market

opportunity" to collaborate with Sandoz and use Momenta's patented process to become the sole

generic enoxaparin supplier.  Among the partnership's benefits: "Valuable cash flows" and

"Incentives for achieving sole generic approval."

32.    The Collaboration Agreement itself is rife with proof of the parties' intent to

monopolize.  It included milestone payments triggered if Defendants were the sole provider of

generic enoxaparin in the United States.  For example, on or about July 23, 2011, Momenta

received a $10 million milestone payment from Sandoz in recognition of completing a full year

of sales without an additional generic enoxaparin product entering the market.

33.    The Collaboration Agreement also provided that Momenta would receive no less

than a 45% share of all profits earned by Sandoz's sales of its generic enoxaparin so long as

Defendants were the sole source of generic enoxaparin in the United States—and a significantly

lower royalty in the event of entry by any generic competitors.  As Momenta's President and

CEO, Craig Wheeler, put it at a March 7, 2011 conference in Boston, Massachusetts: "when we

signed [the Collaboration Agreement], we actually had a huge incentive to be the sole generic,"

and "we are hoping to be able to enjoy the sole generic status for some time to come."

34.    The Collaboration Agreement also exclusively licensed Momenta's patents to

Sandoz, which were intended to be used by Defendants to exclude competition.  Among the

licensed patents was United States Patent No. 7,575,886 (the "'886 patent").  Momenta filed the

application that matured into the '886 patent on March 11, 2003, and the '886 patent issued on August 18, 2009. Among the named inventors was Momenta's Dr. Zachary Shriver.

35.     Sandoz, for its part, also enjoyed significantly higher revenues and profits under a profit-sharing arrangement rather than a royalty payment for the simple reasons that during the time there were no other generic enoxaparin competitors on the market, Sandoz commanded a much higher price for its generic enoxaparin, and no competing sales were diverted to any competitors. Sandoz, in fact, did maintain a high price for Defendants' generic enoxaparin product—a price that was very close to Aventis's price for its Lovenox® brand product—for the entire duration of time that Defendants marketed the sole generic enoxaparin product. During the first year, sales of Defendants' generic enoxaparin product exceeded one billion dollars. Sandoz's ability to maintain a high price for Defendants' generic enoxaparin was of paramount importance to Sandoz, and it was critical to Sandoz to ensure generic competitors were blocked from entering the market.

## III.     USP Method 207 and the '886 Patent

36.     Defendants' plan depended on making sure that every one of Sandoz's potential competitors would be hamstrung by lack of access to the '886 patent. The value of that patent depended, in turn, not on its intrinsic innovative value, but on the privileged place that Momenta and Dr. Shriver secretly secured for it in the regulatory structure. They did this through the USP.

37.     The USP is a scientific nonprofit organization that sets standards for identity, strength, quality, and purity of medicines, food ingredients, and dietary supplements that are manufactured, distributed and consumed worldwide. USP's drug standards are enforceable in the United States by the FDA. USP standards are recognized under federal law. For example, the FDA enforces USP standards by requiring that any pharmaceutical product comply with the standards set forth in the USP monograph for that drug product. *See* 21 U.S.C. § 351(b).

38.     The USP has an express policy about allowing insiders to manipulate the standards-setting process to favor one stakeholder over another.  USP commits itself to "processes that are open, rigorous, science-based, and unbiased."  USP Code of Ethics, "Standards-Setting Activities."[1]  USP states as a goal that it will not "allow any stakeholder to have an undue advantage over another stakeholder."  *Id.*

> "Consistent with and in furtherance of this mission, USP is committed to doing all it reasonably can to assure that USP-NF standards and related methods are developed through an objective, independent, science-based process, and that the resulting official compendial standards not have the effect of favoring any manufacturer over others or putting any FDA-approved product out of compliance.  The USP attempts to maintain independence and impartiality, as it is critical to the integrity and credibility of its standard-setting activities."

*Id.* (emphasis added).

39.     To ensure impartiality and its policy of not favoring any one manufacturer over another, the USP maintains a strict Code of Ethics that applies to all members and participants of USP committees.  The USP develops these standards through "members" or "participants" of various expert panels and committees, often scientists in the field relevant to the standard being developed.  Each member and participant agrees to the USP's Rules and Procedures of the Council of Experts, which include specific rules on conflicts of interest.  Each individual or entity involved in the standard-setting process has a duty to ensure that they remain free of any actual or perceived conflicts of interest in the performance of their duties.  The USP's rule is as simple as it is clear:  "It is your obligation to disclose any potential conflict of interest as soon as you become aware of it."  USP Code of Ethics, "Conflicts of Interest."

---

[1] *Available at* http://www.usp.org/sites/default/files/usp_pdf/EN/code-of-ethics/code-of-ethics-english.pdf.

40.     USP's conflict-of-interest rules thus require each member to submit to the USP a statement disclosing all interests that could result in a conflict of interest, including intellectual property rights.  In the event that a conflict of interest arises, it is the duty of the member to disclose the conflict of interest to the USP.  The USP will not permit a member to be present for the final discussion, deliberation, or vote on the issue on which he or she has a conflict of interest.

41.     It is common practice for USP staff to review USP conflict of interest policies at the beginning of USP panel meetings.

42.     By at least 2007, Aventis had requested that the USP adopt criteria for enoxaparin that included a standardized test that Aventis had developed for determining whether 15 to 25% of the carbohydrate chains in enoxaparin had a 1,6-anhydro ring structure on one of their terminal ends.  In or around February 2007, or at least by that time, the USP had begun work on a proposed standard for enoxaparin, including work on a test method proposed by Aventis.  Aventis's proposed method became known as USP Method <207>.

43.     Zachary Shriver, who was Senior Director of Research Analytics at Momenta during the relevant time period, served as Momenta's representative on USP's Heparin Ad Hoc Advisory Panel and Low Molecular Weight Heparins Expert Panel, which oversaw the development and approval of USP's enoxaparin standard.  Dr. Shriver—and Momenta, whom he represented on the panel—owed the USP a duty to disclose any and all conflicts of interest relevant to the USP's adoption of the enoxaparin standard.  Dr. Shriver and Momenta were well aware of their duty to the USP and the USP's policy not to favor one manufacturer over another.  Indeed, Dr. Shriver signed one or more Disclosure Statements during the relevant time period in which he verified that he had disclosed "all employment, professional research, organizational

- 13 -

memberships, and other interests that could result in a conflict of interest" relating to "the USP standards of activities of the Expert Committee or Expert Panel on which [he] serve[d] as a member." Dr. Shriver had the privilege of serving on the USP panel by virtue of his supposed commitment to represent the public interest, as opposed to the pecuniary interests of himself and Momenta.

44.     Sandoz also participated in panel discussions and owed the USP a duty to disclose any and all information relevant to the USP's adoption of USP Method <207>.

45.     During the USP's consideration of USP Method <207>, Defendants and Dr. Shriver learned that Aventis had a pending patent application, the claims of which, if issued, would read on USP Method <207>. Defendants objected to Aventis having a patent that covered a standardized USP test, contending that the test, once adopted, should be free for anyone to use. Defendants insisted that the USP require Aventis to "expressly abandon" the patent application so that there would be no doubt that any member of the public could practice USP Method <207>.

