# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

THE HOSPITAL AUTHORTIY OF    )
METOPOLITAN GOVERNMENT OF    )
NASHVILLE AND DAVIDSON    )
COUNTY, TENNESSEE, d/b/a    )
NASHVILLE GENERAL HOSPITAL    )   **No. 3:15-cv-01100**
and AMERICAN FEDERATION OF    )   **CHIEF JUDGE CRENSHAW**
STATE, COUNTY AND MUNICPAL    )
EMPLOYEES DISTRICT COUNCIL 37    )
HEALTH & SECURITY PLAN,    )
    )
    Plaintiffs,    )
    )
v.    )
    )
MOMENTA PHARMACEUTICALS,    )
INC. and SANDOZ INC.,    )
    )
    Defendants.    )

## MEMORANDUM OPINION

Pending before the Court is Momenta Pharmaceuticals, Inc. ("Momenta") and Sandoz Inc.'s ("Sandoz") (collectively "Defendants") Motion to Dismiss for Lack of Jurisdiction Under Fed. R. Civ. P. 12(b)(2) (Lack of Personal Jurisdiction), Motion to Dismiss for Lack of Jurisdiction Under Fed. R. Civ. P. 12(b)(1) (Lack of Subject-Matter Jurisdiction), and Motion to Dismiss for Failure to State a Claim Under Fed. R. Civ. P. 12(b)(6). (Doc. Nos. 193, 195, 197.) Nashville General Hospital ("NGH") and American Federation of State, County and Municipal Employees District Council 37 Health & Security Plan ("DC 37") (collectively "Plaintiffs") have filed responses to Defendants' motions (Doc. Nos. 208, 209, 210), to which Defendants have replied (Doc. Nos. 213, 214, 215). For the reasons below, the Court will (1) grant Defendants' Rule 12(b)(1) motion to dismiss; (2) deny Defendants' Rule 12(b)(2) motion; and (3) grant in part and deny in part Defendants' Rule 12(b)(6) motion.

A. Procedural Background

On October 14, 2015, NGH filed its initial complaint against the Defendants, alleging four separate counts under the Sherman Antitrust Act ("Sherman Act"). (Doc. No. 1.) NGH sought damages, as well as declaratory and injunctive relief. (Id. at 27.) NGH brought its claims on behalf of itself and a nationwide class of persons and entities, pursuant to the Class Action Fairness Act of 2005 ("CAFA") and Fed. R. Civ. P. 23(a) and (b). (Id. at 6, 21.) As explained in more detail in Section B infra, the alleged Sherman Act violations centered on the role that Defendants played in a conspiracy to monopolize the production and distribution of enoxaparin, a generic version of the drug Lovenox®. (Id. at 4-23.)

In response to the complaint, Defendants filed a motion to transfer the case to the District of Massachusetts and a motion to dismiss. (Doc. Nos. 65, 68.) Momenta additionally filed a separate motion to dismiss or transfer for improper venue. (Doc. No. 62.) On September 29, 2016, Magistrate Judge Barbara Holmes entered a Report and Recommendation recommending that the motions be denied. (Doc. No. 114.) Defendants filed joint and separate objections to the Report and Recommendation. (Doc. Nos. 117, 119.) On March 21, 2017, the Court issued a Memorandum Opinion that adopted in part and declined to adopt in part the Report and Recommendation. (Doc. No. 134.) The Court dismissed NGH's Sherman Act claims, to the extent that NGH sought damages in connection with those claims. (Id. at 8-14.) The Court found that NGH did not have standing to seek damages for its Sherman Act claims under the "indirect purchaser rule." (Id.) However, NGH's Sherman Act claims were permitted to proceed on declaratory and injunctive theories of relief. (Id. at 16.)

Thereafter, NGH filed a motion for leave to file an amended complaint. (Doc. No. 140.) The amended complaint contained three primary changes: (1) the addition of DC 37 as a new

representative plaintiff; (2) the addition of various state antitrust and consumer protection claims; and (3) the addition of new substantive allegations pertaining to Defendants' alleged anticompetitive conduct. (Doc. No. 141 at 5.) Defendants filed a response in opposition. (Doc. No. 148.) Ultimately, Magistrate Judge Holmes granted Plaintiffs' motion for leave to file an amended complaint, and Plaintiffs filed their amended complaint on December 21, 2017. (Doc. No. 191.) Defendants then filed the instant motions to dismiss.

B. Factual Background

NGH is a metropolitan charity hospital that purchases certain drugs it administers, including the generic anticoagulant enoxaparin. (Doc. No. 191 at 6-7.) DC 37 is a non-profit health and welfare benefit plan covering public sector employees, retirees and their families. (Id.) Plaintiffs allege that they have, and will continue to, indirectly purchase and/or provide reimbursement for Lovenox® and enoxaparin. (Id. at 7-8.)

The drug at issue, enoxaparin, is used in the prevention and treatment of deep vein thrombosis and in the treatment of heart attacks. (Id. at 10.) Sanofi-Aventis ("Aventis"), a non-party to this lawsuit, brought enoxaparin to market in the United States under the brand name Lovenox® and held a patent on the drug, which was subsequently held to be unenforceable in 2007. (Id. at 10-11.)

However, Momenta is the assignee of a patent (the "886 Patent") for a chemical process used to test the quality of enoxaparin ("Method <207>"). (Id. at 13.) In 2003, Momenta entered into a collaboration agreement (the "Collaboration Agreement") with Sandoz, whereby Sandoz eventually began manufacturing and selling generic enoxaparin. (Id. at 11-14.) The Collaboration Agreement provided for profit-sharing between Momenta and Sandoz, with regard to Sandoz's sales of its generic enoxaparin, so long as Defendants remained the sole source of generic

enoxaparin in the United States. (Id. at 13.) Further, the Collaboration Agreement provided for Momenta to receive "milestone payments" if Sandoz remained the sole supplier of generic enoxaparin. (Id.) Essentially, the Collaboration Agreement provided Momenta with a powerful incentive to use whatever rights it had to prevent other parties from entering the generic enoxaparin market.

