# EXHIBIT 5

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| THE HOSPITAL AUTHORITY OF METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, d/b/a NASHVILLE GENERAL HOSPITAL and AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES DISTRICT COUNCIL 37 HEALTH & SECURITY PLAN,<br><br>Plaintiffs,<br><br>v.<br><br>MOMENTA PHARMACEUTICALS, INC. and SANDOZ INC.,<br><br>Defendants. | Civil Action No. 3:15-cv-01100<br><br>Chief Judge Waverly D. Crenshaw, Jr.<br>Magistrate Judge Barbara D. Holmes |

**PLAINTIFFS' PROPOSED TRIAL MANAGEMENT AND CLAIMS ADMINISTRATION PLAN**

**I.       Introduction**

Plaintiffs have moved to certify a Class of indirect purchasers of Enoxaparin. Plaintiffs submit this proposed Trial Management and Claims Administration Plan outlining how they intend to prosecute the antitrust, consumer protection, and unjust enrichment claims of the proposed Class at trial. While "[t]here is no requirement that plaintiffs must submit a formal trial plan for purposes of class certification," *Palombaro v. Emery Fed. Credit Union*, No. 1:15-CV-792, 2017 WL 213071, at *8 (S.D. Ohio Jan. 17, 2017), Plaintiffs submit the below proposals to assist the Court in properly managing trial in this case.

Plaintiffs propose the Court elect one of two viable routes for trial. The first route ("Version 1") would involve a single-phase trial, at which Plaintiffs would present to the jury evidence concerning Momenta and Sandoz's antitrust violation, followed by evidence of class-wide damages. The jury would receive special verdict forms asking questions about facts needed to establish Defendants' antitrust violation as well as facts needed to establish their violation of consumer protection and unjust enrichment laws of the various jurisdictions, as delineated further below, as well as class-wide damages. Based on the verdict forms, the Court would determine under which jurisdictions' laws Plaintiffs have established liability. The Court would then reduce the aggregate award to account for any jurisdiction(s) as to which Plaintiffs' proof did not succeed. The Court would allocate the net damages to each remaining jurisdiction to calculate multiples of damages, if permitted by that jurisdiction's law. These reductions and allocations would be proportional to each state's current population, using the same Census Bureau data originally used to generate the aggregate number. Plaintiffs believe a trial under a single-phase plan could be accomplished in three weeks or less (inclusive of jury selection and opening and closing statements).

1

The second route ("Version 2") involves a two-phase trial for establishing Defendants' liability and the damages owed to the Class. The only advantage of bifurcating is that it does not depend on the Court to reduce the aggregate damages, if necessary. In Phase I, Plaintiffs would present to the jury evidence concerning Momenta and Sandoz's antitrust violation. Assuming liability is established in Phase I, the jury will determine in Phase II the aggregate amount of damages owed by Defendants for states as to which liability has been established. The Court would then allocate the damages per state and multiply them as required by the respective jurisdictions' laws to arrive at a final judgment. Plaintiffs believe a bifurcated trial will take slightly longer than a single-phase trial, to account for additional opening and closing statements and the fact that certain experts might have to take the stand twice.

Plaintiffs believe Version 1 presents a workable approach given the Court's busy trial docket and the need to proceed efficiently to avoid unnecessarily burdening the jury. If, however, the Court prefers a trial plan modeled on Version 2, which has been adopted in various forms in pharmaceutical antitrust class actions similar to this one, Plaintiffs will be equally ready to prosecute their claims in that format. Indeed, "the U.S. Court of Appeals for the Sixth Circuit has observed that a trial plan including bifurcated proceedings may be used by courts as a case management tool." *In re Tennessee Valley Auth. Ash Spill Litig.*, No. 3:09-CV-006, 2011 WL 3471000, at *2 (E.D. Tenn. Aug. 8, 2011) (bifurcating into liability and damages phases).

