## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

THE HOSPITAL AUTHORITY OF
METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON COUNTY,
TENNESSEE, d/b/a NASHVILLE GENERAL
HOSPITAL and AMERICAN FEDERATION
OF STATE, COUNTY AND MUNICIPAL
EMPLOYEES DISTRICT COUNCIL 37
HEALTH & SECURITY PLAN,

                Plaintiffs,

                v.

MOMENTA PHARMACEUTICALS, INC. and
SANDOZ INC.,

                Defendants.

Civil Action No. 3:15-cv-01100

Chief Judge Waverly D. Crenshaw, Jr.
Magistrate Judge Barbara D. Holmes

## DEFENDANTS' POST-HEARING BRIEF
### (1) *IN OPPOSITION TO* PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL, AND
### (2) *IN SUPPORT OF* DEFENDANTS' RENEWED MOTION TO EXCLUDE REPORT AND OPINIONS OF DR. RUSSELL L. LAMB

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................. 1

II. EVIDENCE PRESENTED AT CLASS CERTIFICATION HEARINGS......................... 3

    1. Evidence Concerning Hospital Overcharge.............................................5

    2. Evidence Concerning Hospital Pass-Through .........................................8

    3. Evidence Concerning Retail Pharmacy Pass-Through ...........................13

III. ARGUMENT.................................................................................................. 17

    A. Dr. Lamb's testimony is inadmissible under Rule 702 and *Daubert*.....................17

    B. Plaintiffs have not identified a common method to prove impact to all class members or reliably calculate aggregate damages for their newly defined class...............................................................................18

        1. *Hospital Overcharge:* Plaintiffs failed to present classwide evidence that all hospitals paid an overcharge, and the evidence demonstrates that an individualized inquiry is required. .......................... 19

        2. *Hospital Pass-Through:* Even Dr. Lamb concedes that hospitals sometimes pass on overcharges and that an individualized inquiry is necessary to identify those transactions. ............................... 20

        3. *Retail Pass-Through:* The unrebutted empirical proof shows both that many end-payors in the retail channel are uninjured and that Dr. Lamb's pass-through assumptions are wrong..................................... 23

    C. The defects identified in Defendants' opposition brief are still applicable. ..........25

IV. CONCLUSION.............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bell Atl. Corp. v. AT&T Corp.*,
339 F.3d 294 (5th Cir. 2003) ........................................................................................4

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)...................................................................................................21, 22

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993).................................................................................................17, 18

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ......................................................................................18

*Food Lion, LLC v. Dean Foods Co.*,
312 F.R.D. 472 (E.D. Tenn. 2016)..............................................................................4

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018).......................................................................................4, 22

*In re Baycol Prods. Litig.*,
495 F. Supp. 2d 977 (D. Minn. 2007).........................................................................18

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008)........................................................................................4

*In re Lidoderm Antitrust Litig.*,
2017 U.S. Dist. LEXIS 24097 (N.D. Cal. Feb. 21, 2017) .....................................1, 18

*In re Methionine Antitrust Litig.*,
204 F.R.D. 161 (N.D. Cal. 2001)................................................................................4

*In re Processed Egg Prods. Antitrust Litig.*,
312 F.R.D. 124 (E.D. Pa. 2015)..................................................................................25

*In re Rezulin Prods. Liab. Litig.*,
369 F. Supp. 2d 398 (S.D.N.Y. 2005).........................................................................18

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
299 F.R.D. 555 (E.D. Tenn. 2014).............................................................................22

*In re Thalomid & Revlimid Antitrust Litig.*,
2018 U.S. Dist. LEXIS 186457 (D.N.J. Oct. 30, 2018)...........................................19

*Kilpatrick v. Breg, Inc.*,
613 F.3d 1329 (11th Cir. 2010) ..................................................................................18

Case 3:15-cv-01100    Document 385    Filed 07/19/19    Page 3 of 35 PageID #: 17019

*Leathers v. Pfizer, Inc.*,
   233 F.R.D. 687 (N.D. Ga. 2006)..............................................................................................18

*Tamraz v. Lincoln Elec. Co.*,
   620 F.3d 665 (6th Cir. 2010) ..................................................................................................18

*Vista Healthplan, Inc. v. Cephalon, Inc.*,
   2015 U.S. Dist. LEXIS 74846 (E.D. Pa. June 10, 2015) ....................................................1, 19

**RULES**

Fed. R. Evid. 702 .........................................................................................................3, 17, 18

Fed. R. Civ. P. 23............................................................................................................ *passim*

Case 3:15-cv-01100    Document 385    Filed 07/19/19    Page 4 of 35 PageID #: 17020

## I. INTRODUCTION

The July 12, 2019 hearing on Plaintiffs' Renewed Motion for Class Certification provided further evidentiary proof for what was already clear on paper: Plaintiffs have failed to identify a common method to either (1) prove impact to all members of the proposed class; or (2) reliably calculate aggregate damages for their newly defined class.

The July 12 hearing focused on the expert testimony. That's no surprise. In complex pharmaceutical antitrust cases, "[w]eighing conflicting expert testimony at the certification stage is not only permissible; it may be integral to the rigorous analysis that Rule 23 demands." *Vista Healthplan, Inc. v. Cephalon, Inc.*, 2015 U.S. Dist. LEXIS 74846, at *19 (E.D. Pa. June 10, 2015). "At class certification, a court must determine whether the expert's evidence supporting certification is persuasive following a rigorous analysis of the same." *In re Lidoderm Antitrust Litig.*, 2017 U.S. Dist. LEXIS 24097, at *54 (N.D. Cal. Feb. 21, 2017).

Plaintiffs—who "bear the burden of establishing the propriety of their new proposed class," Dkt. 375 at 2—presented testimony from Dr. Russell Lamb. Dr. Lamb provided little more than a summation of his aggregate damages calculation ($234 million) and a perfunctory explanation of how he arrived at the number by taking wholesale prices and shifting them back in time by four months. But Dr. Lamb conceded that the wholesale data that he reviewed does not bear on the most critical questions in this case: what proposed ***class members paid*** on the retail side; and whether hospitals ***passed on*** alleged overcharges in the non-retail channel.

In the non-retail channel, Dr. Lamb failed to analyze whether common proof could be used to prove that all hospitals paid an overcharge in the first instance, even after being confronted with evidence that many hospitals did not pay an overcharge. He also admitted that the wholesale data is not relevant to whether hospitals passed on or absorbed the alleged overcharges. And in the retail

channel, Dr. Lamb admitted that he did not perform an empirical analysis to test whether the wholesale prices he considered were passed on to members of the proposed class, even after being confronted with evidence prices were not uniformly passed on.

Without an empirical foundation for his opinions, the record is clear that Dr. Lamb's opinions rest entirely on *assumptions*: (i) that all 2,000-plus hospitals in 30 jurisdictions were both overcharged and uniformly absorbed the entire cost of enoxaparin on every enoxaparin transaction over a four-year period; and (ii) that all 30,000-plus retail pharmacies invariably passed through 100% of their cost savings to patients and their insurers. Dr. Lamb conceded that both of those assumptions could have been tested empirically, but vaguely claimed that the "vast economic literature" and his "extensive experience" establish that his views are irrefutable. A rigorous analysis proves the opposite: Dr. Lamb has no relevant experience, his assumptions are not supported by the literature, and his opinions are refuted by the empirical facts.