46.     On or about November 14, 2008, USP held a meeting of the Heparin Ad Hoc Advisory Panel that was considering the USP's adoption of USP Method <207>. At the beginning of the meeting, USP Staff member, Mr. Van Hook, gave a presentation to those in attendance of USP's rules of conflict of interests. The attendees were specifically advised that their "[p]osition as a member should not be used to benefit one's own interest, or the interest of his or her company." Defendant Momenta presented a detailed analysis of USP Method <207> including commenting on specific enzymes, columns, reagents and procedures used in the method. Dr. Shriver was in attendance during the November 14, 2008 USP meeting.

- 14 -

47. Also during the November 14, 2008 Heparin Ad Hoc Advisory Panel meeting, the USP Staff reported: "USP has had successful correspondence with the company [Sanofi-Aventis] that may have patents that may pertain to the test or related tests. The company has reported that it will allow the one patent that may cover the method to lapse. As such USP is not aware of any patent issue that may cover the test. The AP may proceed with the use of the test as planned."

48. Notes from a November 21, 2008 telephone call between Defendants and the USP demonstrate that Defendants pushed USP officials to require Aventis to "affirmatively 'expressly abandon' any patent application," and that the USP agreed to take that into account. The notes reflect that Defendants required that USP produce to them Aventis's letter to the USP which states that it would allow its patent applications related to methods for determining the 1,6-anhydro content of enoxaparin sodium to lapse.

49. Notwithstanding the USP Code of Ethics and their own participation in the process that stripped Aventis of its patent rights with respect to USP Method <207>, neither Momenta nor Dr. Shriver advised the USP of the pending '886 patent application.[2] Indeed, USP Senior Vice President and General Counsel Susan de Mars confirmed in a sworn statement that "[a]t no time during the development of Chapter <207> or subsequently did Momenta, its employees or agents, ever suggest to USP staff, advisory panels (including Ad Hoc Advisory Panels and Expert Panels) involved in developing Chapter <207> (namely, Biologics & Biotechnology 1), that any of Momenta's intellectual property, including patents, might pertain to or in any way constrain the public use of USP compendial standards or Chapter <207>."

50. Other than Dr. Shriver, no one else serving on the USP panel for setting standards for enoxaparin knew that Defendants had a patent application that they would use to block the use of USP Method <207> upon issuance. This mattered because the pending application

_____

[2] Dr. Shriver himself is the official applicant for the '886 patent, *i.e.*, the purported inventor.

- 15 -

claimed methods that covered USP Method <207>.  For instance, the pending application claimed a method of analyzing an enoxaparin sample "for the presence or amount of a non naturally occurring sugar" using digestion of an enoxaparin sample with a heparin-degrading enzyme—the basic process contemplated by USP Method <207>.  Indeed, this application was the whole basis of the collaboration agreement Momenta had signed with Sandoz many years before.

51.     Had Defendants disclosed their application, the USP would have either required Momenta to abandon its patent rights regarding the USP Method <207>—as the USP required Aventis to abandon its patent rights, with the express encouragement of Sandoz and Momenta— or chosen a different standard or a different test among standard techniques over which Momenta would have had no patent rights.  Indeed, the FDA noted the existence of alternative techniques to USP Method <207> in the very order that opened the market to Sandoz and Momenta; but this did not relieve suppliers of enoxaparin from complying with the USP standard.  *See* Docket No. FDA-20030P-0273 (July 23, 2010 at pp. 16-17).

52.     Having obtained Aventis's abandonment of Aventis' pending patent application, *see supra* ¶ 48—and being unaware of Momenta's pending application due to its non-disclosure by Defendants— in December 2009, the USP approved and adopted USP Method <207>.  Once the USP adopted USP Method <207>, it became the official test method that Amphastar had to use to test its enoxaparin in order to obtain and maintain its FDA approval.

53.     Defendants were monitoring these developments closely.  Becoming the sole generic provider of enoxaparin, and maintaining that status, was a key strategic goal for Momenta during this time period; indeed, it was plotted and tracked at the most senior levels of the company.  At a September 12, 2008 meeting of the Momenta Board of Directors (the

"Board") in Cambridge, Massachusetts, CEO Wheeler and Board members discussed the impact on Momenta's projected revenue if Momenta were able to obtain and maintain "sole generic provider" status. Both in 2008 and 2009, Momenta's ability to achieve sole generic provider status was a "key strategic driver" for the company, and was discussed in detail at Board meetings in December 2008 and December 2009.

54. On or about March 4, 2011, the USP held a meeting of the USP Low Molecular Weight Heparins Expert Panel. Dr. Ishan Capila appeared on behalf of Momenta as an Expert Panel member. Dr. Shriver also attended as an Expert Panel member. The USP staff once again reviewed USP's conflict of interest policy and informed the panel members that conflicts of interest must be disclosed. Again, neither Momenta, nor Dr. Capila, nor Dr. Shriver disclosed the then-issued '886 patent.

55. On or about April 20-21, 2011 the USP held another meeting of the USP Low Molecular Weight Heparins Expert Panel. Again Dr. Capila and Dr. Shriver attended as Expert Panel members. Again, USP Staff reviewed the USP conflicts of interest policy including the requirement that Expert Panel members disclose any conflicts of interest. The USP Staff advised the Expert Panel members: "All Counsel of Expert members, those on either the EC or EP, must declare their conflicts of interest and must sign a confidentiality agreement. Due to the nature of work of the Council of Experts, especially in the biologics and biotechnology area there are potential antitrust and biosimilar issues that the EP should keep in mind throughout its work." Again, despite this warning, neither Momenta, nor Dr. Capila, nor Dr. Shriver advised the USP of Momenta's then-issued '886 patent.

IV. **Defendants Block Competition**

56. Defendants were the first to obtain FDA approval for a generic version of enoxaparin. The FDA granted final approval for Defendants' ANDA on or about July 23, 2010,

- 17 -

and immediately thereafter, Defendants began selling and shipping generic enoxaparin to customers in the United States. At the time, and until Amphastar received FDA approval, Defendants were the sole source of generic enoxaparin in the United States.

57. On September 19, 2011, the FDA approved Amphastar's ANDA to sell generic enoxaparin in the United States. As a condition for approval, the FDA specified that Amphastar needed to establish on a batch-by-batch basis that its generic enoxaparin contains between 15 and 25 percent of the 1,6-AS. Upon approval, the FDA instructed Amphastar to use the USP compendium for enoxaparin, including USP Method <207>. In particular, as required by the USP Monograph for enoxaparin, Amphastar was required to establish that: "About 20 percent of the material contains a 1,6-anhydro derivative on the reducing end of the chain, the range being between 15 and 25 percent."

58. On September 21, 2011, two days after Amphastar received FDA approval to market generic enoxaparin in the United States, Defendants sued Amphastar, contending that it was essentially illegal for Amphastar to comply with USP Method <207> because it couldn't do so without infringing the '886 patent.

59. In their complaint, Defendants represented to the court: "The FDA requires a generic manufacturer to include in its manufacturing process the analysis of each batch of its enoxaparin drug substance to confirm that its manufacturing process results in the production of oligosaccharides that include defined relative amounts of a non- naturally occurring sugar that includes a 1,6-anhydro ring structure."