By 2007, Aventis had requested that the United States Pharmacopeial Convention ("USP") adopt criteria for enoxaparin that included a standardized test to assure that enoxaparin produced by drug companies in the United States met chemical criteria approved by the FDA.[1] (Id. at 16.) Aventis's proposed method for testing enoxaparin was Method <207>. (Id.) At that time, Aventis had a pending patent application for Method <207>. (Id. at 17.) Defendants, who participated in the relevant USP review panel, objected to Aventis having a patent that covered a standardized USP test, contending that the test, once adopted, should be free for anyone to use. (Id.) After discussions with USP, Aventis agreed to abandon its patent application. (Id. at 18.) However, unbeknownst to the USP panel, Momenta had its own patent application pending—the 886 Patent—that, when granted, would give Momenta patent rights that could be asserted against third parties that used Method <207>. (Id. at 18-19.) In December 2009, the USP approved and adopted Method <207> as the standardized test to assure enoxaparin quality, and the 886 Patent was issued shortly thereafter. (Id. at 13, 19.) Plaintiffs allege that, had Defendants disclosed their own application for the 886 Patent, the USP would have either required Momenta to abandon its patent

---

[1] The USP is a scientific nonprofit organization that sets standards for identity, strength, quality, and purity of medicines, food ingredients, and dietary supplements that are manufactured, distributed, and consumed worldwide. (Id. at 14.) USP standards are enforceable as binding by the United States Food and Drug Administration ("FDA"). 21 U.S.C. § 351(b).

rights, as it did with Aventis, or chosen an alternative test that would not have been subject to patent protection. (Id. at 19.)

Defendants became the first entities authorized by the FDA to produce generic enoxaparin. (Id. at 20.) Thereafter, Amphastar Pharmaceuticals, Inc. ("Amphastar"), a non-party to this case, received FDA approval to sell generic enoxaparin on September 19, 2011. (Id. at 21.) Upon approval, the FDA instructed Amphastar to use the USP compendium for enoxaparin, including Method <207>. (Id.) Two days later, Defendants sued Amphastar in the District of Massachusetts, contending that it was essentially illegal for Amphastar to comply with Method <207> and produce generic enoxaparin because it could not do so without infringing on the 886 Patent. (Id.) After filing their complaint, Defendants obtained a temporary restraining order and preliminary injunction preventing Amphastar from selling enoxaparin. (Id. at 22.) However, the U.S. Court of Appeals for the Federal Circuit stayed the preliminary injunction in January 2012 and vacated it in August 2012. (Id.)

In July 2013, the U.S. District Court for the District of Massachusetts granted Amphastar's motion for summary judgment, finding that Amphastar did not infringe on the asserted claims of the 886 Patent. (Id. at 22-23.) Defendants appealed the district court's order, and the U.S. Court of Appeals for the First Circuit vacated the district court's grant of summary judgment. (Id. at 23.) In July 2017, a jury found that Momenta's 886 Patent was invalid for lack of enablement and lack of written description. See Momenta Pharm., Inc. v. Amphastar Pharm., Inc., No. 1:11-cv-11681-NMG, Doc. No. 1081 (D. Mass. July 21, 2017) (jury verdict in favor of defendants).[2] The district

---

[2] The Court takes judicial notice of the District of Massachusetts proceedings, as those proceedings are public record and integral to the Amended Complaint. See Campbell v. Nationstar Mortg., 611 F. App'x 288, 291 (6th Cir. 2011) ("In addition to the allegations in the complaint, [the Court] may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice.").

court accepted post-trial briefing and, on February 7, 2018, issued its post-trial orders, upholding the jury's verdict. See Momenta Pharmaceuticals, Inc., Doc. Nos. 1134, 1135, 1136, 1137, 1138, 1139, 1149. Defendants have sought an appeal of this order before the Federal Circuit. See Momenta Pharm., Inc. v. Amphastar Pharm., Inc., Case No. 18-740, Doc. No. 1 (Fed. Cir. Mar. 29, 2018) (notice of appeal).

Plaintiffs, in their Amended Complaint, assert four counts under the Sherman Act, seeking declaratory and injunctive relief. (Doc. No. 191 at 30-35.) Plaintiffs allege that Defendants' anticompetitive conduct "is continuing and will continue unless enjoined by the Court." (Id.) Plaintiffs also claim, on behalf of themselves and members of the putative class, a host of state violations, pursuant to those states' antitrust, consumer protection, and unjust enrichment laws. (Id. at 35-73.)

C.  Defendants' Motion to Dismiss Under Federal Rule Civil Procedure 12(b)(1)

Defendants first filed a Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(1) (Lack of Subject Matter Jurisdiction). (Doc. No. 193.) Defendants' primary argument is that Plaintiffs lack Article III standing to pursue their Sherman Act claims for injunctive and declaratory relief. (Doc. No. 196 at 10-13.)  Defendants contend that Plaintiffs sole sought-after relief—permanent enjoinment of Defendants from asserting their rights in the 886 Patent against other potential entrants in the generic enoxaparin marketplace—would require this Court to prohibit future, hypothetical conduct. (Id. at 13.) Moreover, Defendants maintain that (1) it has been more than six years since they have sought to use the 886 Patent to bar others from entering the generic enoxaparin market; and (2) even if they wished to assert their 886 Patent rights to engage in anticompetitive conduct, the litigation in the District of Massachusetts prevents them from doing so. (Id. at 11-13.) Accordingly, Defendants argue that the Amended Complaint does

not allege facts showing a concrete threat of imminent harm, and, therefore, Plaintiffs fail to present the Court with a justiciable Article III case or controversy. (Id. at 13.)