Whichever route the Court chooses, after trial claims will be paid to individual members of the Class (i.e., hospitals, and third-party payors, and people without insurance that purchased from pharmacies) based on the amount of each claimant's actual Lovenox and/or generic enoxaparin purchases through a claims administration process that will be subject to final approval by the Court.

## II. Details of Trial Management Plan: Version 1

Because the state statutes under which Plaintiffs bring their antitrust claims are interpreted in conformity with the federal Sherman Act, as explained in the memorandum to which this document is attached as an exhibit (at p. 21), Plaintiffs' claims can be jointly prosecuted in a single trial. The same core common evidence will also be used to establish Plaintiffs' consumer protection law and unjust enrichment claims. In a single phase, without bifurcation, the trial will include:

### 1. Preliminary Instruction to the Jury

At the commencement of the trial, jurors will be provided with a summary of the key factual and legal issues that will be at issue during the trial. *Manual for Complex Litigation (Fourth)* § 12.432 (2004). This summary will explain that because this case is brought on behalf of indirect purchasers in different jurisdictions, jurors will also hear evidence relevant to certain jurisdictions' legal requirements, on which they will receive more instruction before beginning their deliberation. Although the final instructions given to the jurors at the end of the trial will govern the jurors' deliberations, these preliminary instructions will orient the jurors to the evidence they will see and hear throughout trial.[1]

### 2. Opening Statements

The parties will present opening statements.

### 3. Presentation of Evidence

Plaintiffs will submit proof that Defendants pursued a conspiracy involving deception of the USP into adopting a standard for the manufacture of generic enoxaparin that allowed

---

[1] *E.g.*, *In re Nexium (Esomeprazole) Antitrust Litig.*, No. 1:12-md-02409-WGY (D. Mass. Oct. 14, 2014), ECF No. 1051 (proposed preliminary jury instructions for phase I of trial on behalf of all plaintiffs).

Defendants to use patent infringement litigation to exclude competitors, to the detriment of the Class. Plaintiffs' evidence will demonstrate, among other things, that:

- Dr. Zachary Shriver, a named inventor of the '886 patent, participated in U.S. Pharmacopeia ("USP") panels relating to Enoxaparin and did not disclose his conflict of interest or the '886 patent;
- Other Defendant personnel actively participated in the standard-setting process that resulted in Method <207>, likewise without disclosing the '886 patent;
- Defendants initiated patent-infringement litigation to exclude competitors based on the patent they and Dr. Shriver improperly failed to disclose;
- Defendants' anticompetitive conduct restrained competition in the sale of generic Enoxaparin and Lovenox; and
- Absent Defendants' unlawful conduct, one or more competitors would have fully entered the market sooner, driving prices down sooner than they declined in the actual world.

All of the evidence Plaintiffs will present to prove antitrust violations will come from sources common to the Class, including Defendants' documents and internal communications; publicly-available documents; submissions to the United States Patent and Trademark Office (PTO); meeting minutes and communications with the USP, orders, decisions, and correspondence from the FDA and federal courts, Defendants' testimony, and expert testimony.

Evidence will also be presented on impact and damages.

*Impact*: Plaintiffs will submit proof that Defendants' conduct impacted Plaintiffs by denying them access to less-expensive generic Enoxaparin and instead requiring them to purchase more-expensive Enoxaparin, or branded Lovenox. Plaintiffs' evidence will demonstrate that:

- Consumers and third-party payors pay significantly less for generic drugs than they do for branded drugs;
- The price of generic Enoxaparin would have been substantially lower than what Class members paid for Enoxaparin and, in the non-retail channel, branded Lovenox;

- State laws and health benefit plans promote or require the substitution of less expensive generic drugs for branded versions once the generic drug products are on the market;
- Defendants' conduct delayed the availability of, and competition from, other manufacturers of generic Enoxaparin; and
- Defendants' conduct impacted the Class.