This was shown through the testimony of Defendants' expert, Dr. Pierre-Yves Cremieux. Over the course of two hours, Dr. Cremieux, an expert with decades of experience in pharmaceutical economics, walked the Court step-by-step through the rigorous scientific methodology that he used to actually test Dr. Lamb's assumptions. On the non-retail side, Dr. Cremieux explained that the fixed-schedule supplier contracts utilized by some GPOs meant that some hospitals in the proposed class would have paid the same prices for enoxaparin even if Amphastar had not been briefly enjoined. His analysis demonstrated that an economist must look at each hospital's GPO relationship to determine whether an individual hospital would have paid a lower price if Amphastar had not been enjoined. Dr. Cremieux then showed that, even if hospitals paid an overcharge, many hospitals would have passed on some or all of the overcharge to patients and insurers (who are no longer in the proposed class for non-retail transactions). This, too, cannot

2

be assessed without an individualized review.

Finally, on the retail side, Dr. Cremieux described two different empirical tests that he performed using retail data—a "bottom across" test and a "top-down" test—which proved that many insurers would have paid the same amount even if Amphastar had not been enjoined (meaning they were not impacted)**,** and that, to the extent overcharges were passed through to some insurers, the pass-through rate was nowhere close to 100% as Dr. Lamb assumes. Dr. Cremieux made similar empirical findings for uninsured consumers. Plaintiffs did not cross-examine Dr. Cremieux on his empirical findings, which collectively demonstrated the need for an individualized inquiry in order to assess impact or reliably calculate damages.

Dr. Cremieux's analysis is the sort of rigorous scientific inquiry that courts require of *plaintiffs* in complex pharmaceutical cases. Dr. Lamb's refusal to consider relevant data and complete abandonment of the scientific method render his opinion inadmissible under Rule 702. Moreover, Dr. Lamb's threadbare analysis lacks the persuasive force needed to satisfy a rigorous analysis under Rule 23. At bottom, Dr. Lamb, who does not himself publish in the area of pharmaceutical economics, offers this Court nothing but a handful of non-peer-reviewed articles that don't support his theory of the case. Having failed yet again to carry their burden, Plaintiffs' renewed motion for class certification should be denied.

## II.     EVIDENCE PRESENTED AT CLASS CERTIFICATION HEARINGS

As shown below (in the red boxes),[1] there are three critical questions for this Court to consider in analyzing whether Plaintiffs have presented common proof of classwide impact or aggregate damages:

---

[1] The visual shown is taken from Slide 40 from the demonstratives used to support Dr. Cremieux's direct examination. The full slide deck used in support of Dr. Cremieux's testimony is attached for the Court's convenience as Exhibit 1.

3



On the non-retail side, because hospitals sit in the middle of the distribution chain, the inquiry is two-fold. First, the Court must analyze whether Plaintiffs have identified a common method to show that *all* hospitals in the class paid an overcharge in the first instance.[2] If there is no common method to show that all hospitals paid an overcharge, then the inquiry is over and class certification should be denied. Even if common evidence that all hospitals paid an overcharge does exist, given Dr. Lamb's theory of the case, the Court must also determine whether there is a common method to show that every hospital in the proposed class absorbed 100% any overcharge.[3] If an individualized inquiry of putative class members is required to assess whether overcharges

---

[2] *See Food Lion, LLC v. Dean Foods Co.*, 312 F.R.D. 472, 485 (E.D. Tenn. 2016) ("Meeting the predominance requirement of Rule 23(b)(3) demands more than common evidence [of a conspiracy]. The plaintiffs must also show that they can prove, through common evidence, that *all* class members were in fact injured by the alleged conspiracy.") (emphasis added); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 57 n.5 (1st Cir. 2018) ("[O]ur circuit precedent clearly requires that there exist 'some means of determining that *each* member of the class was in fact injured.'") (emphasis added); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008) ("[T]o prevail on the merits, *every* class member must prove at least some antitrust impact resulting from the alleged violation.") (emphasis added); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) ("[W]e have repeatedly held that where fact of damage cannot be established for *every* class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance.") (emphasis added).
[3] *In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 164 (N.D. Cal. 2001).

Case 3:15-cv-01100    Document 385    Filed 07/19/19    Page 8 of 35 PageID #: 17024

were passed on or absorbed, then class certification must be denied. In the retail channel, the Court must determine whether there is common evidence that any overcharges paid by retail pharmacies were uniformly passed through to insurers and uninsured patients in the proposed class. If the answer to any of these questions is no, then Plaintiffs are unable to prove injury or reliably calculate aggregate damages on a classwide basis, and class certification should be denied. The evidence presented on these questions is discussed below.

### 1. Evidence Concerning Hospital Overcharge

Plaintiffs presented *no* affirmative evidence (at either hearing) to show that all hospitals in the proposed class paid an overcharge for enoxaparin. Neither Mr. Little nor Ms. Smith offered fact testimony regarding prices paid by NGH. And although Dr. Lamb modeled his "backcasting" approach (the visual with the red and blue lines), the data depicted on that chart was limited to the retail channel only.[4] That decision was likely strategic, as Dr. Lamb's own earlier review of non-retail prices produced the same stair-stepped graph that Dr. Cremieux has linked to GPO contract timing that was unaffected by the injunction. *See* J.A. 326 (Figure 17).

As Dr. Cremieux explained, because of the manner in which GPOs negotiate for drug pricing, it is counterfactual and therefore unreasonable to simply assume that Amphastar's three-and-a-half month delay had a common impact on every hospital in the proposed class.[5] Premier, a large GPO with thousands of hospital members, is a prime example. Amphastar submitted a bid to Premier in September 2011 shortly after receiving FDA approval. In response to that bid, Sanofi (Premier's incumbent supplier) responded with lower pricing on September 28, 2011—more than

---

[4] Transcript of July 12, 2019 Hearing ("Hr'g Tr.") __ (discussing retail price data). The Court has instructed the parties not to cite the rough transcript of the July 12 hearing. Defendants will seek leave file an amended brief with appropriate citations when the final transcript is available.
[5] Hr'g Tr. __.

Case 3:15-cv-01100    Document 385    Filed 07/19/19    Page 9 of 35 PageID #: 17025

a week *before* Amphastar was enjoined.[6] In notifying Amphastar that Sanofi had matched its bid, Premier instructed Amphastar to wait and bid again on the next contract, which would be effective nine months later in July 2012.[7] Although Amphastar was enjoined from October 7, 2011 to January 25, 2012, Amphastar reentered in time to (and, in fact, did) bid on the July 2012 Premier contract. Hr'g Tr. __. Thus, Premier members received the benefit of Amphastar's initial entry, and the brief injunction did not impair the competitive landscape surrounding the new Premier contract.

Dr. Cremieux found similar evidence for NGH's GPO, MedAssets. Based on his review of NGH's purchase data (shown below), Dr. Cremieux explained that MedAssets received a substantial discount in October 2011—months *before* Amphastar re-entered in January 2012.



**Exhibit 1**
**Timeline of MedAssets Negotiations with Amphastar**
**Nashville General Hospital Average Enoxaparin Purchase Price per 10mg**
**All Dosages**

---

[6] Ex. 2 (Defs.' Hearing Exhibit 29) (email from Premier to Amphastar dated September 28, 2011 (before Amphastar injunction): "Sanofi has responded with lower pricing. Thank you for your offer, but at this time we cannot add. Please include pricing in the RFP, as this will not have right of first refusal."); *see also* Ex. 1 at Slide 10.