60. Defendants represented in other pleadings that the FDA also requires generic manufacturers of enoxaparin to ensure that each batch complies with the standards for identity enumerated in the USP Monograph for enoxaparin.

61.     Defendants further represented that the USP Monograph for enoxaparin is an official written standard that provides the definition of enoxaparin and the requirements that a maker of enoxaparin must satisfy in order to ensure the drug product's quality, strength, and purity.

62.     Still further, Defendants represented that the USP is the standard-setting body for drugs sold in the United States and that the USP monographs are enforced by the FDA.

63.     Defendants further contended that the claims of the '886 patent covered the USP Method <207>.

64.     Defendants admitted that Amphastar's market entry was certain to cause an immediate and substantial reduction in Sandoz's price for enoxaparin and Sandoz's market share.

65.     Upon filing their complaint against Amphastar, Defendants moved for a TRO and preliminary injunction.

66.     On October 7, 2011, the District of Massachusetts court issued a temporary restraining order ("TRO") enjoining Amphastar from selling enoxaparin pending a hearing on the motion for preliminary injunction.  The court required Defendants to post a $50,000 bond for the TRO.

67.     On October 28, 2011, the court issued a preliminary injunction to the same effect. The court required the Defendants to post a $100,000,000 bond for the preliminary injunction.

68.     The Federal Circuit stayed the preliminary injunction on January 25, 2012 and vacated the wrongfully obtained preliminary injunction on August 3, 2012.

69.     On July 19, 2013, the United States District Court for the District of Massachusetts granted Amphastar's motion for summary judgment, finding that Amphastar did

not infringe the asserted claims of the '886 patent under the Patent Act's safe harbor provision, 35 U.S.C. § 271(e)(1). As a result, Amphastar and a subsequent ANDA applicant, Teva, have the ability to freely use the USP Method <207> for batch release testing for their generic enoxaparin.

70.     Momenta and Sandoz appealed the district court's order. On November 10, 2015, the Court of Appeals for the First Circuit vacated the district court's grant of summary judgment in Amphastar's favor to the extent it was based on the erroneous determination that Amphastar's activities fall within the § 271(e)(1) safe harbor and therefore do not infringe under 25 U.S.C. § 271(a), and remanded the proceedings to the district court consistent with that opinion. Trial in the case against Amphastar is set to begin July 10, 2017.

71.     Application of the doctrine of fraudulent concealment tolled the statutes of limitations on claims asserted by Plaintiffs. Plaintiffs had no knowledge of the conspiracy alleged herein, or any facts that could or would have led to the discovery thereof, until at the earliest September 17, 2015, when Amphastar filed its antitrust lawsuit against Defendants. *See Amphastar Pharm. Inc. v. Momenta Pharm. Inc.*, No. 5:15-cv-01914 (C.D. Cal. Sept. 17, 2015). Amphastar's antitrust lawsuit publicly disclosed for the first time Momenta's conduct before the USP. Before that date, Plaintiffs could not have discovered Defendants' violations through the exercise of due diligence, because there was no information in the public domain about Defendants' conspiracy, in particular Momenta's failure, despite an affirmative duty, to disclose the '886 patent to the USP as a potential conflict of interest. As described in this Complaint, Defendants' conduct was calculated to conceal the existence of their illegal conduct, and Defendants committed affirmative acts to conceal the details of their illegal conspiracy.

- 20 -

## V.     Monopoly Power

72.     Defendants' lawsuit prevented Amphastar from selling generic enoxaparin in the relevant market. From the issuance of the TRO until the Federal Circuit stayed the preliminary injunction on January 25, 2012, Amphastar was completely prevented from selling the drug enoxaparin. Even after the Federal Circuit vacated the preliminary injunction on August 3, 2012, Amphastar's sales were considered "at risk" since final judgment based on the safe harbor provision of 35 U.S.C. § 271(e)(1) had not yet happened, which prevented or impeded Amphastar from obtaining sales contracts it would have otherwise obtained. There were no other independent competitive suppliers during this time period; the only other supplier, Winthrop, was a subsidiary of Aventis selling an "authorized" generic enoxaparin. Winthrop did not have the ability or incentive to take market share from Momenta/Sandoz through aggressive pricing. Thus, even during late 2012 and into 2013 Defendants continued to wield significant (monopoly-level) power over prices in the relevant market for generic enoxaparin.

73.     This is borne out by market share statistics, reflecting the shares of prescriptions supplied by Momenta/Sandoz and Amphastar/Watson, according to publicly available Medicaid utilization data.

| Firm Name | 2011 | 2012 | 2013 |
|---|---|---|---|
| Momenta/Sandoz | 100% | 85% | 66% |
| Amphastar/Watson | 0% | 15% | 34% |

## VI.     Harm to Plaintiffs and the Classes

74.     Defendants' wrongful conduct kept the prices of Lovenox® and generic enoxaparin higher than they otherwise would have been.

75.    For example, a display of the average wholesale price of generic enoxaparin (published by Truven Health Analytics in its RedBook) shows that it began a significant decline in May of 2012, four months after the Federal Circuit stayed the preliminary injunction against Amphastar, and Amphastar began taking steps to try to enter the market.  It reached a low point in July of 2013, shortly before Amphastar's final victory, and began plummeting in 2014.



76.    Had Defendants not delayed competition, this decline would have started earlier, in September of 2011, when Amphastar could have first entered the market, and when generic enoxaparin cost $80 per dose, rather than $90 per dose.[3]  It also would have accelerated faster, because Amphastar would have been a stronger competitor.  By delaying competition, Defendants made buyers of generic enoxaparin—a billion-dollar drug—pay hundreds of millions of dollars in overcharges.

77.    Similarly, the RedBook shows that the average wholesale price of branded Lovenox® plateaued at $100 per dose in May of 2012, four months after Amphastar entered the

---

[3] There are other dosage strengths of enoxaparin; however they all follow the same price structure, despite the fact that they might individually be priced more or less than the common 80MG/0.8ML dosage.  The same is true of branded Lovenox®.

market on a limited basis, and at around the same time that the price of generic enoxaparin began a modest decline.



78.    Had Defendants not delayed generic competition, this plateau would have occurred months earlier, when the price of Lovenox® was a few dollars lower per dose.

79.    RedBook data for Lovenox® ends in 2013.  However, the Centers for Medicare and Medicaid Services (CMS) provides data collected in its survey of drug acquisition costs paid by retail community pharmacies from October 2012 to the present.  The survey provides the national average drug acquisition cost (NADAC) for each drug and dosage form and strength in the survey.[4]

80.    The Medicare data begins around October, 2012.  It shows that after this plateau period, the price of branded Lovenox® began a steady decline.

---

[4] The RedBook and Medicare data do not show the same prices during the few months in which they overlap because the average wholesale price self-reported by the drug manufacturer is not the same thing as the average acquisition cost reported by retail pharmacies.



81.     Had Defendants not delayed competition, this decline would have started earlier, and from a lower price, and driven the price of branded Lovenox® to levels below those paid even today.

82.     By delaying competition Defendants thus made indirect purchasers of branded Lovenox®—a billion-dollar drug—pay tens if not hundreds of millions of dollars in overcharges.