1. Applicable Law

A motion pursuant to Federal Rule of Civil Procedure 12(b)(1) alleges that the Court does not have subject matter jurisdiction over the claims as presented. Fed. R. Civ. P. 12(b)(1). A motion that alleges lack of standing is properly characterized as a motion to dismiss for lack of subject matter jurisdiction. See Forest City Residential Mgmt., Inc. ex rel. Plymouth Square Ltd. Dividend Housing Ass'n v. Beasley, 71 F. Supp. 3d 715, 722 (E.D. Mich. 2014) (citing Stalley v. Methodist Healthcare, 517 F.3d 911, 916 (6th Cir. 2008)).

The Article III standing doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong. Spokeo, Inc. v. Robins, 136 S.Ct. 1540, 1547 (2016). Standing is the threshold question in every federal case. Warth v. Seldin, 422 U.S. 490, 498 (1975). In order to establish Article III standing, the plaintiff must have (1) suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendants; and (3) that is likely to be redressed by a favorable judicial decision. Spokeo, 136 S.Ct. at 1548. The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements. FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231 (1990). Where, as here, a case is at the pleading stage, the plaintiff must "clearly . . . allege facts demonstrating" each element of standing. Warth, 422 U.S. at 518.

To establish injury in fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992). For an injury to be particularized, it must affect the plaintiff in a distinct way. Whitmore v. Arkansas, 495 U.S.

7

149, 155 (1990). A concrete injury must be "de facto," in other words, it must actually exist. Spokeo, 136 S. Ct. at 1548. Moreover, "although 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is '*certainly* impending.'" Lujan, 504 U.S. at 564 n.2 (citing Whitmore, 495 U.S. 149 U.S. at 158 (emphasis in original)).

At issue in this case is whether Plaintiffs have sufficiently alleged the injury-in-fact element. Individuals who, like Plaintiffs, seek only injunctive or declaratory relief, must nonetheless show that they are under threat of suffering an injury in fact. Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009) (citation omitted). The "threat of a prospective injury must be real and immediate and not premised upon the existence of past injuries alone." Gaylor v. Hamilton Crossing CMBS, 582 F. App'x 576, 579 (6th Cir. 2014) (citing City of Los Angeles v. Lyons, 461 U.S. 95, 102-03 (1983)). "It is the reality of the threat . . . not the plaintiff's subjective apprehensions . . . the emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant." Lyons, 461 U.S. at 107 n. 8.

2. Application to Plaintiffs' Sherman Act Claims

Plaintiffs, in their Amended Complaint, allege that Defendants' anticompetitive conduct "is continuing and will continue unless enjoined by the Court." (Doc. No. 191 at 31-35.) As set out in greater detail in Plaintiffs' response to Defendants' Rule 12(b)(1) motion, Plaintiffs allege that they and the putative class were harmed beginning in September 2011 by paying supracompetitive prices resulting from Defendants' efforts to exclude Amphastar and other potential entrants from the generic enoxaparin market. (Doc. No. 208 at 13.) Plaintiffs argue that, because the Amended Complaint alleges that the harm to them and the putative class is "ongoing,"

they have standing to pursue injunctive and declaratory relief. (Id.) Plaintiffs contend that, until there is no possibility that the 886 Patent will be used to exclude competitors from the market—for example, through a permanent injunction barring Defendants from enforcing it (the relief Plaintiffs seek)—Plaintiffs will continue to be threatened with the prospect of future injury and have standing to seek injunctive relief. (Id. at 14.)

Here, the Court concludes that Plaintiffs have not made a sufficient threshold demonstration that they have Article III standing to pursue their Sherman Act claims for injunctive and declaratory relief.[3] In this particular case, Plaintiffs, pursuing only injunctive and declaratory relief, fail to show that they are under threat of suffering a prospective injury that is "real and immediate." Summers, 555 U.S. at 493 (emphasis added). To be sure, Plaintiffs have detailed a host of factual allegations regarding prior injuries that Defendants have allegedly inflicted. (See Doc. No. 191 at 4-30.) However, these prior injuries are insufficient to demonstrate the threat of an impending future injury. Lyons, 461 U.S. at 102-03.

Essentially, Plaintiffs' prospective injury theory is that (1) Defendants' ongoing appeal of their 886 Patent rights before the Federal Circuit might be successful; (2) this successful appeal might result in Amphastar, or other drug companies, being prevented from participating in the generic enoxaparin market; (3) if Defendants decide to enforce their regained 886 Patent rights. (Doc. No. 208 at 14.) Thus, Plaintiffs rely on a hypothetical chain of events, any of which may not occur. This is not "real and immediate" nor "certainly impending." Lujan, 504 U.S. at 564 n.2;

---

[3] As a preliminary matter, Plaintiffs argue that Defendants' Rule 12(b)(1) motion confuses jurisdictional and merits-based issues. (Doc. No. 208 at 9-10.) However, the Court is convinced that Defendants' Rule 12(b)(1) motion properly raises issues regarding Article III standing. Defendants do not argue that Plaintiffs have failed to satisfy certain statutory elements of federal antitrust law, rather, they raise a facial challenge to Plaintiffs' Article III standing to pursue the Sherman Act claims for injunctive and declaratory relief. (See Doc. No. 196.)

Lyons, 461 U.S. at 102–03. To be clear, Defendants, as a result of the District of Massachusetts litigation, cannot simply restart the alleged anticompetitive conduct through the assertion of their presently-invalid 886 Patent rights. The stopgap created by the District of Massachusetts litigation necessarily limits the Plaintiffs' ability to demonstrate that there is a real or immediate threat of prospective injury. Accordingly, because Plaintiffs' theory of prospective harm relies on a string of actions, the occurrence of any of which is speculative, its Sherman Act claims do not reach the level of imminency required to confer standing on a plaintiff seeking injunctive and declaratory relief in federal court. The Court will grant Defendants' Rule 12(b)(1) motion to dismiss, and Plaintiffs' Sherman Acts claims will be dismissed.