*Damages*: Plaintiffs will also present documentary evidence and expert analysis establishing the aggregate amount of Class damages. Plaintiffs' evidence will demonstrate:

- The prices of Enoxaparin (including Lovenox) that would have prevailed in the absence of Defendants' anticompetitive conduct;
- The number of units of Enoxaparin (including Lovenox) purchased during the Class period;
- That Plaintiffs and Class members paid more for their Enoxaparin (including Lovenox) purchases or reimbursements than they would have in the absence of Defendants' anticompetitive conduct; and
- What Plaintiffs and Class members would have paid in the absence of Defendants' anticompetitive conduct.

All of the evidence Plaintiffs will present to prove impact and damages will come from sources common to the Class, including Defendants' documents and data, data and other information from third-party sources, Defendants' testimony, and expert testimony.

### 4. Closing Arguments

The parties will present closing arguments summarizing the evidence presented throughout trial and the issues that the jury will be asked to decide.

### 5. Final Instructions and Special Verdict Forms

The jury will be provided with instructions and make factual findings for all of plaintiffs' claims by answering questions on special verdict forms, and will also make a finding regarding proof of aggregate damages. The following jury instruction, modeled on the ABA *Model Jury Instructions in Civil Antitrust Cases* under Section 1 of the federal Sherman Act (with which all the Indirect Purchaser Jurisdictions require harmonization, or the interpretation of which they at

5

least consider instructive or persuasive),[2] will encompass all of the core elements of Plaintiffs' state antitrust claims.[3]

> In this case, plaintiffs claim that defendant Momenta misused the standard setting of the USP, and that defendants Momenta and Sandoz conspired to sue Amphastar for patent infringement, to prevent, impede, or eliminate competition. More specifically, plaintiffs claim that defendants pursued a conspiracy involving deception of the USP into adopting a standard for the manufacture of generic enoxaparin that allowed Defendants to use patent infringement litigation to exclude competitors, to the detriment of indirect purchasers.
>
> Setting standards for the purpose of disadvantaging a competitor is illegal, but setting standards for proper purposes is not, even if it disadvantages competitors. Proper purposes include, but are not limited to, ensuring interoperability of products, making multiple sources of supply available to consumers, or providing basic assurances of quality, performance, and safety of products.
>
> In determining whether defendants intended to disadvantage a competitor rather than further a proper purpose, you may consider whether defendants provided misleading information, failed to disclose relevant information, made promises to the standard-making body that they did not keep, or prevented the standing-setting process from being fair by acting in bad faith.
>
> You may also consider all of the evidence and the following factors in making your determination:
>
> - whether Defendant Momenta participated in or influenced the setting of USP Method <207> in a manner that injured Plaintiffs;
>
> - whether Defendant Momenta caused or participated in a process whereby the USP deviated significantly from its normal objective, expert judgments, and instead adopted a biased or unfair method;
>
> - whether Defendants exploited the biased or unfair method to sue competitors who practiced USP Method <207> for patent infringement;

---

[2] ABA, *Model Jury Instructions in Civil Antitrust Cases*, Instruction No. 11, at 59-61.

[3] With respect to this and other proposed instructions, Plaintiffs will, of course, adhere to this Court's March 1, 2019 Trial Management Order and any subsequent orders concerning jury instructions. *See* Dkt. 291.

6

- the importance of USP Method <207> in the market in which Plaintiffs purchased Enoxaparin (including Lovenox);

- whether the delay of Amphastar's being able to fully enter the market caused plaintiffs significant injury in that market; and

- whether Defendants had a good faith basis for their actions.

Additional instructions will of course be necessary on impact and damages, and some supplemental antitrust instructions will also be required. The jury will also be instructed on the few elements of Plaintiffs' consumer protection and unjust enrichment claims that may not be encompassed by Plaintiffs' antitrust claims.

The jury will likely be given a special verdict form along the following lines:

1. Did Defendants wrongfully restrain competition in the market for Enoxaparin (including Lovenox)?
2. Absent the conduct you found was unlawful in Question 1, would prices paid by hospitals, third-party payors, and uninsured patients for Enoxaparin (including Lovenox) have been lower?
3. Was Defendants' conduct unconscionable?[4]
4. Was Defendants' conduct unfair?[5]
5. Was Defendants' conduct deceptive?[6]

---

[4] *See* Ark. Code Ann. § 4-88-107(a) (prohibiting "deceptive and unconscionable trade practices").