[7] Ex. 3 (Defs.' Hearing Exhibit 27) (explaining that Sanofi had matched Premier offer and that next contract was "up for bid with contract eff. Date [of] 7/1/12"); *see also* Ex. 1 at Slide 11.

6

Because MedAssets received a discount in October 2011, it (like Premier) did not receive an *additional* discount in January 2012 when Amphastar re-entered. Dr. Cremieux thus found that the MedAssets-negotiated prices that NGH received would have been unchanged in the but-for world. That means there was no antitrust impact to NGH, or any other hospital that purchased pursuant to MedAssets' contract.

Although Dr. Lamb attempted to critique Dr. Cremieux's GPO analysis, he concedes that he did not analyze the impact of GPO negotiations in forming his opinions.[8] Recognizing that these are serious issues (that Dr. Lamb ignored), Plaintiffs attempted to impeach Dr. Cremieux's GPO opinions on cross examination. Plaintiffs first tried to show that Dr. Cremieux had not reviewed GPO contracts. Plaintiffs were wrong,[9] but the point is irrelevant because Dr. Cremieux's opinions are based on the *data* (which reveal when prices declined) and the contemporaneous business documents that explain the data. Hr'g Tr. __. Ignoring Premier entirely, Plaintiffs also attacked Dr. Cremieux's statement that MedAssets had reached an agreement with Sanofi in September 2011 (rather than October 2011), erroneously suggesting that this discrepancy negated Dr. Cremieux's point that the threat of Amphastar's entry drove down prices to a new competitive level. Hr'g Tr. __. Plaintiffs ignore that Dr. Lamb made the very same observation in his earlier report, namely that many hospitals received the competitive discounts *before* Amphastar was enjoined.[10] But whether the effective date was September or October 2011, the point remains that

---

[8] Lamb Dep. (Dkt. 363-7) at 292:10–293:14 (testifying that "analyz[ing] whether there were any [nuances] in GPO contracting" that would impact his analysis "wasn't necessary" and that he "[didn't] know if NGH purchased through a group purchasing organization or not").

[9] Dr. Cremieux's materials-considered list identifies numerous GPO contracts, including the contract between MedAssets and NGH. *See* J.A. 436 (listing the following GPO contracts produced by NGH: NGH000062, NGH000074, NGH000076, NGH000093, and NGH000130).

[10] *See* J.A. 44 (Lamb Opening Rpt. ¶ 44) ("An internal Sandoz presentation indicates *Sanofi took similar steps to retain sales by reducing prices in anticipation of Amphastar's entry*: '*Sanofi preemptively* reduced pricing in [the] GPO segment' from '~60% of BWAC to 38%' *before the preliminary injunction was granted*.") (emphasis added).

the threat of Amphastar's entry resulted in lower pricing that was implemented notwithstanding the injunction. In the end, Plaintiffs' granular cross-examination about the negotiations by NGH's GPO proves Dr. Cremieux's point: there is no common method to show injury to all hospitals because an individualized inquiry into each hospital's GPO relationship is necessary to determine whether any hospital paid an overcharge.

### 2. Evidence Concerning Hospital Pass-Through

In earlier stages of this case, when Plaintiffs' class included "all persons and entities" in the non-retail channel, Plaintiffs admitted that hospitals sometimes pass on their costs, either in full or in part, and that sometimes hospitals are not injured.[11]

**Admission No. 43**

response is required    Plaintiff Nashville General responds for itself only that it admits it purchased both Generic Enoxaparin and Lovenox® and that in some instances it was paid or reimbursed in full for its cost of the Drug by either a Patient or a Third-Party Payor.

**Admission No. 44**

response is required    Plaintiff Nashville General responds for itself only that it admits it purchased both Generic Enoxaparin and Lovenox® and that in some instances it was paid or reimbursed in part for its cost of the Drug by either a Patient or a Third-Party Payor.

5.  You have requested all of Nashville General's pharmacy billing data related to Enoxaparin and Lovenox. Yesterday we produced data reflecting those transactions for which Nashville General may recover as described by the proposed class (NGH000148).¹ You also already

_____

¹ This spreadsheet was created by pulling Nashville General's pharmacy billing data, deleting patient identifying information, and then deleting the entries reflecting those transactions where Nashville General was not injured.

_____

[11] Ex. 4 (Defs.' Hearing Exhibit 23) at Nos. 43 and 44; Ex. 5 (Defs.' Hearing Exhibit 2) at ¶ 5 n.1; *see also* Ex. 1 at Slides 17 & 18 (referencing Defs.' Hearing Exhibits 2 & 23).

8

Plaintiffs now try to walk away from those admissions:[12] They claim that all 2,000-plus hospitals in the 30 class jurisdictions invariably absorbed 100% of the cost of enoxaparin—and were therefore injured—on *every enoxaparin transaction* over a four-year period. Hr'g Tr. __. In support of that newfound assertion, Plaintiffs offered fact testimony from Neill Little and Mindy Smith, and expert testimony from Dr. Lamb.

Neither Mr. Little's nor Ms. Smith's testimony was probative of whether there is common evidence of hospital billing and charge-setting practices. Mr. Little testified on May 13, 2019 that Nashville General Hospital sets its charges for enoxaparin based on ███████████████ ████████████████████. J.A. 553:13–19. But Mr. Little admitted that he had no knowledge of how other hospitals set charges and that some may base charges on their actual costs. *See* J.A. 560:7–10, 564:16–565:4. Moreover, by Mr. Little's own admission, ███████████ ████████████████████████████████████████████████████████████████. *See* J.A. 562:5–563:4; 569:3–6 ████████████████████████████████ ███████████████████████████████████. Mr. Little also offered testimony that NGH bills for procedures, not for individual drugs. J.A. 554:15–24. But, on examination by the Court, Mr. Little admitted that he lacked personal knowledge to support that testimony. J.A. 573:24–574:5 ("THE COURT: "Okay. So when you testified that it really doesn't matter what the cost of the drug is because you – you bill based on procedure, what's your basis for saying that? THE WITNESS: That's – again, that's probably a better question for our billing person to answer . . . ."). And that testimony was later shown to be incorrect. Hr'g Tr. __.

---

[12] Through a leading re-direct of Dr. Lamb, Plaintiffs tried to suggest that the admission to Request No. 43 somehow related to NGH's retail pharmacy (which was added in 2016, after the original complaint in this case and after the end of the current class period). That argument fails for at least two reasons. First, the request asks about "Healthcare Providers," which would not include retail pharmacies. Second, No. 44 says that NGH is sometimes reimbursed "in part," which would be inconsistent with Plaintiffs' theory in the retail channel that pass-on is always 100%.