## CLASS ACTION ALLEGATIONS

83.     Plaintiffs bring this action on behalf of themselves and as a nationwide class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure seeking injunctive and declaratory relief, as well as costs of suit and attorneys' fees, for violations of the Sherman Act, 15 U.S.C. § 1 and § 2, on behalf of the following class (the "Nationwide Injunctive Relief Class"):

> All persons and entities residing in the United States that, during the period from September 21, 2011, through the present (the "Class Period"), indirectly purchased Lovenox® or generic enoxaparin for their own use and not for resale.

- 24 -

84.     Plaintiffs bring this action on behalf of themselves and as a class action under

Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking injunctive and declaratory

relief, costs of suit and attorneys' fees, and treble damages, on behalf of themselves and class

members residing in states that provide a damages remedy for indirect purchasers (the "Indirect

Purchaser Jurisdictions"[5]) (the "Damages Class"):

> All persons and entities in the Indirect Purchaser Jurisdictions who
> indirectly purchased, paid and/or provided reimbursement for some
> or all of the purchase price for generic enoxaparin or Lovenox®,
> other than for resale, from September 21, 2011, through the present
> (the "Class Period").

85.     The Nationwide Injunctive Relief Class and the Damages Class are collectively

referred to herein as the "Classes" unless otherwise indicated.

86.     While Plaintiffs do not know the exact number of the members of the Classes,

Plaintiffs believe there are at least thousands of persons and entities.

87.     Common questions of law and fact exist as to all members of the Classes. This is

particularly true given the nature of Defendants' conspiracy, which was applicable to all of the

members of the Classes, thereby making appropriate relief with respect to the Classes as a whole.

Such questions of law and fact common to the Classes include, but are not limited to:

a.      Whether Defendants agreed to restrain competition in the market for

generic enoxaparin;

b.      Whether Defendants exercised monopoly power in the market for generic

enoxaparin;

---

[5] The "Indirect Purchaser Jurisdictions" are jurisdictions that provide for a damages remedy for indirect purchasers under state antitrust or consumer protection laws:  Alabama, Arizona, Arkansas, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

- 25 -

c.      Whether Defendants conspired to monopolize the market for generic enoxaparin;

d.      Whether Defendants had a dangerous probability of achieving monopoly power in the market for generic enoxaparin;

e.      Whether Defendants' conduct raised the price of generic enoxaparin above what it otherwise would have been absent their conduct;

f.      Whether Defendants' conduct raised the price of Lovenox® above what it otherwise would have been absent their conduct;

g.      Whether the Collaboration Agreement and Defendants' related conduct and agreements violated Section One of the Sherman Act, as alleged in the First and Second Claims for Relief;

h.      Whether Defendants' exclusionary practices violated Section Two of the Sherman Act, as alleged in the Third and Fourth Claims for Relief;

i.      Whether Defendants' exclusionary practices violated state laws, as alleged in the Fifth through Seventh Claims for Relief;

j.      Whether Defendants' exclusionary practices caused injury to the business or property of Plaintiffs and the members of the Classes;

k.      The appropriate injunctive and related equitable relief for the Nationwide Injunctive Relief Class; and

l.      The appropriate class-wide measure of damages for the Damages Class.

88.     Plaintiffs' claims are typical of the claims of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs and all members of the Classes are

similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic enoxaparin and Lovenox® during the Class Period.

89.     Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust, consumer protection and class action litigation.

90.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

91.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

## COUNT I

### Violation of Section One of the Sherman Act:
### Agreements in Unreasonable Restraint of Trade Violation Of State Antitrust Laws
### (On Behalf of Plaintiffs and the Nationwide Injunctive Relief Class)

92.     Every paragraph above and in the following counts is incorporated herein by reference.

93.     Defendants' anticompetitive conduct set forth in this Complaint has violated Section One of the Sherman Act.  *See* 15 U.S.C. § 1.

94.     Defendants are separate and distinct entities; neither is a subsidiary or agent of the other.  Apart from their agreements discussed herein, Defendants are economically independent from each other.

95.     Defendants acted in concert during the proceedings before the USP.

96.     Defendants' conspiracy, including the Collaboration Agreement, was made with the purpose and effect of restraining competition in the market for generic enoxaparin.

97.     During the Class Period, Defendants had significant pricing (i.e., market) power in the market for generic enoxaparin.

98.     Defendants' conspiracy had no pro-competitive benefits; it did nothing to increase competition in the market for generic enoxaparin.  It instead inflicted substantial competitive harms, namely by preventing entry by other generics and raising prices of both generic enoxaparin and Lovenox® during the Class Period.

99.     Defendants affected interstate commerce by keeping the price of enoxaparin unreasonably high due to their wrongful restraint of trade.

100.     As a result of Defendants' conspiracy, Plaintiffs and other members of the Nationwide Injunctive Relief Class who purchased Lovenox® or generic enoxaparin have suffered antitrust injury.  Plaintiffs and the Class members paid significantly higher prices for Lovenox® and generic enoxaparin than they would have paid had Defendants not blocked competition in the market for generic enoxaparin.

101.     Defendants' unlawful conduct is continuing and will continue unless enjoined by this Court.

- 28 -

102.     Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and the Nationwide Injunctive Relief Class seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT II

### Violation of Section Two of the Sherman Act: Monopolization
### (On Behalf of Plaintiffs and the Nationwide Injunctive Relief Class)

103.     Every paragraph above and in the following counts is incorporated herein by reference.

104.     Defendants' anticompetitive conduct set forth in this Complaint has violated Section Two of the Sherman Act.  *See* 15 U.S.C. § 2.

105.     Defendants wrongfully acquired and unlawfully maintained monopoly power in the market for generic enoxaparin by deceiving the USP into adopting a standard test method that Defendants contended is covered by Defendants' patent rights.

106.     Defendants then used the wrongfully obtained monopoly to exclude other generic manufacturers from the relevant market for generic enoxaparin.

107.     As a result of Defendants' exclusionary conduct, Plaintiffs and the other members of the Nationwide Injunctive Relief Class who purchased Lovenox® or generic enoxaparin have suffered antitrust injury.  Plaintiffs and the Nationwide Injunctive Relief Class paid significantly higher prices for Lovenox® and generic enoxaparin than they would have paid had Defendants not blocked competition in the market for generic enoxaparin.

108.     Defendants' unlawful conduct is continuing and will continue unless enjoined by this Court.

109.     Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and the Nationwide Injunctive Relief Class seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT III

### Violation of Section Two of the Sherman Act: Conspiracy to Monopolize
### (On Behalf of Plaintiffs and the Nationwide Injunctive Relief Class)

110.     Every paragraph both above and in the following counts is incorporated herein by reference.

111.     Defendants conspired to monopolize the market for generic enoxaparin in violation of 15 U.S.C. § 2.

112.     Defendants are separate and distinct entities; neither is a subsidiary or agent of the other.  Apart from their agreement discussed herein, Defendants are economically independent from each other.

113.     Defendants had a specific intent to monopolize.  Defendants specifically intended and effected through their willful deception of the USP to create and maintain monopoly power by barring other generics from selling generic enoxaparin and did so by, inter alia, wrongfully pursuing a patent infringement action regarding another generic company's use of USP Method <207>.  This action resulted in court orders that temporarily barred generic entry.