D.  Defendants' Motion to Dismiss Pursuant to Federal Rule Civil Procedure 12(b)(2)

In their second motion to dismiss, Defendants contend that this Court lacks personal jurisdiction over them regarding Plaintiffs' remaining state law claims.[4] (Doc. No. 193.) Defendants' argument primarily relies on the Supreme Court's recent decision in Bristol-Myers Squib Co. v. Superior Court, 137 S.Ct. 1773 (2017). (Doc. No. 194 at 9-14.) Defendants contend that, under the holding in Bristol-Myers, courts may not exercise personal jurisdiction over non-resident defendants for claims that arise outside the forum state. (Id. at 9.) Defendants assert that (1) they are both non-residents of Tennessee; (2) Plaintiffs' state law claims, brought under the laws of 30 non-Tennessee jurisdictions, necessarily arose out of purchase and reimbursement activity that occurred outside Tennessee; and, consequently (3) the Court lacks jurisdiction to hear

---

[4] The Court retains subject matter jurisdiction over Plaintiffs' state law claims pursuant to the Class Action Fairness Act, 28 U.S.C. §§ 1711, *et seq.*, which vests original jurisdiction in the district courts of the United States for any multi-state class action where the aggregate amount in controversy exceeds $5 million and where the citizenship of any member of the class of plaintiffs is different from that of any defendant. Accordingly, the Court proceeds to consider whether it has personal jurisdiction over the Defendants' with regard to Plaintiffs' remaining state law claims.

those claims. (Id. at 11-14.) Plaintiffs respond that (1) Sandoz consented to general personal jurisdiction in Tennessee by registering an agent for service of process in Tennessee; (2) Bristol-Myers does not apply to the instant class action; and (3) specific personal jurisdiction exists over the Defendants for all of the state law claims. (See Doc. No. 209.)

     1.  Applicable Law

Federal Rule of Civil Procedure 12(b)(2) allows a defendant to file a motion to dismiss for lack of personal jurisdiction. "The Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts," Walden v. Fiore, 134 S. Ct. 1115, 1121 (2014), and, thus, in order for the Court to have personal jurisdiction over Defendants, Plaintiffs must show that Defendants have (or had) sufficient minimum contacts with Tennessee such that "the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"[5] International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). Minimum contacts exist where a defendant purposefully avails itself of the privilege of conducting activities within the forum state.[6] Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985).

---

[5] Plaintiffs have the burden of showing personal jurisdiction but "that burden is 'relatively slight' where, as here, the . . . court rules without conducting an evidentiary hearing." MAG IAS Holdings, Inc. v. Schmuckle, 854 F.3d 894, 899 (6th Cir. 2017) (citing Air Prods & Controls Inc. v. Safetech Int'l Inc., 503 F.3d 544, 549 (6th Cir. 2007) (quotation omitted)). "To defeat dismissal in this context, [Plaintiffs] need make only a prima facie showing that personal jurisdiction exists." Id. Nevertheless, "[i]n response to a motion to dismiss, the plaintiff may not stand on his pleadings, but must show the specific facts demonstrating that the court has jurisdiction." Miller v. AXA Winterthur Ins. Co., 694 F.3d 675, 678 (6th Cir. 2012) (citing Theunissen v. Matthews, 935 F.2d 1454, 1458 (6th Cir. 1991)).

[6] "Tennessee's long-arm statute has been interpreted to be 'coterminous with the limits on personal jurisdiction imposed' by the Due Process Clause of the United States Constitution," and, thus, "'the jurisdictional limits of Tennessee law and of federal constitutional law of due process are identical.'" Intera Corp. v. Henderson, 428 F.3d 605, 616 (6th Cir. 2005) (citation omitted). Because of that, "the court 'need only determine whether the assertion of personal jurisdiction violates constitutional due process.'" Id. (citation omitted).

"Personal jurisdiction maybe found either generally or specifically." Miller, 694 F.3d at 678 (quoting Air Prods. & Controls, Inc., 503 F.3d at 549-50). "General jurisdiction depends on continuous and systematic contact with the forum state, so that the courts may exercise jurisdiction over any claims a plaintiff may bring against the defendant." Id. at 678-79 (quoting Kerry Steel, Inc. v. Paragon Indus., Inc., 106 F.3d 147, 149 (6th Cir. 1997)). "Specific jurisdiction, on the other hand, grants jurisdiction only to the extent that a claim arises out of or relates to a defendant's contacts in the forum state." Id.

2. Specific Personal Jurisdiction

Plaintiffs argue that Defendants are both subject to specific personal jurisdiction and, with respect to Sandoz, general personal jurisdiction in Tennessee. Because the Court finds that the Defendants, and their state law claims, are subject to specific personal jurisdiction, the Court does not address any other arguments. As noted, specific jurisdiction deals with a Defendant's contacts with the forum state relating to the claims at issue. The Sixth Circuit has identified three criteria for specific jurisdiction:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

AlixPartners, LLP v. Brewington, 836 F.3d 543, 549-50 (6th Cir. 2016) (quoting Air Prods., 503 F.3d at 550). "If any of the three requirements is not met, personal jurisdiction may not be invoked." Miller, 694 F.3d at 680. That is, "each criterion represents an independent requirement, and failure to meet any one of the three means that personal jurisdiction may not be invoked." LAK Inc. v Deer Creek Enters., 885 F.2d 1293, 1303 (6th Cir. 1989). The court must have personal jurisdiction over each

defendant and as to each asserted claim. <u>Bd. of Forensic Document Exam'rs, Inc. v. ABA</u>, No. 16-cv-2641, 2017 WL 549031, at *3 (W.D. Tenn. Feb. 9, 2017) (citation omitted).