[5] *See* Cal. Bus. & Prof. Code § 17200 (prohibiting "unfair competition"); Mo. Rev. Stat. § 407.020 (1) (prohibiting "[t]he act, use or employment by any person of any … unfair practice … in connection with the sale or advertisement of any merchandise in trade or commerce"); Neb. Rev. Stat. § 59-1602 (prohibiting "[u]nfair methods of competition and unfair … acts or practices in the conduct of any trade or commerce"); N.M. Stat. Ann. § 57-12-3 (prohibiting "[u]nfair … trade practices"); N.C. Gen. Stat. § 75-1.1(a) (prohibiting "[u]nfair methods of competition in or affecting commerce, and unfair … acts or practices in or affecting commerce").

[6] *See* Ark. Code Ann. § 4-88-107(a) (prohibiting "deceptive and unconscionable trade practices"); Mo. Rev. Stat. § 407.020 (1) (prohibiting "[t]he act, use or employment by any person of any deception … in connection with the sale or advertisement of any merchandise in trade or commerce"); Neb. Rev. Stat. § 59-1602 (prohibiting "deceptive acts or practices in the conduct of any trade or commerce); N.M. Stat. Ann. § 57-12-3 (prohibiting "deceptive trade practices … in the conduct of any trade or commerce"); N.Y. Gen. Bus. Law § 349(a)

6. Was Defendants' conduct knowing or willful?[7]

7. Was Defendants' conduct fraudulent?[8]

8. Did Plaintiffs rely to their detriment on the existence of a competitive market in the sale of Lovenox and Enoxaparin?[9]

9. Did Defendants accept the benefits from the conduct you found was unlawful in Question 1?[10]

---

(prohibiting "deceptive acts or practices in the conduct of any business, trade or commerce); N.C. Gen. Stat. § 75-1.1(a) (prohibiting "deceptive acts or practices in or affecting commerce").

[7] *See* N.M. Stat. Ann. § 57-12-2(D) (defining "unfair or deceptive trade practice" as "an act … knowingly made in connection with the sale, lease, rental or loan of goods or services"); *id.* at § 57-12-10(B) ("Where the trier of fact finds that the party charged with an unfair or deceptive trade practice or an unconscionable trade practice has willfully engaged in the trade practice, the court may award up to three times actual damages or three hundred dollars ($300), whichever is greater[.]"); N.Y. Gen. Bus. Law § 349(h) ("The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section.").

[8] *See* Cal. Bus. & Prof. Code § 17200 (prohibiting any "fraudulent business act or practice").

[9] *See* § Ark. Code. Ann. § 4-88-113(f) ("A person who suffers an actual financial loss as a result of his or her reliance on the use of a practice declared unlawful by this chapter may bring an action to recover his or her actual financial loss proximately caused by the offense or violation, as defined in this chapter. ... To prevail on a claim brought under this subsection, a claimant must prove individually that he or she suffered an actual financial loss proximately caused by his or her reliance on the use of a practice declared unlawful under this chapter.").