Ms. Smith purported to offer testimony concerning the billing practices for three other hospitals that she had worked for. Hr'g Tr. __. But on cross examination, Ms. Smith admitted that she had no involvement with billing or setting pharmaceutical charges at those other hospitals. *Id.* at ____. With respect to NGH, Ms. Smith conceded that NGH bills large commercial insurers like BlueCross and Aetna for specific administrations of enoxaparin, and that those insurers pay NGH based on a percent of the hospital's specific line-item enoxaparin charge. *Id.* at ____. On re-direct, Ms. Smith tried to cabin such instances as only a small percentage of NGH's transactions. *Id.* at _____. But Dr. Cremieux explained that percent-of-charge reimbursements are more common among for-profit hospitals. J.A. 408–09. and Plaintiffs presented no evidence concerning the prevalence across the thousands of other hospitals in the proposed class, leaving unanswered questions about the impact on Dr. Lamb's methodology.

As he did at the May 13 hearing, Dr. Lamb again testified that hospitals *always* absorb the cost of enoxaparin. J.A. 592:11–17; Hr'g Tr. __. But Dr. Lamb has offered no empirical proof for that proposition, relying instead on generalizations about "how hospitals are paid for the services they provide." J.A. 592:17–19; Hr'g Tr. __. Dr. Lamb has repeatedly conceded that his opinion is not based on any empirical analysis. J.A. 599:12–16 (conceding reliance on data that does not "tell us if a hospital . . . passed on all or some of the costs to patients or insurers"); *id.* at 601:21–602:8; Hr'g Tr. __. And despite that Dr. Lamb readily admits that charge-setting and reimbursement policies vary widely across hospitals, J.A. 629:2–22, he reviewed no hospital records or billing data, J.A. 602:23–603:2 ("Q. You didn't review any hospital records to determine if patients or insurers paid some or all of the cost of enoxaparin, did you? A. I didn't look at hospital records on that. It wasn't necessary."), and did not conduct any type of survey across hospitals. J.A. 629:23–630:1 ("Q. You did not perform any type of survey across hospitals to see whether or not there

were some group of hospitals that charge based on acquisition cost for enoxaparin, did you? A. No, I didn't do any surveys. It wasn't necessary."). In sum, the visual below reflects Dr. Lamb's methodology for analyzing hospital pass-through based on the testimony presented at the class-certification hearings:



Instead of performing an empirical pass-through analysis or reviewing source documents, Dr. Lamb's "methodology . . . was to look at the literature." J.A. 619:11–12; *see also id.* at ("I didn't use a database of hospital prices or charges. . . . . I relied on the vast economic literature that's been published on exactly this topic."); Hr'g Tr. __. But the literature, it was shown, does not support his conclusions. Among many other contradictory statements, the Lewin Group study states that many hospitals "reported basing charges for . . . pharmaceuticals on their costs." Ex. 6 (Defs.' Hearing Exhibit 4) at iii–v; Ex. 1 at Slide 24; J.A. 632:19–633:20. As Dr. Cremieux explained, the Lewin Group study "couldn't be more unambiguous, that charges are not divorced from costs." Hr'g Tr. __. And the Gapenski chapter cited by Dr. Lamb describes a "cost-based" reimbursement methodology that Dr. Lamb conspicuously omitted from his report. Ex. 7 (Defs.' Hearing Exhibit 8) at 52; J.A. 626:21–628:18; Ex. 1 at Slides 25–26. Dr. Lamb conceded that he

11

has "no idea . . . how many hospitals in the proposed class use cost-based reimbursement." J.A. 628:19–629:1.

Plaintiffs have continuously argued, without proof, that every hospital in the class has a claim to damages on at least one transaction. The lack of evidence for this fundamental issue is fatal to Plaintiffs' proposed class. But Plaintiffs' problem is even worse because, despite months of claiming that hospitals "never" pass on their overcharges, *Dr. Lamb finally conceded at the hearing that "[t]here could be transactions" where the hospital passed on the cost*. Hr'g Tr. __; *see also id.* at ___ (conceding that, "in some instances" it may be true that hospitals pass on their costs to patients and insurers). And yet, Dr. Lamb admitted that he has not developed the methodology for identifying those transactions. Hr'g Tr. __. Instead, Dr. Lamb asserted that this unknown universe of uninjured transactions could be somehow sorted out during claims administration, after a final judgment is entered. *Id.* But Dr. Lamb did not propose a method for doing so.

Unlike Dr. Lamb, Dr. Cremieux testified that he considered the primary source documents—hospital billing data, third-party payor contracts, reimbursement data, and hospital charge-setting practices—that would be important to test Dr. Lamb's assumptions. Hr'g Tr. __; Ex. 1 at Slide 16. Dr. Cremieux described his survey of some of the largest hospitals which found direct evidence—in the form of statements from the hospitals themselves —that many hospitals based their pharmacy charges on drug acquisition costs. *See generally* Hr'g Tr. __; *see also* Ex. 1 at Slide 21 (describing Mount Sinai Hospital statement that "hospital charges . . . are based on the cost of a medical supply or drug" and that "[a]s costs change, chargemaster prices are updated"). Dr. Cremieux also described statements in Dr. Lamb's own sources that confirm what Dr. Cremieux found in his independent survey: many hospitals update their charges as costs change

12

and that some hospitals use cost-based reimbursement methodologies. Hr'g Tr. __. Dr. Cremieux explained how changes in the hospital's chargemaster can directly impact the amounts that patients and third-party payors pay for the drug. Dr. Cremieux also explained that the incidence of varying and partial pass-on makes it impossible to reliably calculate aggregate damages using a common method because patients and end-payors who bore a portion of the overcharge are no longer members of the proposed class, at least not for their hospital purchases. Hr'g Tr. __.

### 3. Evidence Concerning Retail Pharmacy Pass-Through

Plaintiffs presented ***no fact testimony*** concerning issues in the retail channel.[13] Instead of providing the Court with evidence and facts, Plaintiffs offered Dr. Lamb's untested assumption that all 30,000-plus retail pharmacies always passed on 100% of the alleged overcharge.

The proposed class members in the retail channel are end-payors (third-party payors and uninsured consumers). Dr. Lamb admitted that he did not consider any data reflecting prices at the end-payor level. Instead, Dr. Lamb relied on IMS NSP data, which reflects "the amount paid by the pharmacy when purchasing enoxaparin from a wholesaler," and "[d]oes not include the amount end-payors paid who were in the proposed class." J.A. 649:11–17. Like his analysis in the non-retail channel, Dr. Lamb concedes that he "did not perform any statistical analysis to test on a classwide basis whether retail pharmacies in 30 jurisdictions over four years invariably passed on 100 percent of the enoxaparin cost." J.A. 650:1–15; Hr'g Tr. __. According to Dr. Lamb, an empirical analysis was unnecessary because a uniform 100% pharmacy pass-through rate is widely recognized in the economic literature. J.A. 650:9–15 ("It wasn't necessary to test a finding which is widely held and has been held . . . in economics literature . . . ."); Hr'g Tr. __. In sum, this is Dr. Lamb's methodology in the retail channel:

---

[13] Plaintiffs did not even call a witness from DC 37, the only named plaintiff with a retail presence.



The evidence developed during the hearing, however, demonstrated that Dr. Lamb's "well-established literature" does not support his sweeping assumptions. When asked on cross-examination to identify the go-to article supporting his view that all pharmacies in the class invariably passed on 100% of their costs savings, Dr. Lamb could recall only one article, a Kaiser Foundation publication titled *Follow the Pill*. J.A. 653:3–12; Hr'g Tr. __. But what *Follow the Pill* actually says is that the "complexity [of the pharmaceutical supply system] results in considerable price variability across different types of consumers"[14] and that "[t]his complexity can result in *substantial variations* in what different purchasers pay for the same drugs."[15] In short, *Follow the Pill* does not support Dr. Lamb's theory about a uniform 100% pass-through rate. *See* Hr'g Tr. __.