114.     As a result of Defendants' exclusionary conduct, Plaintiffs and the other members of the Nationwide Injunctive Relief Class who purchased Lovenox® or generic enoxaparin have suffered antitrust injury.  Plaintiffs and the Nationwide Injunctive Relief Class significantly higher prices for Lovenox® and generic enoxaparin than they would have paid had Defendants not blocked competition in the market for generic enoxaparin.

115. Defendants' unlawful conduct is continuing and will continue unless enjoined by this Court.

116. Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and the Nationwide Injunctive Relief Class seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

**COUNT IV**

**Violation of Section Two of the Sherman Act: Attempt To Monopolize**
**(On Behalf of Plaintiffs and the Nationwide Injunctive Relief Class)**

117. Every paragraph both above and in the following counts is incorporated herein by reference.

118. Defendants attempted to monopolize the market for generic enoxaparin in violation of Section Two of the Sherman Act based on the anticompetitive conduct described herein.

119. Defendants had a specific intent to monopolize the market for generic enoxaparin. As discussed in more detail above, Defendants specifically conspired to wrongfully block anyone else from selling generic enoxaparin in the United States. In doing so, Defendants attempted to control high prices in the relevant market, and to exclude competition.

120. Through the anticompetitive and exclusionary acts described above, Defendants achieved a dangerous probability of success of monopolizing the relevant market. By excluding other generic entrants, Defendants maintained their huge market share and significant pricing power over generic enoxaparin in the United States. As a result, Defendants were able to charge a higher price for generic enoxaparin.

121. As a result of Defendants' exclusionary conduct, Plaintiffs and the other members of the Nationwide Injunctive Relief Class who purchased Lovenox® or generic enoxaparin have

- 31 -

suffered antitrust injury. Plaintiffs and the Nationwide Injunctive Relief Class paid significantly higher prices for Lovenox® and generic enoxaparin than they would have paid had Defendants not blocked competition in the market for generic enoxaparin.

122. Defendants' unlawful conduct is continuing and will continue unless enjoined by this Court.

123. Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and the Nationwide Injunctive Relief Class seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT V

### Violation Of State Antitrust Laws
### (On Behalf of Plaintiffs and the Damages Class)

124. Plaintiffs incorporate and reallege, as though fully set forth herein, each of the paragraphs set forth above.

125. During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of generic enoxaparin and/or Lovenox® in unreasonable restraint of trade and in violation of the following state statues.

126. Alabama: By reason of the foregoing, Defendants have violated Alabama Code § 6-5-60. Plaintiffs on behalf of the Damages Class allege as follows:

a. Defendants' combination or conspiracy had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout Alabama; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout Alabama; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

- 32 -

and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b.     During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Alabama Code § 6-5-60.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Alabama Code § 6-5-60.

127.     Arizona:  By reason of the foregoing, Defendants have violated Arizona Revised Statutes, §§ 44-1401, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.     Defendants' combination or conspiracy had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout Arizona; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b.     During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

- 33 -

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Arizona Revised Statutes, §§ 44-1401, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Arizona Revised Statutes, §§ 44-1401, *et seq.*

128.     <u>California</u>:  By reason of the foregoing, Defendants have violated California Business and Professions Code, §§ 16700, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.     Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation California Business and Professions Code § 16720.  Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic enoxaparin and/or Lovenox® at supra-competitive levels.

b.     The aforesaid violations of California Business and Professions Code § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic enoxaparin and/or Lovenox®.

c.     For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not in any way limited to the acts, practices and course of conduct set forth

- 34 -

above and fixing, raising, stabilizing, and pegging the price of generic enoxaparin and/or Lovenox®.

       d.      The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition in the sale of generic enoxaparin and/or Lovenox® has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic enoxaparin and/or Lovenox® have been fixed, raised, stabilized, and pegged at artificially high, noncompetitive levels in the State of California; and (3) those who purchased generic enoxaparin and/or Lovenox® directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

       e.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the members of the Damages Class have been injured in their business and property in that they paid more for generic enoxaparin and/or Lovenox® than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of California Business and Professions Code § 16720, Plaintiffs and the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

      129.   <u>District of Columbia</u>:  By reason of the foregoing, Defendants have violated District of Columbia Code, §§ 28-4501, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

       a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout the District of Columbia; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of

Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic enoxaparin and/or Lovenox® that was shipped by Defendants or their co-conspirators, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic enoxaparin and/or Lovenox® that was shipped by Defendants or their co-conspirators, paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®, including in the District of Columbia.

b.      During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of District of Columbia Code, §§ 28-4501, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code, §§ 28-4501, *et seq*.

130.    Hawaii:  By reason of the foregoing, Defendants have violated Hawaii Revised Statutes, §§ 480-1, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout Hawaii; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b.     During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Hawaii Revised Statutes, §§ 480-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes, §§ 480-1, *et seq*.

131.   <u>Illinois</u>:  By reason of the foregoing, Defendants have violated the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.     Defendants' combination or conspiracy had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout Illinois; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b.     During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.*

132.   <u>Iowa</u>:  By reason of the foregoing, Defendants have violated Iowa Code, §§ 553.1, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout Iowa; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b.      During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Iowa Code, §§ 553.1, *et seq.*  Accordingly, Plaintiffs and

- 38 -

members of the Damages Class seek all forms of relief available under Iowa Code, §§ 553.1, *et seq*.

133.    <u>Kansas</u>:  By reason of the foregoing, Defendants have violated Kansas Statutes, §§ 50-101, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.    Defendants' combination or conspiracy had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout Kansas; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b.    During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Kansas Statutes, §§ 50-101, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Statutes, §§ 50-101, *et seq*.

134.    <u>Maine</u>:  By reason of the foregoing, Defendants have violated Maine Revised Statutes, 10 M.R.S.A. §§ 1101, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a. Defendants' combination or conspiracy had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout Maine; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Maine Revised Statutes, 10 M.R.S.A. §§ 1101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Maine Revised Statutes, 10 M.R.S.A. §§ 1101, *et seq*.