Defendants contend that DC 37 and NGH assert putative class action claims as non-Tennessee residents, on behalf of non-Tennessee residents, and under non-Tennessee laws, based on enoxaparin purchases made outside Tennessee. (Doc. No. 194 at 9.) Indeed, Plaintiffs do assert 69 state-law claims under the laws of 30 jurisdictions. (Doc. No. 191 at 35-73.) Defendants argue that, under <u>Bristol-Myers</u>, this Courts lacks jurisdiction to hear those non-Tennessee state law claims. (Doc. No. 194 at 11-14.)

In <u>Bristol-Myers</u>, a group of plaintiffs, the majority of which were not California residents, filed eight separate complaints in California Superior Court, alleging that the drug Plavix had damaged their health. <u>See</u> 137 S. Ct. at 1178. In holding that the California Superior Court lacked jurisdiction over the claims brought by those non-resident plaintiffs, the Supreme Court explained that "there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State." <u>Id.</u> at 1780. The Supreme Court noted that the non-residents were not prescribed Plavix in California, did not purchase Plavix in California, did not ingest Plavix in California, and were not injured by Plavix in California. <u>Id.</u> at 1781. Neither the existence of regular in-state sales, nor the fact that other plaintiffs were prescribed, obtained and ingested Plavix in California, was enough to confer jurisdiction over the non-resident claims. <u>Id.</u> The Supreme Court stressed that "[w]hat is needed—and what is missing here—is a connection between the forum and the specific claims at issue." <u>Id.</u> However, whether <u>Bristol-Myers</u> extends to class actions, like the instant case, is an open question. <u>See id.</u> at 1789 n. 4 (Sotomayor, J., dissenting) ("The Court today does not confront the question of whether its opinion here would also apply to a class action in which a plaintiff injured in the forum State seeks

to represent a nationwide class of plaintiffs, not all of whom were injured there."); <u>see also</u> <u>Chavez v. Church & Dwight Co., Inc.</u>, No. 17-C-1948, 2018 WL 2238191, at *10 (N.D. Ill. May 16, 2018) ("Whether <u>Bristol-Myers</u> extends to class actions is a question that has divided courts across the country."); <u>Molock v. Whole Foods Mkt., Inc.</u>, 317 F. Supp. 3d 1, 5 (D.D.C. 2018) ("There are only district court cases, and among them there is a near even split on the question.").

In applying <u>Bristol-Myers</u> to the instant action, the Court first notes that no Court of Appeals has addressed this issue. Second, although district courts are divided on whether <u>Bristol-Myers</u> applies in the federal class action context, the cases have "universally held that in a putative class action (1) courts are only concerned with the jurisdictional obligations of the named plaintiffs; and (2) unnamed class members are irrelevant to the question of specific jurisdiction." <u>See</u> <u>Cheruns v. Logitech, Inc.</u>, No. 17-673-FLW, 2018 WL 1981481, at *7 (D. N.J. April 27, 2018). NGH, as a Tennessee resident, purchased its enoxaparin in Tennessee, and, therefore, there is a sufficient connection between "the forum [Tennessee]" and the "underlying controversy [the sale of generic enoxaparin]" that "takes place in the forum state." <u>See id.</u> at 1780. Although there are no allegations in the Amended Complaint regarding where, or from whom, DC 37 purchased its enoxaparin, DC 37 has alleged that it indirectly purchased enoxaparin that was intended for consumption by its members, who reside in multiple states, including Tennessee. (Doc. No. 191 at 7-8.) The Court finds that DC 37's allegation regarding its indirect purchase of enoxaparin is sufficient to confer specific personal jurisdiction over the Tennessee state law claims, especially considering the "relatively slight" burden it faces here. <u>See</u> <u>MAG IAS Holdings, Inc</u>., 854 F.3d at 899. Unlike in <u>Bristol-Myers</u>, here, DC 37 can show an "affiliation between the forum and the underlying controversy" sufficient to confer specific personal jurisdiction because the indirectly

purchased enoxaparin was intended for distribution and ultimate consumption by Tennessee members. See Bristol-Myers, 137 S. Ct. at 1780.

Further, because there is specific jurisdiction over Plaintiffs' Tennessee state law claims, they may advance their other various state law claims. See Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 778-79 (1984). In Keeton, a New York resident sued Hustler in New Hampshire, claiming that she had been libeled in five issues of the magazine, which was distributed throughout the country, including in New Hampshire. Id. at 776. The Supreme Court relied principally on the connection between the circulation of the magazine in New Hampshire and the damages allegedly caused within the state to conclude that specific jurisdiction was present for the non-resident plaintiff's multistate damages claims. Id. Likewise, here, Defendants' activities with regard to sales of generic enoxaparin have allegedly damaged Plaintiffs, including within Tennessee, and, therefore, Plaintiffs may bring not only their Tennessee claims, but their various other state law claims as well.[7]

As to Defendants' argument regarding Bristol-Myers, the Court agrees with Plaintiffs and concludes that Bristol-Myers does not apply to class actions. In reaching this decision, the Court is persuaded by the analyses of several courts that have aptly confronted the issue. These courts have focused their analyses on the sufficient distinctions between class and mass tort actions (as was the case in Bristol-Myers). See, e.g., Sanchez v. Launch Tech. Workforce Sols., LLC, 297 F. Supp. 3d 1360, 1365-69 (N.D. Ga. 2018) (stating that, unlike in class actions, each plaintiff is a real party in interest in a mass tort action); In re Chinese–Manufactured Drywall Prods. Liab.

---

[7] Although Defendants argue that Keeton's analysis was refuted by Bristol-Myers, the latter analysis was limited to considering the former decision in the context of mass torts. See Bristol-Myers, 137 S.Ct. at 1782. Further, as explained below, the Court concludes that Bristol-Myers is not applicable to class actions.