[10] *See Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So.3d 689, 693 (Fla. Dist. Ct. App. 2018) (requiring that defendant "voluntarily accepts and retains the conferred benefit"); *Haz-Mat Response, Inc., v. Certified Waste Services Ltd.*, 259 Kan. 166, 177 (Kan. 1996) (requiring "acceptance or retention by the defendant of the benefit"); *Estate of White*, 521 A.2d 1180, 1183 (Me. 1987) (same); *AIG Agency, Inc. v. Missouri Gen. Ins. Agency, Inc.*, 474 S.W.3d 222, 228 (Mo. Ct. App. 2015) (requiring that the defendant "accepted and retained the benefit"); *Leasepartners Corp. v. Robert L. Brooks Trust Dated November 12, 1975*, 113 Nev. 747, 755 (Nev. 1997) (requiring acceptance and retention by the defendant of [a] benefit"); *R. Zoppo Co., Inc. v. City of Manchester*, 122 N.H. 1109, 1113 (N.H. 1982) (requiring unjust enrichment "either through wrongful acts or passive acceptance of a benefit"); *Summer Oaks Ltd. Partnership v. McGinley*, 55 P.3d 1100, 1104 (Or. Ct. App. 2003) (requiring "awareness by the recipient that a benefit has been received"); *Parker v. Western Dakota Insurors, Inc.*, 605 N.W.2d 181, 187 (S.D. 2000) (requiring that defendant "accepts or acquiesces in [a] benefit"); *Concrete Products Co., a Div. of Gibbons & Reed Salt Lake County*, 734 P.2d 910, 911 (Utah 1987) (requiring "acceptance or retention by the conferee of the benefit"); *Reed v. Zurn*, 2010 VT 14, ¶ 11, 187 Vt. 613, 616, 992 A.2d 1061, 1066 (2010) (requiring that "defendant accepted the benefit"); *Veolia Es Special Servs., Inc. v. Techsol Chem. Co.*, No. CIV. A. 3:07-0153, 2007 WL 4255280, at *9 (S.D.W. Va. Nov. 30, 2007) (requiring "acceptance or retention by the

10. Did Defendants appreciate or know of the benefits from the conduct you found was unlawful in Question 1?[11]

11. What total damages do you award to the Class?

The foregoing is intended merely as an illustration of the questions implicated by the various consumer protection laws. Plaintiffs understand that the actual verdict form, and instructions, will be subject to the supervision and guidance of the Court.

### 6. Court Adjustment of Damages

Based on the jury's answers to special verdict form questions, the Court will determine the jurisdictions as to which liability has been established. In post-trial proceedings, per-state damages will be allocated proportionally to the populations of the various Indirect Purchaser Jurisdictions, and reduced as indicated by the verdict form or increased as required by law (in the case of mandatory double or treble damages). The Court will enter judgment on the final damages number resulting from that process.

---

defendant of the benefit"); *Staver v. Milwaukee County*, 289 Wis.2d 675, 687 (Wis. App. 2006) (requiring "acceptance and retention by the defendant of the benefit").

[11] *See Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So.3d 689, 693 (Fla. Dist. Ct. App. 2018) (requiring that defendant "voluntarily accepts and retains the conferred benefit"); *Haz-Mat Response, Inc., v. Certified Waste Services Ltd.*, 259 Kan. 166, 177 (Kan. 1996) (requiring "an appreciation or knowledge of the benefit by the defendant"); *Estate of White*, 521 A.2d 1180, 1183 (Me. 1987) (same); *AIG Agency, Inc. v. Missouri Gen. Ins. Agency, Inc.*, 474 S.W.3d 222, 228 (Mo. Ct. App. 2015) (requiring that defendant "appreciated the benefit"); *Leasepartners Corp. v. Robert L. Brooks Trust Dated November 12, 1975*, 113 Nev. 747, 755 (Nev. 1997) (requiring "appreciation by the defendant of such benefit"); *Duo-Fast Carolinas, Inc. v. Scott's Hill Hardware & Supply Co.*, No. 16 CVS 9343, 2018 WL 264607, at *12 (N.C. Super. Jan. 2, 2018) (requiring "that the other party consciously accepted the benefit"); *Summer Oaks Ltd. Partnership v. McGinley*, 55 P.3d 1100, 1104 (Or. Ct. App. 2003) (requiring "awareness by the recipient that a benefit has been received"); *Parker v. Western Dakota Insurors, Inc.*, 605 N.W.2d 181, 187 (S.D. 2000) (requiring that defendant "accepts or acquiesces in that benefit"); *Concrete Products Co., a Div. of Gibbons & Reed Salt Lake County*, 734 P.2d 910, 911 (Utah 1987) (requiring "an appreciation or knowledge by the conferee of the benefit"); *Veolia Es Special Servs., Inc. v. Techsol Chem. Co.*, No. CIV. A. 3:07-0153, 2007 WL 4255280, at *9 (S.D.W. Va. Nov. 30, 2007) (requiring "an appreciation or knowledge by the defendant of such benefit"); *Staver v. Milwaukee County*, 289 Wis.2d 675, 687 (Wis. App. 2006) (requiring "appreciation by the defendant of the benefit").