Although he could not recall them at the hearing, other sources Dr. Lamb relied on are similarly unhelpful to Plaintiffs' position. For example, Dr. Lamb relies on a 1979 law review article titled, "Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis." But, as Dr. Cremieux pointed out, that article (which has nothing to do with healthcare or pharmaceutical

---

[14] Ex. 8 (Defs.' Hearing Exhibit 5) at 2; Hr'g Tr. __.
[15] Ex. 8 (Defs.' Hearing Exhibit 5) at 24 (emphasis added); Hr'g Tr. __.

markets) actually says: "*Without the enrichment of an empirical analysis*, even a sensitive theoretical analysis may provide a weak basis for inferences about real-world situations."[16] If one thing is clear, it's that Dr. Lamb did not perform an empirical analysis.

But Dr. Cremieux did. Dr. Cremieux performed two empirical tests to analyze Dr. Lamb's assumptions: (i) a "bottom-across" test, which looks at prices paid by end payors to see if patterns emerge based on the allegations; and (ii) a "top-down" analysis, which compares wholesale prices to a sample of retail data to determine if a uniform pass-through rate exists. Hr'g Tr. __. The results of those empirical tests refute Dr. Lamb's assumptions.

With respect to the bottom-across test, Dr. Cremieux reviewed retail-level data from OptumHealth, a dataset covering approximately 20 million lives. Hr'g Tr. __. Dr. Cremieux's analysis showed that insurers had remarkably different experiences in terms of how Amphastar's entry impacted retail prices, with 48% paying the same or more for enoxaparin after Amphastar entered, and thus only half of insurers receiving lower prices. Hr'g Tr. __; Ex. 1 at Slide 36. Dr. Cremieux's analysis proves, empirically, that there is no common method to show injury to all insurers in the retail channel. Hr'g Tr. __. With respect to the top-down analysis, Dr. Cremieux compared changes in the average wholesale prices to changes in the average retail prices in the period following Amphastar's entry to determine whether Dr. Lamb's assumption of 100% pass through has a factual basis. He found that it does not, concluding that the *average* pass-through rate in his test sample was 37.5%. Hr'g Tr. __.

Dr. Lamb tried to argue both that Dr. Cremieux's average pass-through rate is wrong, Hr'g Tr. __, and also that the *average* pass-through rate is somehow proof of common injury to all class members. Hr'g Tr. __. Both assertions are incorrect.

---

[16] Ex. 9 (Defs.' Hearing Exhibit 10) at 274; Hr'g Tr. __; Ex. 1 at Slide 34.

Dr. Lamb's dispute about the accuracy of Dr. Cremieux's calculation is based purely on his gut impression that the number "seems" off based on his unproven view that pharmacies are perfectly competitive. Hr'g Tr. __. But Dr. Lamb has never analyzed competition in retail pharmacy markets, and both his own literature and Dr. Cremieux's analysis show that pharmacies across the United States—which include large chain stores in big cities and small independent rural pharmacies—face different degrees of competition. *Id.* at ____.

Dr. Lamb's assertion that the average pass-through rate proves injury to all members of the proposed class is also incorrect. As Dr. Cremieux explained, his bottom-across analysis shows the opposite: that many class members in the retail channel did not suffer any injury—at all. Hr'g Tr. __. His average pass-through rate was offered merely "to demonstrate that [Dr. Lamb's] assumption of 100 percent pass through . . . isn't correct." *Id.* at ____. But the average pass-through rate is just that: an *average*, which includes insurers that experienced pass through higher than 37.5% and some who experienced no pass through at all.

Finally, Dr. Cremieux described his review of the limited data available for uninsured consumers. Based on his review of publicly available data from GoodRx, Dr. Cremieux found that prices charged to uninsured consumers varied and did not move in parallel with wholesale prices, refuting Dr. Lamb's assumption of common injury and uniform pass-through. Hr'g Tr. __. Dr. Lamb argued that Dr. Cremieux's GoodRx analysis in unreliable because it contains only 40 observations. Hr'g Tr. __. But 40 observations (which is all that was available) is better than what Dr. Lamb offered: nothing.

**Plaintiffs did not cross-examine Dr. Cremieux on any of his empirical findings.**

16

## III. ARGUMENT

### A. Dr. Lamb's testimony is inadmissible under Rule 702 and *Daubert*.

For expert testimony to be admissible, it must be based on "sufficient facts or data" and be "the product of reliable principles and methods" that are "reliably applied to the facts of the case." Fed. R. Evid. 702(b)–(d). Dr. Lamb ignored relevant data and abandoned the scientific method. In the retail channel, where the class members consist of end-payors (insurers and uninsured consumers), Dr. Lamb conceded that he did not consider data at the end-payor level and that he did not perform an empirical analysis to test whether and to what extent any assumed overcharges paid by pharmacies were passed through to insurers and consumers. In the non-retail channel, Dr. Lamb failed to empirically test whether hospitals absorbed or passed through their costs, relying instead on an assumption that hospitals bore the entire alleged overcharge on every transaction. Although Dr. Lamb has himself never published in the area of pharmaceutical economics, in both channels, his entire "methodology"—if it can be called that—was to look at the literature.

To be sure, some reliance on supporting literature (if actually supporting) is not itself disqualifying. But literature alone is not enough. The Supreme Court has held that "a key question" in determining admissibility is "whether [the expert's theory] can be (and has been) tested." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993). Dr. Lamb did nothing to empirically test his assumptions. Worse still, it has now been firmly established that his untested opinions are *not*, in fact, supported by the literature that he cites. "[I]f the relevant scientific literature contains evidence tending to refute the expert's theory and the expert does not acknowledge or account for that evidence, the expert's opinion is unreliable. Accordingly, courts have excluded expert testimony 'where the expert selectively chose his support from the scientific

landscape.'" *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005).[17]

Without supporting literature or an empirical foundation for his opinions, this Court is left with nothing to go on but Dr. Lamb's say-so. In the Sixth Circuit, "the 'ipse dixit of the expert alone' is not sufficient to permit the admission of an opinion." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010)). Dr. Lamb's opinions lack factual support and are not the product of a reliable methodology. His testimony should be excluded.

### B. Plaintiffs have not identified a common method to prove impact to all class members or reliably calculate aggregate damages for their newly defined class.

Despite what Plaintiffs would have this Court believe, admissibility under Rule 702 is not sufficient to certify a class under Rule 23. Instead, "simply because an expert opinion clears . . . *Daubert* does not mean it passes the 'rigorous analysis' required by Rule 23 . . . . At class certification, a court must determine whether the expert's evidence supporting certification is persuasive." *Lidoderm*, 2017 U.S. Dist. LEXIS 24097, at \*54 (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983–84 (9th Cir. 2011)). Dr. Lamb's testimony was not persuasive; it was self-defeating. A rigorous analysis demonstrates that Plaintiffs have not shown common evidence exists either (1) to prove that all members of the class were injured; or (2) to reliably calculate aggregate damages for the newly defined class.