135. <u>Michigan</u>: By reason of the foregoing, Defendants have violated Michigan Compiled Laws, §§ 445.771, *et seq*. Plaintiffs on behalf of the Damages Class allege as follows:

a. Defendants' combination or conspiracy had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout Michigan; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

- 40 -

and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b.      During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Michigan Compiled Laws, §§ 445.771, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Michigan Compiled Laws, §§ 445.771, *et seq.*

136.    <u>Minnesota</u>:  By reason of the foregoing, Defendants have violated Minnesota Statutes, §§ 325D.49, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout Minnesota; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b.      During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

- 41 -

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Minnesota Statutes, §§ 325D.49, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Minnesota Statutes, §§ 325D.49, *et seq.*

137.    <u>Mississippi</u>: By reason of the foregoing, Defendants have violated Mississippi Code, §§ 75-21-1, *et seq.* Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout Mississippi; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b.      During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Mississippi Code, §§ 75-21-1, *et seq.* Accordingly, Plaintiffs

- 42 -

and members of the Damages Class seek all forms of relief available under Mississippi Code, §§ 75-21-1, *et seq.*

138.   <u>Nebraska</u>:  By reason of the foregoing, Defendants have violated Nebraska Revised Statutes, §§ 59-801, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.   Defendants' combination or conspiracy had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout Nebraska; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b.   During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Nebraska Revised Statutes, §§ 59-801, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Nebraska Revised Statutes, §§ 59-801, *et seq.*

139.   <u>Nevada</u>:  By reason of the foregoing, Defendants have violated Nevada Revised Statutes, §§ 598A.010, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

- 43 -

a.     Defendants' combination or conspiracy had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout Nevada; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b.     During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Nevada Revised Statutes, §§ 598A.010, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Nevada Revised Statutes, §§ 598A.010, *et seq.*

140.    New Hampshire:  By reason of the foregoing, Defendants have violated New Hampshire Revised Statutes, §§ 356:1, *et seq.* Plaintiffs on behalf of the Damages Class allege as follows:

a.     Defendants' combination or conspiracy had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout New Hampshire; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3)

- 44 -

Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b.     During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes, §§ 356:1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under New Hampshire Revised Statutes, §§ 356:1, *et seq*.

141.   New Mexico:  By reason of the foregoing, Defendants have violated New Mexico Statutes, §§ 57-1-1, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.     Defendants' combination or conspiracy had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout New Mexico; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b.     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

- 45 -

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of New Mexico Statutes, §§ 57-1-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under New Mexico Statutes, §§ 57-1-1, *et seq.*

142.    <u>New York</u>:  By reason of the foregoing, Defendants have violated New York General Business Laws, §§ 340, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout New York; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b.      During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

- 46 -

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of New York General Business Laws, §§ 340, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under New York General Business Laws, §§ 340, *et seq*.

143.    <u>North Carolina</u>:  By reason of the foregoing, Defendants have violated North Carolina General Statutes, §§ 75-1, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout North Carolina; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b.      During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of North Carolina General Statutes, §§ 75-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under North Carolina General Statutes, §§ 75-1, *et seq*.

- 47 -

144.  North Dakota:  By reason of the foregoing, Defendants have violated North Dakota Century Code, §§ 51-08.1-01, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.  Defendants' combination or conspiracy had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout North Dakota; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b.  During the Class Period, Defendants' illegal conduct substantially affected North Dakota commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of North Dakota Century Code, §§ 51-08.1-01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under North Dakota Century Code, §§ 51-08.1-01, *et seq*.

145.  Oregon:  By reason of the foregoing, Defendants have violated Oregon Revised Statutes, §§ 646.705, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.  Defendants' combination or conspiracy had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated

- 48 -

throughout Oregon; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b.      During the Class Period, Defendants' illegal conduct substantially affected Oregon commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Oregon Revised Statutes, §§ 646.705, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Oregon Revised Statutes, §§ 646.705, *et seq*.

146.    South Dakota:  By reason of the foregoing, Defendants have violated South Dakota Codified Laws, §§ 37-1-3.1, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout South Dakota; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

- 49 -

and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b.     During the Class Period, Defendants' illegal conduct substantially affected South Dakota commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of South Dakota Codified Laws, §§ 37-1-3.1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under South Dakota Codified Laws, §§ 37-1-3.1, *et seq*.

147.    <u>Tennessee</u>:  By reason of the foregoing, Defendants have violated Tennessee Code, §§ 47-25-101, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.     Defendants' combination or conspiracy had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b.     During the Class Period, Defendants' illegal conduct substantially affected Tennessee commerce.

- 50 -

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Tennessee Code, §§ 47-25-101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Tennessee Code, §§ 47-25-101, *et seq.*

148.    <u>Utah</u>:  By reason of the foregoing, Defendants have violated Utah Code, §§ 76-10-3101, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout Utah; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b.      During the Class Period, Defendants' illegal conduct substantially affected Utah commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Utah Code, §§ 76-10-3101, *et seq.*  Accordingly, Plaintiffs and

- 51 -

members of the Damages Class seek all forms of relief available under Utah Code, §§ 76-10-3101, *et seq*.

149. <u>Vermont</u>: By reason of the foregoing, Defendants have violated Vermont Statutes, 9 V.S. §§ 2453, *et seq*. Plaintiffs on behalf of the Damages Class allege as follows:

a. Defendants' combination or conspiracy had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout Vermont; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b. During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Vermont Statutes, 9 V.S. §§ 2453, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Vermont Statutes, 9 V.S. §§ 2453, *et seq*.

150. <u>West Virginia</u>: By reason of the foregoing, Defendants have violated West Virginia Code, §§ 47-18-1, *et seq*. Plaintiffs on behalf of the Damages Class allege as follows:

- 52 -

a. Defendants' combination or conspiracy had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout West Virginia; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b. During the Class Period, Defendants' illegal conduct substantially affected West Virginia commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of West Virginia Code, §§ 47-18-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under West Virginia Code, §§ 47-18-1, *et seq.*

151. <u>Wisconsin</u>: By reason of the foregoing, Defendants have violated Wisconsin Statutes, §§ 133.01*, et seq.* Plaintiffs on behalf of the Damages Class allege as follows:

a. Defendants' combination or conspiracy had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout Wisconsin; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

- 53 -

and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

      b.      During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce.

      c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Wisconsin Statutes, §§ 133.01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Wisconsin Statutes, §§ 133.01, *et seq.*

## COUNT VI

### Violation Of State Consumer Protection Statutes
### (On Behalf of Plaintiffs and the Damages Class)

152.      Plaintiffs incorporate and reallege, as though fully set forth herein, each of the paragraphs set forth above.

153.      Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

154.      <u>Arkansas:</u>  By reason of the foregoing, Defendants have violated the Arkansas Deceptive Trade Practices Act, Arkansas Code, §§ 4-88-101, *et. seq.* Plaintiffs on behalf of the Damages Class allege as follows:

      a.      Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic enoxaparin and/or

- 54 -

Lovenox® was sold, distributed, or obtained in Arkansas, and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. This conduct on the part of the Defendants constituted "deceptive" and "unconscionable" acts or practices in violation of Arkansas Code, § 4-88-107(a)(10).

b.      Defendants' unlawful conduct had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout Arkansas; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

c.      During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Damages Class have been injured and are threatened with further injury.

e.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code, §§ 4-88-101, *et. seq.*, and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

155.    California:  By reason of the foregoing, Defendants have violated California's Unfair Competition Law, California Business and Professions Code, §§ 17200, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants committed acts of unfair competition, as defined by Section 17200, *et seq.*, by engaging in a conspiracy to fix and stabilize the price of generic enoxaparin and/or Lovenox® as described above.

b.      The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as described above, constitute a common and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of Section 17200, *et seq.*, including, but not limited to:  (1) violations of Section 1 of the Sherman Act, as set forth above; and (2) violations of the Cartwright Act, California Business and Professions Code, §§ 16720, *et seq.*, as set forth above.

c.      Defendants' acts, omissions, misrepresentations, practices and nondisclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

d.      Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.*

e.      Defendants' conduct was carried out, effectuated, and perfected within the State of California.  Defendants maintained offices in California where their employees engaged in communications, meetings, and other activities in furtherance of Defendants' conspiracy.