Litig., No. 09-2047, 2017 WL 5971622, at *12–14 (E.D. La. Nov. 30, 2017) ("Class actions, nonetheless, are different from mass torts."); Molock v. Whole Foods Mkt., Inc., 297 F. Supp. 3d 114, 126 (D.D.C. 2018) ("[U]nlike in a mass tort action, 'for a case to qualify for class action treatment, it needs to meet the additional due process standards for class certification under Rule 23 . . .'"). Specifically, in a mass tort action, the plaintiff is a real party in interest to the complaints, whereas, in a putative class action, one or more plaintiffs seeks to represent the rest of similarly situated plaintiffs and the named plaintiffs are the only plaintiffs actually named in the complaint. See Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 155 (1982) ("The class-action device was designed as an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."). Additionally, unlike a mass tort action, "for a case to qualify for class action treatment, it needs to meet the additional due process standards for class certification under Rule 23—numerosity, commonality, typicality, adequacy of representation, predominance and superiority." In re Chinese–Manufactured Drywall, 2017 WL 5971622, at *14. "These additional elements of a class action supply due process safeguards not applicable in the mass tort context." Molock, 297 F. Supp. 3d at 126.

The Court therefore concludes that it has specific personal jurisdiction over Defendants regarding Plaintiffs' remaining state law claims. Accordingly, the Court will deny Defendants' Rule 12(b)(2) motion to dismiss the Amended Complaint for lack of personal jurisdiction.

E. Defendants' Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

Defendants' final motion to dismiss, pursuant to Rule 12(b)(6), advances a host of arguments, all of which are aimed at Plaintiffs' various state law claims. (Doc. No. 198.) Defendants assert that (1) the statute of limitations bars almost all of Plaintiffs' state law claims; (2) Plaintiffs do not have standing to assert their state law claims; and (3) Plaintiffs' fail to meet

the state law pleading requirements for their state law claims. (Id.) Plaintiffs respond that (1) their state law claims are timely; (2) they have standing to assert those claims; and (3) their Amended Complaint adequately pleads the elements of each state law claim. (See Doc. No. 210.) The Court will address each argument in turn.

1. Statute of Limitations

Defendants argue that the challenged anti-competitive conduct that is the subject of Plaintiffs' state law claims ended January 25, 2012, when the Federal Circuit stayed the preliminary injunction preventing Amphastar from entering the generic enoxaparin marketplace. (Doc. No. 198 at 13.) As a result, Defendants contend that the statute of limitations began running on January 26, 2012. (Id.) Because NGH sought leave to amend its complaint on June 9, 2017 (and filed the Amended Complaint on December 21, 2017), over five years passed after expiration of the preliminary injunction. (Id. at 14.) Consequently, Defendants argue that Plaintiffs' state law claims are barred by various state statutes of limitation. (Id.) Defendants also assert that the continuing violation doctrine, fraudulent concealment doctrine, and the discovery rule did not toll the various state statutes of limitations periods. (Id. at 14-19.) Plaintiffs respond that each of these doctrines independently applies to extend the state statutes of limitations, making their state law claims timely. (Doc. No. 210 at 10-19.) The Court finds that the continuing violation doctrine extended the Plaintiffs' various limitations periods.[8]

In an antitrust lawsuit, the cause of action accrues and the accompanying limitations period commences "each time a defendant commits an act that injures the plaintiff's business." In re Southeastern Milk Antitrust Litig., 555 F. Supp. 2d 934, 946-47 (E.D. Tenn. 2008) (citation

---

[8] Accordingly, the parties' arguments regarding the fraudulent concealment doctrine and the discovery rule are not discussed.

omitted). "For statute of limitations purposes . . . the focus is on the timing of the causes of injury, i.e. the defendant's overt acts, as opposed to the effects of the overt acts." DXS, Inc. v. Siemens Medical Systems, Inc., 100 F.3d 462, 467 (6th Cir. 1996) (citing Peck v. General Motors Corp., 894 F.2d 844, 849 (6th Cir. 1990)). A continuing antitrust violation is one in which the plaintiff's interests are repeatedly invaded. Peck, 894 F.2d at 849 (quoting Pace Indus., Inc. v. Three Phoenix Co., 813 F.2d 234, 237 (9th Cir.1987)).

When a plaintiff alleges a continuing antitrust violation, the cause of action "accrues each time a plaintiff is injured by an act of defendants." Barnosky Oils, Inc. v. Union Oil Co. of California, 665 F.2d 74, 81 (6th Cir. 1981). However, even in the event of an alleged continuing violation, "an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act." Peck, 894 F.2d at 849. Such an overt act involves: (1) a new and independent act that is not merely a reaffirmation of a previous act; (2) that inflicts new and accumulating injury on the plaintiff. In re Southeastern Milk Antitrust Litig., 555 F. Supp. 2d at 947.

Plaintiffs allege ongoing harm in light of overpaying for generic enoxaparin as a result of Defendants' anti-competitive conduct. (Doc. No. 191 at 24-28.) The Amended Complaint alleges that the wholesale price of generic enoxaparin did not begin to decline until May 2012 and subsequently began plummeting in 2014, until which time Plaintiffs allegedly suffered hundreds of millions dollars in overcharges. (Id.) As noted in Magistrate Judge Holmes's previous order allowing Plaintiffs to amend their complaint, the Supreme Court, in Klehr v. A.O. Smith Corporation, directly addressed what constitutes a "continuing violation" in an ongoing price-fixing conspiracy:

> Antitrust law provides that, in the case of a "continuing violation" say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, "each overt act that is part of the violation and that injures the plaintiff," e.g., each sale to the plaintiff, "starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times."