9

### III.  Details of Trial Management Plan: Version 2

A bifurcated trial would follow much the same format as a unitary trial, with the exception of dividing liability and damages into two phases.

### A.  Phase I: Proof of Liability with Common Evidence

In Phase I, the jury will hear common evidence on core issues that, once proven, will concurrently establish Defendants' violation of each state law under which Plaintiffs have brought their claims.

Phase I will include:

#### 1.  Preliminary Instruction to the Jury

At the commencement of the trial, jurors will be provided with a summary of the key factual and legal issues that will be at issue during the trial. *Manual for Complex Litigation (Fourth)* § 12.432 (2004).

#### 2.  Opening Statements

The parties will present opening statements regarding the elements of the violations.

#### 3.  Presentation of Evidence of Liability

Plaintiffs will submit proof that Defendants pursued a conspiracy involving deception of the USP into adopting a standard for the manufacture of generic enoxaparin that allowed Defendants to use patent infringement litigation to exclude competitors, to the detriment of the Class. The liability evidence will mirror that discussed above. *See supra* pp. 3-4.  Although proof of damages would be reserved for the second phase, the jury would need to hear enough economic evidence in the first phase to conclude that that Defendants' conduct materially restrained competition.

#### 4.  Closing Arguments

The parties will present closing arguments on liability.

### 5. Final Instructions and Special Verdict Forms

The jury will be provided with instructions and make factual findings for all of Plaintiffs' claims by answering questions on special verdict forms. The jury instruction given above, modeled on the ABA *Model Jury Instructions in Civil Antitrust Cases* under Section 1 of the federal Sherman Act (with which all the Indirect Purchaser Jurisdictions require harmonization, or the interpretation of which they at least consider instructive or persuasive),[12] will be the primary statement of the elements of Plaintiffs' state antitrust claims.[13] As set forth above, the jury will also receive certain supplemental antitrust instructions and will also be instructed on any special elements of the various consumer protection and unjust enrichment laws.

### B. Phase II: Proof of Impact and Damages

Based on the jury's answers to the special verdict questions in Phase I, the Court will determine under which jurisdictions' laws Plaintiffs have established liability. In Phase II, jurors will be provided with the liability findings from Phase I. Plaintiffs will then present class-wide proof of impact and aggregate damages for purchases made in each of the jurisdictions in which liability was established in Phase I.

Phase II will include:

#### 1. Opening Statements

The parties will present opening statements regarding their methodologies for determining class-wide impact and damages.

---

[12] ABA, *Model Jury Instructions in Civil Antitrust Cases*, Instruction No. 11, at 59-61.

[13] *E.g.*, *In re Nexium (Esomeprazole) Antitrust Litig.*, No. 1:12-md-02409-WGY (D. Mass. Oct. 14, 2014), ECF No. 1051 (proposed preliminary jury instructions for phase I of trial on behalf of all plaintiffs).

11

### 2. Presentation of Evidence Regarding Impact and Aggregate Damages

Plaintiffs will present documentary evidence and expert analysis establishing class-wide impact and the amount of class-wide damages.

### 3. Closing Arguments

The parties will present closing arguments regarding Plaintiffs' method for demonstrating impact and for measuring damages.

### 4. Final Instructions and Special Verdict Forms

The jury will return special verdict forms in which they will provide the aggregate damages incurred by the Class. In post-trial proceedings Plaintiffs will present a proposed per-state allocation of the aggregate damages awarded by the jury based on census data. After any mandatory doubling or trebling, the Court will enter judgment on a final damages number.