---

[17] *See also Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1341 (11th Cir. 2010) (holding that "the literature Dr. Poehling based his conclusions upon was insufficient to create a reliable methodology which passes *Daubert* muster"); *In re Baycol Prods. Litig.*, 495 F. Supp. 2d 977, 990 (D. Minn. 2007) (excluding testimony because "the medical literature does not support" the expert's opinion); *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687, 695 (N.D. Ga. 2006) (excluding expert's opinion because the "articles and reports on which he relies fall short of *Daubert*'s requirements").

1. ***Hospital Overcharge:*** **Plaintiffs failed to present classwide evidence that all hospitals paid an overcharge, and the evidence demonstrates that an individualized inquiry is required.**

Plaintiffs presented *no* evidence, much less *persuasive* evidence, to show that all hospitals in the class paid an overcharge. During both the May 13 and July 12 hearings, Plaintiffs limited their impact evidence to a graphical depiction of the price curve in the *retail* channel—ignoring entirely prices paid by hospitals in the non-retail channel. Plaintiffs have presented no evidence to carry their burden on this issue.

Dr. Cremieux examined hospital prices in detail and explained that unique circumstances surrounding GPO negotiations are such that many hospitals would not have paid the same amount even if Amphastar had not been briefly enjoined. Dr. Cremieux's analysis showed that an individual review of each hospital's GPO relationship is necessary to determine whether a hospital's prices would have adjusted on a different schedule if Amphastar had not been briefly enjoined. When that type of individualized analysis is required to identify and remove uninjured parties, class certification must be denied.[18]

Although Plaintiffs cross-examined Dr. Cremieux about whether he was certain MedAssets (one of many GPOs) received a price discount in September (rather than October) 2011, it doesn't change the import of Dr. Cremieux's testimony. The fact remains that Amphastar's initial entry in September 2011 enabled several GPOs to obtain lower pricing that was unaffected by the subsequent temporary injunction, and as a result, those GPOs did not get additional discounts when Amphastar re-entered the market three-and-a-half months later. Plaintiffs, who had their own

---

[18] *See In re Thalomid & Revlimid Antitrust Litig.*, 2018 U.S. Dist. LEXIS 186457, at *34 (D.N.J. Oct. 30, 2018) ("[T]he predominance requirement is not satisfied here because there are large categories of uninjured class members that Plaintiffs have not identified and cannot identify without individualized inquiry."); *Vista Healthplan*, 2015 U.S. Dist. LEXIS 74846, at *66 ("Plaintiffs have not sufficiently proven that they are able to demonstrate antitrust impact on a class-wide basis . . . due to various groups of uninjured persons that remain within the class . . . .").

information available, introduced no evidence to refute the notion that hospitals received the competitive benefit of Amphastar's entry notwithstanding the three-and-a-half month injunction.

### 2. *Hospital Pass-Through:* **Even Dr. Lamb concedes that hospitals sometimes pass on overcharges and that an individualized inquiry is necessary to identify those transactions.**

Because hospitals are in the middle of the distribution chain, even if they paid an overcharge, analysis of whether the hospital was injured is not complete unless there is also proof that the hospital absorbed the overcharge without passing it on to patients and insurers. No court has ever addressed the pass-through question for hospitals. Indeed, Plaintiffs do not dispute that this case is the first-of-its-kind because end-payors *and* hospitals have never been in the same class. Given that Plaintiffs are sailing in uncharted waters, one might expect that they would present a rigorous analysis showing that there is a testable method to confirm that no hospital passes on its costs. They do not. Instead, Plaintiffs present nothing more than the general impression of Dr. Lamb, someone who is not a scholar in this area, that hospitals don't pass on their costs because that's not "how hospitals are paid for the services they provide." J.A. 592:17– 19; *see also* Hr'g Tr. __.

The record before the Court, however, includes overwhelming evidence that hospitals *do* sometimes pass on their costs, which Dr. Lamb *finally* admitted at the July 12 hearing. NGH has also admitted that it sometimes passes on its costs (either in full or in part)[19] and that there are many transactions where the hospital was not injured.[20] Both positions are inconsistent with Plaintiffs' tenuous theory that hospitals *always* absorb the overcharge. All flip-flopping aside, Dr. Lamb's own literature—which is the sole support for his opinions—explicitly states that many hospitals base their pharmaceutical charges on their costs. Ex. 6 (Defs.' Hearing Exhibit 4) at iii–

---

[19] Ex. 4 (Defs.' Hearing Exhibit 23) at Nos. 43 and 44; *see also* Ex. 1 at Slide 17.
[20] Ex. 5 (Defs.' Hearing Exhibit 2) at ¶ 5 n.1; *see also* Ex. 1 at Slide 18.

v; *see also* Ex. 1 at Slide 24. Dr. Cremieux's empirical analysis confirmed the same: that many hospitals throughout the country consider costs when setting charges. J.A. 399–402; Hr'g Tr. __; Ex. 1 at Slides 20–24. When those hospitals bill or receive payment based under a percent-of-charge methodology, their costs are passed on to patients and insurers. J.A. 405.

But even assuming Plaintiffs could show that all hospitals suffered at least a penny's worth of damages, that would still not eliminate the need for an endless series of mini-trials to determine *which* transactions qualify for inclusion in the aggregate damages model. Dr. Lamb conceded several times that there may be transactions where hospitals did, in fact, pass on the overcharge. Hr'g Tr. __. That admission completely invalidates his damages methodology.

The problem is that Dr. Lamb's damages model assumes injury on *every* hospital transaction and allocates the full amount to the hospital in all circumstances. Under Plaintiffs' former proposed class definition, which included "all" indirect purchasers in the non-retail channel (patients and insurers included), Plaintiffs could possibly defend their aggregate figures because, even if a hospital passed on the overcharge, the overcharge would fall to another member of the class. Not anymore. In redefining their class to cure the ascertainability issues, Plaintiffs excluded persons and entities that, by Dr. Lamb's own admission, bore some portion of the overcharges that are currently attributed (improperly) to hospitals. Dr. Lamb's damages model no longer fits the facts of the case or his own opinions and therefore must be rejected. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("[P]laintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation.").

The fact that Dr. Lamb's model attributes damages to hospitals for transactions where hospitals admittedly did not suffer the harm means that the damages model is necessarily overstated and unreliable. And Dr. Lamb admits that he "[has not] developed the methodology for

21

identifying those [transactions where the hospital passed on the overcharge]." Hr'g Tr. __. As a result, the Court is left in a situation where "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Comcast*, 569 U.S. at 34. Dr. Lamb's assertion that those uninjured transactions "*probably* could be identified as part of the claims administration process" (Hr'g Tr. __) is not a constitutionally acceptable solution, particularly where Dr. Lamb has not identified how this would be done. "One can only guess what data and documentation may be deemed necessary, what the formula will be, and how the claims administrator will decide [which transactions] suffered no injury." *Asacol*, 907 F.3d at 52.

To be clear, the issue with Dr. Lamb's aggregate model has nothing to do with post-trial determinations about how much each class member should receive from the total sum. Instead, the problem is that if uninjured (or even partially injured) transactions are included in Dr. Lamb's all-or-nothing model, then the *aggregate* number will be incorrect. As in *Asacol*, "proving that the defendant is not liable [on a particular transaction] reduces the amount of the possible total damage." *Asacol*, 907 F.3d at 55. Punting these issues to claims administration does not comport with due process because it does not afford a "meaningful opportunity to contest" those transactions (which are already included in Dr. Lamb's aggregate damages) where the hospital passed on the overcharge to a non-class member. *Id.* at 53. Instead, "until proceeding through each transaction and resolving factual disputes about who 'bears the burden' of the price in that transaction, the Court cannot say . . . who has paid or reimbursed a portion of the purchase price." *In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. 555, 571 (E.D. Tenn. 2014)).