f.      By reason of the foregoing, Plaintiffs and the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

g.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of California Business and Professions Code, §§ 17200, *et seq.*, and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

156.   <u>Florida:</u>  By reason of the foregoing, Defendants have violated the Florida Deceptive and Unfair Trade Practices Act, Florida Statues, §§ 501.201, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.     Defendants' unlawful conduct had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout Florida; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b.     During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Damages Class have been injured and are threatened with further injury.

d.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Statutes, §§ 501.201, *et seq.*, and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

157.   <u>Hawaii:</u>  By reason of the foregoing, Defendants have violated Hawaii Revised Statutes, § 480-2.  Plaintiffs on behalf of the Damages Class allege as follows:

- 57 -

a.    Defendants' unlawful conduct had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout Hawaii; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b.    During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Damages Class have been injured and are threatened with further injury.

d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Revised Statutes, § 480-2, and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

158.    Massachusetts:  By reason of the foregoing, Defendants have violated the Massachusetts Consumer and Business Protection Act, M.G.L. c. 93A, § 1, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.    Defendants' unlawful conduct had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout Massachusetts; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs

and the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b.      During the Class Period, Defendants marketed, sold, or distributed generic enoxaparin and/or Lovenox® in Massachusetts, and Defendants' illegal conduct substantially affected Massachusetts commerce and consumers.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Damages Class have been injured and are threatened with further injury.

d.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of M.G.L. c. 93A, § 2 and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

e.      Each of the Defendants or their representatives have been served with a demand letter in accordance with M.G.L. c. 93A, § 1, or such service of a demand letter was unnecessary due to the defendant not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth. More than thirty days has passed since such demand letters were served, and each Defendant served has failed to make a reasonable settlement offer.

f.      By reason of the foregoing, Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of M.G.L. c. 93A, § 2.  Defendants' violations of Chapter 93A were knowing or willful, entitling Plaintiffs and the Damages Class to multiple damages.

159.    Missouri:  By reason of the foregoing, Defendants have violated Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020.  Plaintiffs on behalf of the Damages Class allege as follows:

- 59 -

a.     Defendants' unlawful conduct had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout Missouri; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b.     During the Class Period, Defendants marketed, sold, or distributed generic enoxaparin and/or Lovenox® in Missouri, and Defendants' illegal conduct substantially affected Missouri commerce and consumers.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Damages Class have been injured and are threatened with further injury.

d.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce," as further interpreted by Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq*., 15 CSR 60-8.010, *et seq*., and 15 CSR 60-9.010, *et seq*., and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

160.   <u>Montana</u>:  By reason of the foregoing, Defendants have violated the Montana Unfair Trade Practices and Consumer Protection Act of 1973, Montana Code, §§ 30-14-101, *et seq*. and §§ 30-14-201, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

- 60 -

e.     Defendants' unlawful conduct had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout Montana; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

f.     During the Class Period, Defendants marketed, sold, or distributed generic enoxaparin and/or Lovenox® in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers.

g.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Damages Class have been injured and are threatened with further injury.

h.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Montana Code, §§ 30-14-101, *et seq*. and §§ 30-14-201, *et seq.*, and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

161.     Nebraska:  By reason of the foregoing, Defendants have violated Nebraska's Consumer Protection Act, Nebraska Revised Statues, §§ 59-1601, *et seq*. Plaintiffs on behalf of the Damages Class allege as follows:

a.     Defendants' unlawful conduct had the following effects: (1) generic enoxaparin and/or Lovenox® price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic enoxaparin and/or Lovenox® prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages

- 61 -

Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

b. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce and consumers.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Damages Class have been injured and are threatened with further injury.

d. Defendants' actions and conspiracy have had a substantial impact on the public interests of Nebraska and its residents.

e. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nebraska's Consumer Protection Act, Nebraska Revised Statues, §§ 59-1601, *et seq*., and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

162. <u>New Mexico:</u> By reason of the foregoing, Defendants have violated the New Mexico Unfair Practices Act, New Mexico Statutes, § 57-12-1, *et seq*. Plaintiffs on behalf of the Damages Class allege as follows:

a. Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic enoxaparin and/or Lovenox® was sold, distributed, or obtained in New Mexico. Defendants took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. This conduct on the part of the Defendants constituted "unfair or deceptive trade practices and unconscionable trade practices" in violation of New Mexico Statutes, § 57-12-3.

b. Defendants and their co-conspirators possessed the sole power to set prices of generic enoxaparin and/or Lovenox®, and used this power to conceal their price-fixing

- 62 -

conspiracy from Plaintiffs and members of the Damages Class. Defendants took advantage of

Plaintiffs' and members of the Damages Class' lack of knowledge to a grossly unfair degree,

within the meaning of New Mexico Statutes, § 57-12-2(E).

        c.    Defendants' unlawful conduct had the following effects: (1) price

competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and

eliminated throughout New Mexico; (2) prices for generic enoxaparin and/or Lovenox® were

raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3)

Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs

and the Damages Class paid supra-competitive, artificially-inflated prices for generic

enoxaparin and/or Lovenox®.

        d.    During the Class Period, Defendants' illegal conduct substantially

affected New Mexico commerce and consumers.

        e.    As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs and the Damages Class have been injured and are threatened with further injury.

        f.    Defendants have engaged in unfair competition or unfair or deceptive

acts or practices in violation of New Mexico Statutes, § 57-12-1, *et seq.*, and, accordingly,

Plaintiffs and the Damages Class seek all relief available under that statute.

    163.   <u>New York:</u> By reason of the foregoing, Defendants have violated New York

General Business Laws, § 349, *et seq.* Plaintiffs on behalf of the Damages Class allege as

follows:

        a.    Defendants agreed to, and did in fact, act in restraint of trade or

commerce by affecting, fixing, controlling and/or maintaining, at artificial and noncompetitive

levels, the prices at which generic enoxaparin and/or Lovenox® was sold, distributed or

obtained in New York and took efforts to conceal their agreements from Plaintiffs and the Damages Class.

b.      The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of New York General Business Laws, § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

c.      Defendants made certain statements about generic enoxaparin and/or Lovenox® that they knew would be seen by New York residents and these statements either omitted material information that rendered the statements they made materially misleading or affirmatively misrepresented the real cause of price increases for generic enoxaparin and/or Lovenox®.

d.      Defendants' unlawful conduct had the following effects: (1) generic enoxaparin and/or Lovenox® price competition was restrained, suppressed, and eliminated throughout New York; (2) generic enoxaparin and/or Lovenox® prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

e.      During the Class Period, Defendants' illegal conduct substantially affected New York commerce and consumers.

f.      During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic enoxaparin and/or Lovenox® in New York.

g.      Plaintiffs and members of the Damages Class seek all relief available pursuant to New York General Business Laws, § 349(h).