521 U.S. 179, 189 (1997).

Defendants contend that <u>Klehr</u> is inapplicable because the Amended Complaint does not allege a price-fixing agreement. (Doc. No. 198 at 15.) Defendants argue that Plaintiffs' allegations focus on "discrete past actions involving the enforcement of a patent to the exclusion of a competitor." (<u>Id.</u>) The Court finds this characterization of the allegations unpersuasive. Plaintiffs' allegations detail a price-fixing conspiracy between Sandoz and Momenta, based on enforcement of the 886 Patent, in order to (1) prevent new entrants from entering the generic enoxaparin market; thereby (2) keeping prices artificially inflated. (<u>See</u> Doc. No. 191 at 24-28.) Thus, under <u>Klehr</u>, each time Defendants sold enoxaparin to Plaintiffs at supracompetitive prices, which, as alleged in the Amended Complaint, extended well past May 2012, the statutory period started again. <u>See</u> <u>Klehr</u>, 521 U.S. at 189. Accordingly, because Plaintiffs allege that Defendants wrongfully sold them enoxaparin at supracompetitive prices until at least 2014, and each sale restarted the five year statute of limitations, the continuing violation doctrine extended the statute of limitations period. Plaintiffs' state law claims are timely.

2.  Standing for State Law Claims

Defendants next argue that Plaintiffs do not have standing to bring claims under the laws of the states where they do not reside and where they did not purchase generic enoxaparin. (Doc. No. 198 at 19-20.) Plaintiffs respond that Defendants confuse the issue of standing with the adequacy of class representation and argue that, in accordance with <u>Fallick v. Nationwide Mut. Ins. Co.</u>, 162 F.3d 410, 423 (6th Cir. 1998), the ability of Plaintiffs to seek relief on behalf of

unnamed class members residing in the other 30 jurisdictions should be determined as part of the class certification process. (Doc. No. 210 at 19-21.)

The Sixth Circuit has not directly reached the question of whether class certification must be addressed before considering standing for claims arising under state statutes in which a named plaintiff is not resident. District courts have pursued divergent paths to resolve such standing challenges. Compare In re Packaged Ice Antitrust Litig. (Packaged Ice II), 779 F. Supp. 2d 642, 657 (E.D. Mich. 2011) (addressing standing before class certification) with Hovering v. Transnation Title Insur. Co., 545 F. Supp. 2d 662, 667 (E.D. Mich. 2008) (postponing standing analysis until class certification). The Court concludes that the weight of authority suggests that the better course is to defer deciding the issue of standing on state law claims until the class certification stage. See In re Cast Iron Soil Pipe And Fittings Antitrust Litig., No. 1:14-MD-2508, 2015 WL 5166014, at *19 (E.D. Tenn. June 24, 2015) ("If the Court were to decide the standing issue at this juncture on the basis that the named plaintiffs do not reside in some of the states under whose laws they bring claims on behalf of the class, it would not be giving due appreciation to the complex nature of Article III standing in class actions and the nuances of class certification."); see also In re Auto. Parts Antitrust Litig., No. 12-MD-02311, 2013 WL 2456612, at *11 (E.D. Mich. June 6, 2013) ("[T]he Court finds the better path is to defer this issue until the class certification stage."). Waiting until the class certification stage will enable the Court to most properly analyze complex issues of standing. Accordingly, the Court will defer deciding whether the Plaintiffs have standing to assert their various state law claims until the class certification stage.

   3.   State Law Pleading Requirements

Defendants next argue that the Amended Complaint fails to adequately plead the state law claims. (Doc. No. 198 at 22-27.) Defendants' primary argument is that Plaintiffs fail to establish a

sufficient nexus to numerous states for purposes of the antitrust and consumer protection statutes of those states. (Id. at 22-23.)

        i.    Intrastate Nexus

The parties are in agreement that the antitrust statutes of certain jurisdictions require a plaintiff to allege a nexus between a defendant's conduct and intrastate commerce; boilerplate allegations are insufficient. (Doc. Nos. 198 at 22-23, 210 at 22-25.) The parties disagree as to whether the allegations in the Amended Complaint satisfy the pleading requirements. (Id.) Those jurisdictions at issue include Arizona, the District of Columbia, Maine, Minnesota, Mississippi, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Wisconsin, and West Virginia. (Doc. No. 198 at 22-23.) Defendants also maintain that the consumer protection statutes for California, Nebraska, New York, and North Carolina require the same intrastate nexus, and, therefore, for these same reasons, Plaintiffs fail to adequately plead their state law consumer protection claims for those states. (Id. at 23.)

Plaintiffs allege that, in each aforementioned jurisdiction, Defendants' anticompetitive conduct reduced competition and increased prices, causing a substantial effect on commerce within the jurisdiction. (Doc. No. 191 at 35-57.) The "intrastate effects" requirement is met at the pleading stage by a plaintiff's allegations, like those in the instant case, claiming that the anticompetitive conduct caused supracompetitive price effects in the relevant jurisdictions. See In re Automotive Parts Antirust Litig., 29 F. Supp. 3d 982, 1010 (E.D. Mich. 2014) (holding that allegations that anticompetitive conduct caused supracompetitive price effects in relevant jurisdictions meets the intrastate effects requirement); In re Chocolate Confectionary Antitrust Litig., 602 F. Supp. 2d 538, 581 (M.D. Pa. 2009) (alleging a nationwide price fixing scheme that resulted in price increases in Nevada and elsewhere sufficiently alleged intrastate effects).