## IV. Proposed Trial Schedule

Under a unitary plan, the Plaintiffs believe that the evidence portion of the case can be put on in two weeks, with both sides splitting time evenly (assuming standard-length trial days of 5-6 hours on the record per day). Adding in time for openings, closings, jury selection, and jury instruction and deliberation, Plaintiffs believe the entire trial should take slightly less than 3 weeks in total. The bifurcated plan adds two days to reflect the need for separate instructions and deliberations and the probably re-calling of witnesses from Phase I. Below Plaintiffs outline a hypothetical schedule for unitary and bifurcated trials.

### A. Under Version 1

January 7, 2020: Jury selection; preliminary instructions to the jury; openings

January 8, 9, 10, 13, 14, 15, 16, 17, 21, 22: Presentation of evidence (both sides)

January 23: Closings; jury deliberation

12

January 24, 27: Jury deliberation; Court determination of where (i.e., in which jurisdictions) liability has been established

B. <u>**Under Version 2**</u>

Phase I

January 7, 2020: Jury selection; preliminary instructions to the jury; openings

January 8, 9, 10, 13, 14, 15, 16, 17: Presentation of common evidence of liability (both sides)

January 21: Closings; jury deliberation

January 22-24: Jury deliberation; Court determination of where (i.e., in which jurisdictions) liability has been established

Phase II

January 27, 28: Openings; presentation of evidence regarding impact and damages

January 29: Closings; jury deliberation

V. **Claims Administration Protocol**

Aggregate damages awarded by the jury (and modified by the Court as appropriate) will be allocated through an administrative process and the submission of claim forms. The payment of claims will not involve any issues related to Defendants or their liability, but will instead only address issues that are internal to the Class.

After the conclusion of trial proceedings under Version 1, or Phase II under Version 2, Plaintiffs will submit for Court approval a detailed Claims Administration Protocol. Plaintiffs anticipate proposing a plan that will pay claims based on a per-normalized-dose basis (i.e., accounting for the fact that some shipments have more dosages, and some dosages are larger than others). The protocol will call for Class members to submit information to verify their Enoxaparin (including Lovenox) purchases during the damages period. Uninsured consumers

13

will submit proof of their purchases, whether by affidavit or documentation. Third-party payors will submit claims data showing their reimbursements for purchases made by their members. Hospitals will submit acquisition data showing their purchases.

Plaintiffs may recommend the appointment of a special master charged with reviewing the forms and information submitted by Class members and resolving any claims issues. For example, a Special Master may need to review alternative proof to adjudicate a claim if a Class member's purchase or reimbursement data has been lost due to the passage of time. Plaintiffs' protocol will also include whatever reporting on claims volume and payments that the Court desires to see.

## VI. The Court May Modify the Trial Management and Claims Administration Plan If Needed

Plaintiffs will be prepared to address any case management concerns the Court may have as they arise. To the extent events occur during the course of the litigation or trial that would require modification of the Trial Management and Claims Administration Plan, the Court may do so. Plaintiffs also reserve the right to suggest changes to this Trial Management and Claims Administration Plan in advance of trial, if necessary.

Dated: June 18, 2019                    Respectfully submitted,

*/s/ Brendan P. Glackin*
Brendan P. Glackin (*pro hac vice*)
Dean M. Harvey (*pro hac vice*)
Bruce W. Leppla (*pro hac vice*)
Katherine L. Benson (*pro hac vice*)
David T. Rudolph (*pro hac vice*)
Adam Gitlin (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 946111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Mark P. Chalos (TN State Bar No. 19328)
Andrew R. Kaufman (TN State Bar No. 33864)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
One Nashville Place
150 Fourth Avenue, North, Suite 1650
Nashville, TN 37219-2423
Telephone: (615) 313-9000
Facsimile: (615) 313-9965

*Attorneys for Plaintiffs Nashville General and DC 37 and the Proposed Class*

John T. Spragens (TN State Bar No. 31445)
SPRAGENS LAW PLC
1200 16th Ave. S.
Nashville, TN 37212
Telephone: (615) 983-8900
Facsimile: (615) 682-8533

*Additional Counsel for Plaintiffs*