The need for a transaction-level review to determine impact and the amount of damages renders class certification inappropriate. Plaintiffs have not presented persuasive evidence that a common method exists to prove classwide impact or damages in the non-retail channel.

**3. *Retail Pass-Through:* The unrebutted empirical proof shows both that many end-payors in the retail channel are uninjured and that Dr. Lamb's pass-through assumptions are wrong.**

For his retail-channel impact and damages conclusions, Dr. Lamb relies exclusively on IMS NSP data, which reflects prices between two non-class members (pharmacies and wholesalers) that are upstream in the distribution chain. In order to link that wholesale data to his ultimate opinions, Dr. Lamb makes a sweeping, untested assumption that 30,000 pharmacies over a four-year period all invariably would have passed through 100% of their costs savings to end payors. But Dr. Lamb's own non-peer-reviewed sources refute that assumption. For example, *Follow the Pill*, the lone article Dr. Lamb cited at the hearing as the bedrock for his pharmacy pass-on assumption, says *nothing* about pass-on; on the contrary, it explains that the "constellation of negotiated contracts between manufacturers, PBMs, wholesale distributors, pharmacies, and plan sponsors" creates a "complexity [that] can result in substantial variations in what different purchasers pay for the same drugs." Ex. 8 (Defs.' Hearing Exhibit 5) at 24. And the non-healthcare-related law review article that Dr. Lamb cites to show a pass-through analysis is unnecessary says just the opposite: that theoretical assumptions are unreliable "without the enrichment of an empirical analysis." Ex. 9 (Defs.' Hearing Exhibit 10) at 274.

Dr. Lamb's decision to forgo an empirical analysis of retail data is surprising considering Plaintiffs' earlier statements in this case. Before expert discovery, Plaintiffs' counsel told this Court that Plaintiffs planned to analyze impact and calculate damages using what is known as a "bottom across" analysis at the retail level, which would eliminate the need to trace overcharges through the distribution chain. Ex. 10, Dkt. 211 at 31:12–16 (arguing that "people representing payors in these [indirect-purchaser pharmaceutical] cases have not been required to prove or to analyze the overcharge to every different level of the distribution chain because there's reliable data on what the thing costs at the final level."). But now that Dr. Lamb failed to deliver on that

23

promise (likely because the retail data does not support his assumption), Plaintiffs have changed their position, claiming that a review of end-payor data is unnecessary. Plaintiffs were right the first time. Dr. Cremieux, who has testified in more than a dozen indirect-purchaser pharmaceutical antitrust cases, explained that he has never been involved in a case where the plaintiffs' expert did not consider some measure of retail data. Hr'g Tr. __. The cases that Plaintiffs cite, as shown Appendix A attached hereto, confirm this to be true. *See* Appendix A (describing retail-level data considered in indirect-purchaser pharmaceutical cases cited by Plaintiffs); *see also* Dkt. 363 at 16 & n.35. Based on Defendants' review, no indirect-purchaser pharmaceutical case has ever been certified where the expert did not consider at least some end-payor purchase data.

Although Defendants do not carry the burden in this case, Dr. Cremieux nevertheless undertook the empirical analysis that Dr. Lamb should have performed. Dr. Cremieux's data-driven analysis provided empirical proof that Dr. Lamb's assumptions are wrong. Using a bottom-across approach, Dr. Cremieux presented compelling evidence that many end payors in the proposed class paid the same (or sometimes more) for enoxaparin following Amphastar's entry into the market, which suggests that those insurers were not impacted by Amphastar's temporary injunction. Dr. Lamb's damages model improperly includes damages for those uninjured class members, and there is no method to remove them without an individualized analysis.

Dr. Cremieux also performed a top-down analysis to test Dr. Lamb's pass-through assumption. Dr. Cremieux's analysis revealed that pass-through rates vary widely across third-party payors, with an average pass-through rate of 37.5%. That pass-through rate is unsurprising because pharmacies, which are for-profit businesses, have an economic incentive to take their time lowering prices when costs decline. Hr'g Tr. __. Although the variability in the pass-through among class-members renders Dr. Cremieux's *average* pass-through estimate inappropriate for

classwide application, Dr. Cremieux's analysis demonstrates definitively that Dr. Lamb's pass-through assumptions are wrong and that his damages are substantially overstated. *See In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 162 (E.D. Pa. 2015) (denying class certification where defendants expert presented "persuasive" evidence "demonstrat[ing] that the use of a single overcharge pass-through rate . . . is flawed" and would not "result in a reasonably accurate measure of damages on a classwide basis").

Perhaps one of the most telling aspects of the class-certification hearing is Plaintiffs' response to Dr. Cremieux's testimony and opinions in the retail channel. Although Dr. Lamb offered his general reaction to Dr. Cremieux's empirical findings, he did not challenge the empirical methodology. And Plaintiffs' counsel apparently found those methods so far beyond reproach that they chose not to not ask Dr. Cremieux a single question about them.

In sum, Dr. Lamb's opinions in the retail channel depend on assumptions that are refuted by Dr. Lamb's sources and disproven through an empirical review. Plaintiffs have not offered persuasive evidence that a common method exists to identify impacted parties in the retail channel or to reliably calculate aggregate damages.

### C. The defects identified in Defendants' opposition brief are still applicable.

The evidence presented at the class-certification hearing was tailored to the expert opinions concerning classwide impact and aggregate damages, and thus did not implicate many of the other arguments raised in Defendants' opposition brief. Defendants stand on their prior briefing with respect to the following issues: adequacy/conflicts (Dkt. 363 at 19–21); standing (Dkt. 363 at 22—23), and the state-law differences (Dkt. 363 at 23–24).

### IV. CONCLUSION

For the foregoing reasons, Dr. Lamb's opinions should be excluded under Rule 702 and Plaintiffs' renewed motion to certify the class should be denied.

25

Respectfully submitted this 19th day of July, 2019.

/s/ Teresa T. Bonder
Michael P. Kenny (*pro hac vice*)
Teresa T. Bonder (*pro hac vice*)
Matthew Kent (*pro hac vice*)
Kara F. Kennedy (*pro hac vice*)
D. Andrew Hatchett (*pro hac vice*)
Tony Greene (*pro hac vice*)
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
Tel: (404) 881-7000
Fax: (404) 881-7777

/s/ Timothy L. Warnock
Timothy L. Warnock (TN Bar No. 12844)
RILEY WARNOCK & JACOBSON, PLC
1906 West End Avenue
Nashville, TN 37203
Tel: (615) 320-3700
Fax: (615) 320-3737

*Attorneys for Sandoz Inc.*

/s/ Michael L. Keeley
Michael L. Keeley (*pro hac vice*)
Bradley D. Justus (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
950 F Street, NW
Washington, DC 20004
Tel: (202) 912-4700
Fax: (202) 912-4701

Thomas G. Rohback (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
Tel: (860) 275-8100
Fax: (860) 275-8101

/s/ Dale Grimes
R. Dale Grimes (TN Bar No. 6223)
BASS, BERRY & SIMS PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Tel: (615) 742-6200
Fax: (615) 742-6293

*Attorneys for Momenta Pharmaceuticals, Inc.*

26

| Case | Retail Data Considered? | Data Analysis Offered to Prove Antitrust Impact |
|------|------------------------|-------------------------------------------------|
| *Cardizem* | **Yes.**<br><br>*In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 344 (E.D. Mich. 2001) ("Rather than tracing overcharges as they are passed through the chain of distribution, Plaintiffs intend to use a 'bottom across' approach . . . . 'Bottom across' means that the overcharge is determined by examining the price differential between the generic and the brand drug *at the retail level only*") (emphasis added). | • Comparison of brand and generic pricing data from Drugstore.com<br>• Analysis "on a store-by-store basis of the two most commonly prescribed doses" to show the price difference between the brand and generic<br>• Analysis of retail sales and pricing data from the following sources:<br>  ○ Pharmacy records<br>  ○ IMS<br>  ○ Defendant's records<br>  ○ TPP class members' records<br>  ○ List price and average wholesale price from private data collection firms (Medispan and First Data Bank)<br>• Before-and-after/ yardstick approach to determine the expected generic penetration in the but-for world<br>• Before-and-after/ yardstick approach to determine pricing in the but-for world using "detailed pharmaceutical data" |

A-1

| Case | Retail Data Considered? | Data Analysis Offered to Prove Antitrust Impact |
|------|------------------------|------------------------------------------------|
| *Flonase* | **Yes.**<br><br>*In re Flonase Antitrust Litigation*, No. 2:08-cv-3301 (E.D. Pa.), Dkt. No. 388 at ECF pg. 74 (listing the data sources analyzed by plaintiffs' expert, which include SDI-VONA data showing "[r]etail sales (price and timing of transactions reflects purchases by end payers)"); *id.* at 38 (explaining that plaintiffs' expert calculated "class members' *actual* payments . . . using *actual* data"). | • Yardstick methodology based on the following data:<br>  o Sales and pricing data:<br>    ▪ Retail sales data (SDI VONA)<br>    ▪ Non-Retail Sales (IMS NSP)<br>    ▪ Transaction-level sales data from defendant<br>    ▪ Rebate payment data from defendant<br>    ▪ Employer and plaintiff plan claims data<br>    ▪ National data on prescriptions by units and sales dollars<br>    ▪ Data on prescriptions by state<br>    ▪ List price data<br>  o Reimbursement data:<br>    ▪ Data on prescriptions by payer type by state<br>    ▪ Co-pay data by state<br>    ▪ Formulary status data<br>  o Product substitutability data:<br>    ▪ Drug use by demographic group<br>• Sensitivity analyses:<br>  o Uninsured consumers' prices across each sales channel and for each generic manufacturer<br>  o Insured consumer cost-sharing by state using data on net consumer contribution for commercial and Medicare third-party payer plans<br>  o TPPs' net cost using a sampling of extreme values of consumer contribution and rebates<br>  o Yardstick analysis of actual transaction data from the named plaintiff TPPs to show that they each suffered injury |

| Case | Retail Data Considered? | Data Analysis Offered to Prove Antitrust Impact |
|---|---|---|
| *Lidoderm* | **Yes.** <br><br> *In re Lidoderm Antitrust Litig.*, No. 3:14-md-02521 (N.D. Cal.), Dkt. 644, (Transcript of Class Certification Hearing) at 72:13–24 (testimony that plaintiffs' expert used OptumRx data, which "tells you what the TPP paid and it tells you what the . . . consumer paid"). | • Yardstick approach to determine but-for prices using data from OptumRx, which shows: <br>    o the total price <br>    o what the TPP paid <br>    o what the consumer paid <br> • Estimated the number of brand loyalists based on real-world data and excluded their damages |
| *Nexium* | **Yes.** <br><br> *In re Nexium (Esomeprazole) Antitrust Litig.*, 777 F.3d 9, 26 (1st Cir. 2015) (explaining that plaintiffs' expert used IMS National Prescription Audit data (i.e., retail-level data)). | • Yardstick methodology utilizing IMS-NPA data (because there was still no generic on the market, she looked to pricing data of similar drugs). <br> • Estimated rebates passed through to TPPs <br> • Estimated the number of prescriptions attributed to "brand copay, coinsurance, or cash-paying transactions with no overcharge" <br> • Estimated percentage of prescriptions that used Nexium co-pay coupons |
| *Solodyn* | **Yes.** <br><br> *In re Solodyn Antitrust Litig.*, 2017 U.S. Dist. LEXIS 170676, at *62 n.21 (D. Mass. Oct. 16, 2017) (explaining that plaintiffs' expert used "IMS Xponent data, which tracks retail sales across mail order and retail channels" and which "captures the entity that paid for the prescription at the pharmacy"). | • Conducts three yardstick models based on different but-for assumptions regarding timing of market entry <br>    o Estimates and excludes brand loyalists under each of the three scenarios <br>    o Excludes prescriptions with no co-payment from aggregate damages <br> • His damages/impact models use: <br>    o IMS Xponent data, which tracks retail sales across mail order and retail changes and captures the entity that paid for the prescription at the pharmacy <br>    o Publicly available data (unspecified) <br>    o Defendants' data <br> • Calculates unjust enrichment damages separately from overcharge damages using the difference between actual and but-for profits of defendant |

APPENDIX A

| Case | Retail Data Considered? | Data Analysis Offered to Prove Antitrust Impact |
|---|---|---|
| *Wellbutrin*<br><br>**(class later decertified)** | **Yes.**<br><br>*In re Wellbutrin XL Antitrust Litig.,* 282 F.R.D. 126, 143 (E.D. Pa. 2011) (finding that a pass-through analysis was unnecessary because plaintiffs "show[ed] that the price actually paid [by class members] . . . was higher"); *In re Wellbutrin XL Antitrust Litig*., No. 08-cv-2433 (E.D. Pa.), Dkt. No. 317 (transcript of class certification evidentiary hearing) at 106:3–10 (clarifying that the expert "calculate[d] impact by looking at end payer prices"); *id.* at 106:19–107:3 (explaining that expert did not calculate overcharges to direct purchasers and then calculate pass-through). | • Yardstick methodology using IMS data showing the actual prices paid by class members<br>• Probability analysis regarding the likelihood that any TPP class member would be uninjured due to lack of generic purchases, looking at average generic substitution rates |

A-4

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of July, 2019, a true and correct copy of the foregoing document was filed electronically with the U.S. District Court for the Middle District of Tennessee. Notice of this filing was served via the court's electronic filing system on counsel listed below:

Adam Gitlin
Brendan P. Glackin
Bruce W. Leppla
Dean M. Harvey
Katherine C. Lubin
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Mark P. Chalos
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
One Nashville Place
150 Fourth Avenue, North, Suite 1650
Nashville, TN 37219-2423
Telephone: (615) 313-9000
Facsimile: (615) 313-9965

John T. Spragens
SPRAGENS LAW
1200 16th Ave. S.
Nashville, TN 37212
Telephone: (615) 983-8900
Facsimile: (615) 682-8533


*Attorneys for Plaintiffs*

/s/ Andrew Hatchett