164.   North Carolina:  By reason of the foregoing, Defendants have violated North Carolina General Statutes, §§ 75-1.1, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic enoxaparin and/or Lovenox® was sold, distributed, or obtained in North Carolina.  Defendants took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.  Defendants and their co-conspirators possessed the sole power to set prices of generic enoxaparin and/or Lovenox®, and used this power to conceal their price-fixing conspiracy from Plaintiffs and members of the Damages Class.  Plaintiffs and members of the Damages Class were therefore unaware that they were being unfairly and illegally overcharged for generic enoxaparin and/or Lovenox®.

b.      Defendants' unlawful conduct had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout North Carolina; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs

- 65 -

and the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

c.  During the Class Period, Defendants marketed, sold, or distributed generic enoxaparin and/or Lovenox® in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

d.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Damages Class have been injured and are threatened with further injury.

e.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina General Statutes, §§ 75-1.1, *et seq.*, and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

165.  <u>Vermont:</u>  By reason of the foregoing, Defendants have violated the Vermont Consumer Protection Act, 9 Vermont Statutes, §§ 2453, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.  Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic enoxaparin and/or Lovenox® was sold, distributed, or obtained in Vermont.  Defendants took efforts to conceal their agreements from Plaintiffs and members of the Damages Class, including through affirmative misrepresentations and omissions of information important to Plaintiffs and members of the Damages Class.

b.  Defendants and their co-conspirators possessed the sole power to set prices of generic enoxaparin and/or Lovenox®, and used this power to conceal their price-fixing conspiracy from Plaintiffs and members of the Damages Class.  Plaintiffs and members of the

- 66 -

Damages Class were therefore unaware that they were being unfairly and illegally overcharged for generic enoxaparin and/or Lovenox®.

        c.        Defendants' unlawful conduct had the following effects: (1) price competition for generic enoxaparin and/or Lovenox® was restrained, suppressed, and eliminated throughout Vermont; (2) prices for generic enoxaparin and/or Lovenox® were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially-inflated prices for generic enoxaparin and/or Lovenox®.

        d.        During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce and consumers.

        e.        As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Damages Class have been injured and are threatened with further injury.

        f.        Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont Statutes, §§ 2453, *et seq.*, and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

## COUNT VII

### Unjust Enrichment
### (On Behalf of Plaintiffs and the Damages Class)

166.    Plaintiffs incorporate and reallege, as though fully set forth herein, each of the paragraphs set forth above.

167.    By reason of their unlawful conduct, Defendants should make restitution to Plaintiffs and the Damages Class.

- 67 -

168.    Plaintiffs and the Damages Class, by overpaying for generic enoxaparin, have conferred a benefit on Defendants.  Defendants knowingly accepted and retained the overpayment, such that it would be inequitable for Defendants to keep the inflated profits.

169.    Defendants have been unjustly enriched through overpayments by Plaintiffs and the Damages Class and the resulting profits enjoyed by Defendants as a direct result of such overpayments.  Plaintiffs' and the Damages Class's detriment and Defendants' enrichment were related to and flowed from the conduct challenged in this Complaint.

170.    Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred via overpayments by Plaintiffs and the Damages Class.

171.    Plaintiffs and Damages Class members in the following Indirect Purchaser Jurisdictions seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and Damages Class members in the Indirect Purchaser Jurisdictions may make claims on a *pro rata* basis:

      a.      Alabama;

      b.      Arizona;

      c.      Arkansas;

      d.      California;

      e.      District of Columbia;

      f.      Florida;

      g.      Hawaii;

      h.      Illinois;

      i.      Iowa;

      j.      Kansas;

k.      Maine;

l.      Massachusetts;

m.      Michigan;

n.      Minnesota;

o.      Mississippi;

p.      Missouri;

q.      Montana;

r.      Nebraska;

s.      Nevada;

t.      New Hampshire;

u.      New Mexico;

v.      New York;

w.      North Carolina;

x.      North Dakota;

y.      Oregon;

z.      South Dakota;

aa.      Tennessee;

bb.      Utah;

cc.      Vermont;

dd.      West Virginia; and

ee.      Wisconsin.

172.     It would be inequitable for Defendants to retain the benefit of these overpayments that were conferred by Plaintiffs and Damages Class members in the Indirect Purchaser Jurisdictions listed above.

173.     Plaintiffs and the Damages Class are entitled to return of these overpayments caused by the willful acts of Defendants either as damages or restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Class members pray for relief as set forth below:

A.     Certification of the action as a class action pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiffs as Class Representatives and their counsel of record as Class Counsel;

B.     A declaration that Defendants' conduct constituted: (1) an unlawful restraint of trade in violation of the federal and state statutes cited herein; and (2) unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes cited herein;

C.     Restitution and/or damages to members of the Damages Class, for their purchases of Lovenox® and/or generic enoxaparin at inflated prices;

D.     Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

E.     Pre-judgment and post-judgment interest on such monetary relief;

F.     Equitable relief in the form of restitution and/or disgorgement of all unlawful or illegal profits received by Defendants as a result of the anticompetitive conduct alleged herein;

G.     An injunction against Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them from in any manner

- 70 -

continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged

herein, or from entering into any other contract, conspiracy, or combination having a similar

purpose or effect, and from adopting or following any practice, plan, program or device having a

similar purpose or effect;

H.      The costs of bringing this suit, including reasonable attorneys' fees; and

I.      All other relief to which Plaintiffs and the members of the Classes may be entitled

at law or in equity.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury

on their claims.

Dated:  December 21, 2017                    Respectfully submitted,


/s/  *Brendan P. Glackin*
Brendan P. Glackin (*pro hac vice*)
Dean M. Harvey (*pro hac vice*)
Bruce W. Leppla (*pro hac vice*)
Katherine C. Lubin (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  946111-3339
Telephone:  (415) 956-1000
Facsimile:   (415) 956-1008

Mark P. Chalos (19328)
John T. Spragens (31445)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
150 Fourth Avenue, North, Suite 1650
Nashville, TN  37219-2423
(615) 313-9000
mchalos@lchb.com
jspragens@lchb.com

*Attorneys for Plaintiffs*

1480236.2

- 71 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 21st day of December, 2017, the foregoing document was filed electronically with the U.S. District Court for the Middle District of Tennessee. Notice of this filing was served via the court's electronic filing system on counsel listed below:

Michael P. Kenny (*pro hac vice*)
Teresa T. Bonder (*pro hac vice*)
Matthew D. Kent (*pro hac vice*)
D. Andrew Hatchett (*pro hac vice*)
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
Telephone: (404) 881-7000
Facsimile: (404) 881-7777

Thomas G. Rohback (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
Tel: (860) 275-8100
Fax: (860) 275-8101

Michael L. Keeley (*pro hac vice*)
Bradley D. Justus (*pro hac vice*)
AXINN, VELTROP & HARKRIDER  LLP
950 F Street, NW
Washington, DC 20004
Tel: (202) 912-4700
Fax: (202) 912-4701

Timothy L. Warnock (TN Bar No. 12844)
RILEY WARNOCK & JACOBSON, PLC
1906 West End Avenue
Nashville, TN 37203
Telephone: (615) 320-3700
Facsimile: (615) 320-3737

R. Dale Grimes (TN Bar No. 6223)
Virginia M. Yetter (TN Bar No. 031471)
BASS, BERRY & SIMS PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Telephone: (615) 742-6200

Attorneys for Sandoz Inc.

Attorneys for Momenta Pharmaceuticals, Inc.

/s/   Brendan P. Glackin
         Brendan P. Glackin

- 1 -