The Court finds that Plaintiffs' set forth facts sufficient at the pleading stage, identifying the relevant jurisdictions and the effect on competition in each of these jurisdictions, to allege the requisite intrastate effects. For these same reasons, Plaintiffs' intrastate nexus allegations are also sufficient to state a claim under the consumer protection statutes of California, New York, and North Carolina.[9]

> ii.     Other State Antitrust Claim Limitations and State Law Consumer Protection Claims

Defendants next contend that Plaintiffs cannot maintain their antitrust claim under Utah state law, as only a person who is a citizen or resident of Utah may bring an action for antitrust violations under that state's antitrust statute. (Doc. No. 198 at 24.) Plaintiffs do not dispute that only citizens or residents of Utah may recover under its antitrust law, but argue that the issue is related to standing and better decided at the class certification stage. (Doc. No. 210 at 25.) Defendants also assert that, under the consumer protection laws of Massachusetts, Missouri, Montana, and Vermont only consumers that purchase a product for personal or household use may bring consumer protection claims. (Doc. No. 198 24-25.) Further, Defendants contend that Plaintiffs' Montana consumer protection claim fails because Montana law does not allow consumer protection class actions. (Id. at 25-26.)

Plaintiffs first respond that the Massachusetts and Montana consumer protection statutes no longer include the limiting "personal or household use" language. (Doc. No. 210 at 26-27.) Further, Plaintiffs argue that Vermont's consumer protection statute expressly contemplates suits involving individuals who purchase goods for use or benefit in their business. (Id. at 28.) Finally,

---

[9] Defendants argue, and Plaintiffs conceded, that Alabama's antitrust law does not provide a cause of action in the instant case. (Doc. Nos. 198 at 24, 210 at 22 n. 19.) Therefore, the Court will dismiss that claim with prejudice.

Plaintiffs maintain the Missouri's consumer protection statute permits suit, even where the product is not purchased for personal or household use. (Id. at 29.)

The parties accurately note that only citizens or residents of Utah may recover under its antitrust law. See Utah Code § 76-10-3109(1)(a). However, Plaintiffs assert allegations on behalf of a putative class that presumably includes Utah citizens and residents. (See Doc. No. 191 at 27-30, 54-55.) Allegations that members of the putative class presumably include Utah citizens and residents are sufficient to overcome a motion to dismiss. See In re Liquid Aluminum Sulfate Antitrust Litig., No. CV-16-MD-2687-JLL, 2017 WL 3131977, at *28 (D. N.J. July 20, 2017) (citing In re Asacol Antitrust Litig., 2016 WL 4083333, *13 (D. Mass. July 20, 2016)). Further, Defendants essentially raise the issue of whether Plaintiffs have standing to pursue the Utah antitrust claim, and, as noted above, this issue is better decided at the class certification state. See Fallick, 162 F.3d at 423. For this same reason, the Court will also not decide the statutory standing issue with regard to Plaintiffs' Massachusetts, Missouri, Montana, and Vermont consumer protection claims, as Defendants' argument again centers on whether Plaintiffs' have standing to pursue those claims. Accordingly, the Court will not dismiss said claims at this juncture.

   iii. Unjust Enrichment Claims

Defendants assert that Plaintiffs' unjust enrichment claims fail for almost half of the state jurisdictions (14 of 31) on the ground that Plaintiffs failed to to allege that they provided a direct benefit to Defendants. (Doc. No. 198 at 26.) Defendants also argue that Plaintiffs' unjust enrichment claims, under the laws of Arizona, Hawaii, Massachusetts, Minnesota, and Tennessee, fail because Plaintiffs do not plead absence of a legal remedy. (Id. at 27.) Finally, Defendants contend that Plaintiffs' California unjust enrichment claim fails because California does not recognize a cause for unjust enrichment. (Id.) Plaintiffs respond that (1) the Amended Complaint

adequately pleads a direct benefit to Defendants and absence of a legal remedy; and (2) California recognizes unjust enrichment claims where the claim arises out of rights based on other laws. (Doc. No. 210 at 32-33.)

With respect to Plaintiffs' unjust enrichment claims, indirect purchasers confer a benefit only on others in the chain of distribution from whom they purchase. See In re Aftermarket Filters Antitrust Litig., No. 08-C-2883, 2010 WL 1416259, at *3 (N.D. Ill. Apr. 1, 2010) ("Only the direct purchasers have conferred a direct benefit on defendants.") However, courts considering indirect consumer price-fixing claims have denied dismissal of unjust enrichment claims where the claims arise out of the alleged antitrust violations that resulted in overpayment. See In re Automotive Parts Antitrust Litig., 29 F. Supp. 3d at 1029. Plaintiffs allege that they conferred a benefit on Defendants in the form of overpayments, resulting in Defendants enjoying profits flowing from the anti-competitive conduct. (Doc. No. 191 at 71.) The Court finds these allegations sufficient to state an unjust enrichment claim under those states' laws. However, because Plaintiffs did not plead absence of a legal remedy, their unjust enrichment claims under the laws of Arizona, Hawaii, Massachusetts, Minnesota, and Tennessee will be dismissed. Moreover, with regard to Plaintiffs' California unjust enrichment claim, California does not recognize unjust enrichment, and, therefore, this claim is also dismissed. See Hill v. Roll Int'l Corp., 195 Cal. App. 4th 1295, 1307 (Cal. Ct. App. 2011) ("Unjust enrichment is not a cause of action . . ."); Levine v. Blue Shield of Cal., 189 Cal. App. 4th 1117, 1138 (Cal. Ct. App. 2010) (holding that there is no cause of action in California for unjust enrichment); accord Fraley v. Facebook, 830 F.Supp.2d 785, 814 (N.D. Cal. 2011) ("Plaintiffs' unjust enrichment claim does not properly state an independent cause of action and must be dismissed.").

F. <u>Conclusion</u>

For the foregoing reasons, Defendants' Motion to Dismiss for Lack of Jurisdiction Under Fed. R. Civ. P. 12(b)(2) (Lack of Personal Jurisdiction) will be denied, Defendants' Motion to Dismiss for Lack of Jurisdiction Under Fed. R. Civ. P. 12(b)(1) (Lack of Subject-Matter Jurisdiction) will be granted, and Defendants' Motion to Dismiss for Failure to State a Claim Under Fed. R. Civ. P. 12(b)(6) will be granted in part and denied in part. The case will proceed on the remaining state law claims.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE