# EXHIBIT 1



THE HOSPITAL AUTHORITY OF METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, d/b/a NASHVILLE GENERAL HOSPITAL and AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES DISTRICT COUNCIL 37 HEALTH & SECURITY PLAN,

Plaintiffs

v.

MOMENTA PHARMACEUTICALS, INC. and SANDOZ INC.,

Defendants

# Demonstratives to Support Dr. Cremieux's Direct Testimony

Civil Action No. 3:15-cv-01100

July 12, 2019



# Plaintiffs' Memorandum in Support of Class Cert

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

THE HOSPITAL AUTHORITY OF
METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON COUNTY,
TENNESSEE, d/b/a NASHVILLE GENERAL
HOSPITAL and AMERICAN FEDERATION OF
STATE, COUNTY AND MUNICIPAL
EMPLOYEES DISTRICT COUNCIL 37 HEALTH
& SECURITY PLAN,

Civil Action No. 3:15-cv-01100

Plaintiffs,

v.

MOMENTA PHARMACEUTICALS, INC. and
SANDOZ INC.,

Defendants.

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' REN...**
**CERTIFICATION AND APPOINTMENT OF...**

(Filed Under Seal)
Confidential Material subject to Order entered by the
United States District Court for the Middle District of Tennessee

> In the non-retail channel, Defendants take a different tack, claiming an "individualized analysis" is necessary to determine the "nature and extent" of pass-on by hospitals.[86] As set forth above, *see supra* pp. 6-8, it is Dr. Cremieux's unconditional view to the contrary that no such pass-on by hospitals occurs. However, regardless, this speculative hypothetical does not go

p. 16

Dkt. No. 353

Case 3:15-cv-01100   Document 385-1   Filed 07/19/19   Page 3 of 41 PageID #: 17054



# Initial Expert Report of Dr. Cremieux – Non-Retail

> *"The structure of provider reimbursement **can vary substantially by payor** with significant implications for determining impact."*

¶ 53, JA-155

> *"To determine whether consumer payment and TPP reimbursement would have been lower with a lower drug price requires an **individualized review** of each hospital's policy to determine its charge master amount and the frequency of updates to reflect changes in the provider's acquisition costs for the drug."*

¶ 55, JA-157

> *"[W]hether the provider suffered injury because of the delay in the second generic entrant would require **individualized inquiry.** Both reimbursement and acquisition cost data are necessary to evaluate whether any payment related to the administration of enoxaparin covered the acquisition cost of the provider's enoxaparin purchase or not. If it did, then the provider was not injured."*

¶ 82, JA-175



# Plaintiffs' Memorandum in Support of Class Cert

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

THE HOSPITAL AUTHORITY OF
METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON COUNTY,
TENNESSEE, d/b/a NASHVILLE GENERAL
HOSPITAL and AMERICAN FEDERATION OF
STATE, COUNTY AND MUNICIPAL
EMPLOYEES DISTRICT COUNCIL 37 HEALTH
& SECURITY PLAN,

Civil Action No. 3:15-cv-01100

Plaintiffs,

v.

Chief Judge Waverly D. Crenshaw, Jr.
Magistrate Judge Barbara D. Holmes

MOMENTA PHARMACEUTICALS, INC. and
SANDOZ INC.,

Defendants.

MEMORANDUM IN SUPPORT OF PLAINTIFFS' REN[...]
CERTIFICATION AND APPOINTMENT OF [...]

(Filed Under Seal)
Confidential Material subject to Order entered by the
United States District Court for the Middle District of Tennessee

of the acquisition cost of enoxaparin.[72]  Dr. Cremieux also explains that wholesalers, retail pharmacies, and PBMs[73] contract in such a way that the overcharge is passed on to TPPs/people without insurance (in the retail channel) and hospitals (in the non-retail channel).[74]  This view is

p. 14

Dkt. No. 353



# Initial Expert Report of Dr. Cremieux – Retail

> "Consumer payments often have no relation to the pharmacy price of the drug, and **consumers are unlikely to benefit from a drop in the price of a generic drug or be harmed by a higher generic drug price**."

¶ 49, JA-153

> "Dr. Lamb fails to provide any support for that assumption [that higher prices paid at the wholesale level in this market will be passed on to consumers and TPPs]. Based on my review of actual data, **Dr. Lamb's trickle-down price theory is demonstrably incorrect**."

¶ 60, JA-161

> "Pharmacy claims data that contain actual consumer and TPP payments for generic enoxaparin prescriptions **do not show a discernable impact on consumers and TPPs** from Amphastar's delayed entry." "

¶ 14, JA-125



# Summary of Conclusions

*Non-Retail:*

1.  **Overcharge.** Individualized inquiry of hospital data and supplier contracts is necessary to determine whether hospitals paid an overcharge. [Supp. Rpt. ¶ 23, JA-395]

2.  **Pass-through.** Individualized inquiry of hospital transactions is necessary to determine whether hospitals absorbed or passed on any overcharge to end payors. [Supp. Rpt. ¶¶ 29, 47, JA-398, JA-411]

*Retail:*

3.  **Pass-through.** Individualized analysis of transactions is necessary to determine whether pharmacies absorbed or passed on overcharges to end payors. [Supp. Rpt. ¶¶ 49, 52 JA-413, JA-414]



# Non-Retail Distribution Channel



Cremieux Rpt. Fig. 2, Fig. 4, ¶¶ 42, 76
JA-145, JA-154, JA-164



# Summary of Conclusions

**_Non-Retail:_**

1. **Overcharge.** Individualized inquiry of hospital data and supplier contracts is necessary to determine whether hospitals paid an overcharge. [Supp. Rpt. ¶ 23, JA-395]

2. **Pass-through.** Individualized inquiry of hospital transactions is necessary to determine whether hospitals absorbed or passed on any overcharge to end payors. [Supp. Rpt. ¶¶ 29, 47, JA-398, JA-411]

_Retail:_

3. **Pass-through.** Individualized analysis of transactions is necessary to determine whether pharmacies absorbed or passed on overcharges to end payors. [Supp. Rpt. ¶¶ 49, 52 JA-413, JA-414]



# Exhibit 1 of Dr. Cremieux's Supplemental Report



Case 3:15-cv-01100    Document 385-1    Filed 07/19/19    Page 10 of 41 PageID #: 17061

JA-456

9



# Def. Exhibit 29 – AMPH00000399

Highly Confidential

AMPH00000399



# Def. Exhibit 27 – AMPH00020438

From: Jacob Liawatidewi-Amph [/O=IMS/OU=AMPHASTAR/CN=RECIPIENTS/CN=JACOBL]
Sent: 9/29/2011 11:52:31 AM
To: Jack Zhang [JYZ@amphastar.com]; Mary Luo-IMS [ml@ims-limited.com]
Subject: Watson-Enoxaparin and our own label

I will be back in the office tomorrow but would like to provide an update on Watson relations and our own label:

1. For Watson: - I have been working with several people for Dec delivery.
- We provided our capacity allocation to them and we plan to start shipping them products around mid Dec.
- Watson provided us with their forecast, and their retail market (because the way reimbursement works in retail market, currently Sanofi has very small market share in Retail market), when Watson found out that Teva did not received approval, they increased their forecast.
- Watson is well aware that we can not provide the qty as they requested in the forecast. I am keeping Jason Shandell aware of the situation in case Watson changes their approach with us, but so far, according to Jason, Watson General Counsel e-mailed him to let us know that his team informed him that launch preparations are proceeding very well and his team was happy
- Lastly, Watson also reached out to discuss international market of this product, specifically Canada, Australia and some EU countries. I have not discussed in detail since I have been traveling
- Overall, the working relations has been good, and I am planning to coordinate this relations for the first 3-6 months, once it's normal, I will hand this to Operation team.

2. For Amph own Label:
- Our main competitor on the Non-Retail market is Sanofi
- Novation at this time has decided not to bid this product
- We made an offer to Premier but they declined because Sanofi offered lower than our offer
- There are 2 major contracts will up for bid with contract eff. Date is 7/1/12. Premier (12 Million units/yr) and Health Trust (7 Million Units/yr). Health Trust currently has Sandoz as Sole Source
- Currently, I am waiting from 4 GPOs to decide whether they will take our product. These GPO has no Sole source agreement with Sanofi or Sandoz. Total market size is about 7 Million Units/yr.
- Until 7/1/12, my forecast of our sales will be about 6 Million units/yr due to the limitation of GPO First Right Refusal
- I am negotiating with the wholesalers to load the short dated products, I should know within 1 wk. My plan

Highly Confidential                                                     AMPH00020438

2. For Amph own Label:
- Our main competitor on the Non-Retail market is Sanofi
- Novation at this time has decided not to bid this product
- We made an offer to Premier but they declined because Sanofi offered lower than our offer
- There are 2 major contracts will up for bid with contract eff. Date is 7/1/12. Premier (12 Million units/yr) and Health Trust (7 Million Units/yr). Health Trust currently has Sandoz as Sole Source



# Exhibit 1 of Dr. Cremieux's Supplemental Report



JA-456



# Dr. Lamb's Supplemental Reply Report

OUTSIDE COUNSEL ONLY

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSE**
**NASHVILLE DIVISION**

THE HOSPITAL AUTHORITY OF
METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON COUNTY,
TENNESSEE, d/b/a NASHVILLE GENERAL
HOSPITAL and AMERICAN FEDERATION
OF STATE, COUNTY AND MUNICIPAL
EMPLOYEES DISTRICT COUNCIL 37
HEALTH & SECURITY PLAN,

Civil Action No. 15-cv-1100

Plaintiffs,

v.

MOMENTA PHARMACEUTICALS, INC.
SANDOZ INC.,

Defendants.

19.     Furthermore, Dr. Cremieux speculates that NGH in particular was not injured because, he claims, MedAssets had a sole-source contract with Sanofi that froze the price from prior to the injunction period until mid-2012, when further discounts were provided. From this, he infers that NGH was not injured. Dr. Cremieux is wrong. ==First, evidence I have reviewed demonstrates that in the but-for world, the price reduction that occurred in mid-2012 would have been greater as price erosion would not have been preempted by the injunction.==



# Summary of Conclusions

*Non-Retail:*

1.  **Overcharge.** Individualized inquiry of hospital data and supplier contracts is necessary to determine whether hospitals paid an overcharge. [Supp. Rpt. ¶ 23, JA-395]

2.  **Pass-through.** Individualized inquiry of hospital transactions is necessary to determine whether hospitals absorbed or passed on any overcharge to end payors. [Supp. Rpt. ¶¶ 29, 47, JA-398, JA-411]

*Retail:*

3.  **Pass-through.** Individualized analysis of transactions is necessary to determine whether pharmacies absorbed or passed on overcharges to end payors. [Supp. Rpt. ¶¶ 49, 52 JA-413, JA-414]



# *Hospital Transactions* – Three Possibilities

| Total Pass On | Partial Pass On | No Pass On |
|---|---|---|
| ↓ | ↓ | ↓ |
| Insurers/Patients | Hospitals/ Insurers/Patients | Hospitals |

**Impacted Parties**

Supp. Rpt. ¶ 28, JA-398



# *Hospital Transactions* – **Three Possibilities**

**What Facts and Data Provide the Answer?**

Acquisition Cost

GPO Contracts

Billing Data

Hospital-TPP Contracts

Charge Setting Practices

Reimbursement Data

Supp. Rpt. ¶¶ 18, 29, JA-390, JA-398



# Plaintiffs' Responses to Request For Admission
## Def. Exhibit 23

**REQUEST FOR ADMISSION NO. 43:**

Admit that the C[...]

Healthcare Provider was[...]

Third-Party Payor.

**RESPONSE TO REQU[...]**

Plaintiffs object [...]

party's claim or defense[...]

ambiguous. Plaintiffs al[...]

absent class members be[...]

readily obtain despite reasonable [...]

activities of any Propose[...]

reasonable inquiry know[...]

further object to this Req[...]

scope of the Class or spe[...]

expert report and before[...]

is set forth in Paragraph[...]

response is required. Pl[...] purchased both Generic [...] reimbursed in full for its [...]

**REQUEST FOR ADMISSION NO. 44:**

[...]sed the Drug, where the [...]rug by either a Patient or [...]ation relevant to any [...]bursed" as vague and [...]asks for information about [...]hat Plaintiffs cannot [...]bout the particular [...]ss Members. Plaintiffs [...]g information about the [...]ave served their opening [...]The definition of the Class [...]se Objections, no further [...]ly that it admits it [...]stances it was paid or [...]d-Party Payor.

### Admission No. 43

response is required. Plaintiff Nashville General responds for itself only that ==it admits it purchased both Generic Enoxaparin and Lovenox® and that in some instances it was paid or reimbursed in full for its cost of the Drug by either a Patient or a Third-Party Payor.==

### Admission No. 44

response is required. Plaintiff Nashville General responds for itself only that ==it admits it purchased both Generic Enoxaparin and Lovenox® and that in some instances it was paid or reimbursed in part for its cost of the Drug by either a Patient or a Third-Party Payor.==



# Letter from A. Gitlin to Defs (July 6, 2018) (Dkt. No. 273-10)

## Def. Exhibit 2



5.  You have requested all of Nashville General's pharmacy billing data related to Enoxaparin and Lovenox. Yesterday we produced data reflecting those transactions for which Nashville General may recover as described by the proposed class (NGH000148).[1] You also already

---

[1] This spreadsheet was created by pulling Nashville General's pharmacy billing data, deleting patient identifying information, and then deleting the entries reflecting those transactions where Nashville General was not injured.

Cremieux Rpt. ¶¶ 36, 109, 120

JA-142, JA-189, JA-195



# Exhibit 11 to Dr. Cremieux's Expert Report

**Exhibit 11**
**Enoxaparin Charge Master 30mg Prices**
**Ten Largest California Hospitals**
**FY 2009 - 2012**

| | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|
| Cedars-Sinai Medical Center[2] | $144.24 | $144.24 | $129.77 | $129.77 |
| Community Regional Medical Center - Fresno[3] | $116.58 | $116.58 | $116.58 | $116.58 |
| LAC-USC Medical Center[4] | LAC-USC Medical Center does not include individual drugs on its charge master | | | |
| Kaiser Fund Hospital - Sacramento[5] | $90.00 | $90.00 | $90.00 | $90.00 |
| Loma Linda Medical Center[6] | $81.18 | $93.96 | $93.00 | $93.96 |
| Scripps Mercy Hospital[7] | $104.32 | $115.99 | $135.00 | $142.00 |
| Sutter Medical Center of Sacramento | $117.37 | $117.71 | $119.70 | $121.74 |
| Sharp Memorial Hospital | $252.55 | $298.05 | $319.00 | Available Upon Request |
| Hoag Memorial Hospital[8] | $104.10 | $113.81 | $97.77 | $103.66 |
| University of California-Davis Medical Center[9] | $91.50 | $99.50 | $108.50 | $108.50 |

Cremieux Rpt. ¶ 113, Fig. 11, JA-267


ANALYSIS GROUP
ECONOMIC, FINANCIAL and STRATEGY CONSULTANTS

## Exhibit 2
## Top U.S. Hospitals Relating Drug Acquisition Costs to Charges

| Hospital Name | Relevant Quotes from Hospital's Chargemaster Webpage |
|---|---|
| Crozer Chester Medical Center | "Charges for drugs and biologicals vary based on market prices, and the "standard charges" shown reflect the charges in effect based on market prices on the date shown. Charges for inpatient admissions vary depending on the particular items and services a patient receives during his or her inpatient stay and the current charges for those items and services, and the "standard charges" shown for inpatient stays reflect the average charges billed during an inpatient stay between the dates shown with no adjustment for subsequent changes in charges." |
| Grossmont Hospital<br>Sharp Memorial Hospital | "Sharp HealthCare's actual reimbursement is influenced by a variety of internal and external factors, including negotiated health plan rates, fixed government rates, individually negotiated package pricing, fixed fund distributions for indigent care populations, prompt payment discounts, and the ability of unfunded patients ability to pay."<br><br>"These charges may have changed since this date due to new technology, added or eliminated services, goods and/or procedures, changes made by manufacturers or vendors, etc." |
| Hospital of the University of Pennsylvania | "Our billed charges are based on the hospital's costs to provide services, which may include: pharmaceuticals and drugs"<br><br>"The cost of obtaining drugs/pharmaceuticals changes often due to the ongoing changes in the prices of drugs. For example, new drugs are approved by the FDA, or brand-name drugs become available as generics. The hospital's pharmacy drug prices are tied to a published quarterly Average Wholesale Price (AWP) listing." |
| Huntsville Hospital | "These listed dollar amounts are the gross standard charges to provide a particular service, supply, or drug."<br><br>"Hospital standard charges vary. This is due to a variety of factors including negotiated payments, average wage index by geographic area, drug and supply costs contracts, and the amount of uncompensated care." |
| Mount Sinai Hospital<br>Mount Sinai Health System - Beth Israel | "Hospital charges will change from time to time as many are based on the cost of a medical supply or drug. As costs change, chargemaster prices are updated."<br><br>"Hospitals set their standard charges for services and items based on internal metrics, including the cost to provide patient care - which varies between hospitals." |
| The Children's Hospital of Philadelphia | "Hospital charges are based on the cost of providing patient care; both direct and indirect costs are taken into consideration. Direct costs include staffing costs and equipment costs for the services provided." |
| The Methodist Hospital (Houston) | "Our reimbursement depends on a variety of factors, including: individually negotiated package pricing." |
| UC Irvine Medical Center | "These charges represent retail pricing as published on June 1, 2018, and are subject to change as a result of new technology, the addition or elimination of services, variation of actual dosage and quantity, as well as any other changes made by manufacturers and suppliers, including the cost of goods and services." |
| University of Michigan Hospitals and Health Centers | "This listing does not include medications and surgical supplies which are not standard charges. Medication charges vary by manufacturer, units, dose, strength and current cost. Supply charges vary by manufacturer, materials, size, units, and current cost." |
| University of North Carolina Hospital | "There is variation in the costs listed, and in some cases, the same items' costs vary at different hospitals within our system. The cost of an item or service is based on a variety of factors, including but not limited to, the cost per unit at the time of purchase for supplies and medications and the classification of a hospital based on federal government standards." |
| Vanderbilt University Medical Center | "Vanderbilt Health determines charges based on costs of providing the services." |

JA-457



# Exhibit 2 of Dr. Cremieux's Supplemental Report

**Exhibit 2**
**Top U.S. Hospitals Relating Drug Acquisition Costs to Charges**

| Hospital Name | Relevant Quotes from Hospital's Chargemaster Webpage |
| --- | --- |
| Crozer Chester Medical Center | "Charges for drug... admissions vary d... charges" shown fo... |
| Grossmont Hospital Sharp Memorial Hospital | "Sharp HealthCar... package pricing, f... "These charges m... |
| Hospital of the University of Pennsylvania | "Our billed charge... "The cost of obtaining drugs/pharmaceuticals changes often due to the ongoing changes in the prices of drugs. For example, new drugs are approved by the FDA, or brand-name drugs become available as generics. The hospital's pharmacy drug prices are tied to a published quarterly Average Wholesale Price (AWP) listing." |
| | "These listed dollar amounts are the gross standard charges to provide a particular service, supply, or drug." |
| Huntsville Hospital | "Hospital standard... uncompensated ca... |
| Mount Sinai Hospital | "Hospital charges... |
| Mount Sinai Health System – Beth Israel | "Hospitals set thei... |
| The Children's Hospital of Philadelphia | "Hospital charges... services provided. |
| The Methodist Hospital (Houston) | "Our reimburseme... |
| UC Irvine Medical Center | "These charges re... and quantity, as w... |
| University of Michigan Hospitals and Health Centers | "This listing does... charges vary by m... |
| University of North Carolina Hospital | "There is variation... including but not l... |
| Vanderbilt University Medical Center | "Vanderbilt Health... |

**Mount Sinai Hospital**

"Hospital charges will change from time to time as many are based on the cost of a medical supply or drug. As costs change, chargemaster prices are updated."

**University of North Carolina Hospital**

"There is variation in the costs listed, and in some cases, the same items' costs vary at different hospitals within our system. The cost of an item or service is based on a variety of factors, including but not limited to, the cost per unit at the time of purchase for supplies and medications and the classification of a hospital based on federal government standards."



# Exhibit 2 of Dr. Cremieux's Supplemental Report

**Exhibit 2**
**Top U.S. Hospitals Relating Drug Acquisition Costs to Charges**

| Hospital Name | |
|---|---|
| Crozer Chester Medical Center | "Charges for drug admissions vary charges" shown fo |
| Grossmont Hospital Sharp Memorial Hospital | "Sharp HealthCare package pricing, f "These charges m |
| Hospital of the University of Pennsylvania | "Our billed charge "The cost of obtai available as gener |
| Huntsville Hospital | "These listed dollar amounts are the gross standard charges to provide a particular service, supply, or drug." "Hospital standard charges vary. This is due to a variety of factors including negotiated payments, average wage index by geographic area, drug and supply costs contracts, and the amount of uncompensated care." |
| Mount Sinai Hospital Mount Sinai Health System - Beth Israel | "Hospital charges "Hospitals set thei |
| The Children's Hospital of Philadelphia | "Hospital charges services provided. |
| The Methodist Hospital (Houston) | "Our reimburseme |
| UC Irvine Medical Center | "These charges re and quantity, as w |
| University of Michigan Hospitals and Health Centers | "This listing does charges vary by m |
| University of North Carolina Hospital | "There is variation including but not l |
| Vanderbilt University Medical Center | "Vanderbilt Health |

### Huntsville Hospital

"Hospital standard charges vary. This is due to a variety of factors including negotiated payments, average wage index by geographic area, drug and supply costs contracts, and the amount of uncompensated care."

### University of Michigan Hospitals and Health Centers

"This listing does not include medications and surgical supplies which are not standard charges. Medication charges vary by manufacturer, units, dose, strength and current cost. Supply charges vary by manufacturer, materials, size, units, and current cost."

JA-457

Case 3:15-cv-01100    Document 385-1    Filed 07/19/19    Page 23 of 41 PageID #: 17074

22



# Boston Children's Hospital Website

## Def. Exhibit 13

*"Pharmacy items are priced at the time they are dispensed to patients, based on acquisition cost and may vary."*

(http://www.childrenshospital.org/patient-resources/financial-and-billing-matters/hospital-services-and-charges)



# *A Study of Hospital Charge Setting Practices*

## Def. Exhibit 4



"A Study of Hospital Charge Setting Practices," The Lewin Group, December 2005 (hereafter "A Study of Hospital Charge Setting Practices"), p. v.

**Use of Cost and Other Information in Charge Master Process**

In an open-ended question about the information that is used in setting charges for existing services, hospitals in large urban areas mentioned using cost information half of the time, while rural hospitals mentioned it only a quarter of the time. Similarly, two-thirds of the major teaching hospitals reported using cost data in the charge setting process compared to one-half of the non-teaching hospitals. A number of respondents indicated that hospital charges do not systematically reflect costs, with some exceptions. Generally charges for new items and procedures are those that are most likely to correlate in some way with hospitals' actual costs. Hospitals also reported basing charges for supplies and pharmaceuticals on their costs. Methods for identifying costs varied widely for respondents due to different cost accounting systems and different assumptions for allocating costs across multiple departments.

**E. Pharmacy Charge Masters**

In addition to pharmacy charges being set differently and generally being under the purview of the Director of Pharmacy rather than finance staff, the charge masters for these items tend to be updated with greater frequency and to be tied more closely to actual costs. Some hospitals reported basing charges on the average wholesale price (AWP) plus a standard mark-up, but many indicated they now work from more sophisticated, internally developed pharmacy mark-up tables. These tables generally were developed by prescription drug category, and were often complex enough to vary costs by drug type, means of administration, involvement of pharmacist, etc. Overhead costs were generally incorporated into the formula or table used by each facility. Many respondents reported using separate software specially developed for pharmacy cost management.



# Dr. Lamb's Reply Report

Period were to hospitals. Hospital care providers sell procedures or care services to patients, and as I demonstrate below, for those procedures or services, Lovenox or generic Enoxaparin is simply an input cost. Hospitals are paid for these procedures either under a prospective payment system (e.g. reimbursed per day, per procedure, per diagnosis) or at a discount off the chargemaster (e.g. 60 percent of the total charges).[95] In each of these instances, it is clear that

[95] Louis C Gapenski and Kristin L Reiter, "Chapter 2: Healthcare Insurance and Reimbursement Methodologies," *Healthcare Finance: An Introduction to Accounting & Financial Management*. Sixth Edition. Arlington: VA. Health Administration Press, 2016, pp. 52-53. Available at: https://www.ache.org/pubs/GapenskiReiter_chapter2.pdf;

¶ 42

JA-304



# *Healthcare Finance* (Louis Gapenski)
## Def. Exhibit 8

### Fee-for-Service Methods

The three primary fee-for-service methods of reimbursement are cost based, charge based, and prospective payment.

### Cost-Based Reimbursement

Under **cost-based reimbursement**, the payer agrees to reimburse the provider for the costs incurred in providing services to the insured population. Reimbursement is limited to *allowable costs*, usually defined as those costs directly related to the provision of healthcare services. Nevertheless, for all practical purposes, cost-based reimbursement guarantees that a provider's costs will be covered by payments from the payer. Typically, the payer makes *periodic interim payments (PIPs)* to the provider, and a final reconciliation is made after the contract period expires and all costs have been processed through the provider's managerial (cost) accounting system.

Louis C Gapenski and Kristin L Reiter, "Chapter 2: Healthcare Insurance and Reimbursement Methodologies,"
*Healthcare Finance: An Introduction to Accounting & Financial Management.* Sixth Edition. Arlington: VA. Health Administration Press, 2016. pp. 52.



# Dr. Cremieux's Publications in Healthcare Economics



# Dr. Lamb's C.V.





Russell Lamb, Ph.D.
President
Monument Economics Group
Phone: (703) 615-3474
Email: rlamb@megconsulting.com

**Professional Summary**

Russell Lamb is an expert in antitrust economics and has testified concerning antitrust liability, impact, and damages in U.S. District Court. He has an extensive background in applied econometrics and has developed econometric models to measure damages in a number of matters involving allegations of horizontal price fixing. He has provided expert testimony in State and Federal Courts in the United States and in Canada on a range of issues including class-certification and economic damages in antitrust, RICO and consumer fraud matters. In addition, he has provided expert advice to client attorneys at all levels of the litigation. Dr. Lamb has an extensive background in the analysis of domestic and international agricultural markets, and has authored more than 50 articles in peer-reviewed economics journals, trade press, and major newspapers.

Dr. Lamb's work has been cited by courts in certifying classes in the United States and Canada. For example, in In re Aftermarket Automotive Lighting Products Antitrust Litigation, the court held that his analysis provided "a sufficient basis from which to conclude that Plaintiffs would adduce common proof concerning the effect of Defendants' alleged price-fixing conspiracy on prices class members paid." In certifying the Class in In re: Titanium Dioxide Antitrust Litigation, the Court said, "This Court finds that Dr. Lamb's regression analysis accurately reflects the characteristics of the titanium dioxide industry, and the facts in this case." In the Canadian LCD Competition Act Class Action, the Court held that Dr. Lamb's analysis provided "evidence of a viable methodology for the determination of loss on a class-wide basis." In In re: Puerto Rican Cabotage Litigation, the Court held that "Dr. Lamb [had] set forth a reputable and workable model for determining

1

**Papers Published in Refereed Journals**

- "Government Regulation and Quality in the U.S. Beef Market," (with Peyton Ferrier) *Food Policy*, Vol. 32, No. 1, February 2007, 84-97

- "Rent-seeking in U.S.-Mexican Avocado Trade," *Cato Journal*, Vol. 26, No. 1, December 2006, 159-177

- "Consolidation in U.S. Agriculture and the Role of Public Policy," *The ICFAI Journal of Agricultural Economics*, Vol. 1, 2004, 7-16

- "Fertilizer Use, Risk, and Off-farm Labor Markets in the Semi-Arid Tropics of India," *American Journal of Agricultural Economics*, Vol. 85, No. 2, May 2003, 359-371

- "Inverse Productivity: Land Quality, Labor Markets, and Measurement Error," *Journal of Development Economics*, Vol. 71, No. 1, June 2003, 71-95

- "A Market-Forces Policy for the New Farm Economy?" *Review of Agricultural Economics*, Vol. 24, No. 1, 1 March 2002, 15-30

- "Food Crops, Exports, and the Short-run Policy Response of Agriculture in Africa," *Agricultural Economics*, Vol. 22, No. 3, April 2000, 271-298

- "FAIR Act Implications for Land Values in the Corn Belt," (with Jason Henderson) *Review of Agricultural Economics*, Vol. 22, No. 1, Summer – Spring 2000, 102-119

- "Why are Estimates of Agricultural Supply Response So Variable?" (with Francis X. Diebold) *Journal of Econometrics*, Vol. 76, No. 1-2, January – February 1997, 367-373



# NGH/BlueCross BlueShield Contract – NGH029572

## Def. Exhibit 24

ANNUAL CONTRACT RATE ADJUSTMENT
**BLUEPREFERRED<sup>SM</sup> NETWORK**
**SCHEDULE 1**
**Metropolitan Nashville General Hospital**
**Provider No. 1000159**
**Effective Date: January 1, 2010**

Institution agrees that this Schedule 1 will be attached to and made part of the BluePreferred<sup>SM</sup> Network Attachment to the BCBST Institution Agreement, all of which have been entered into by the parties of this Schedule. This Schedule 1 regulates reimbursement between BCBST and its affiliates, collectively herein BCBST and Institution, for Institution's provision of Covered Inpatient Services to Members who are admitted to Institution's inpatient facilities during the term of the Attachment.

**High Cost Drugs** — Revenue Code 636 — **70% of Covered Charges**

\*(Revenue Code 636 is paid in addition to outpatient surgery, approved observation services, outpatient case rates, qualified implants, emergency room services, cardiac rehabilitation and ambulance services. The payment made will in no instance be greater than the total cost of the drug.)

**All Other Outpatient Services** — **65% of Covered Charges**

All other Outpatient Services are defined as those services that cannot be appropriately categorized for reimbursement in Sections I – VII of this Schedule 2 and that are approved for reimbursement by BCBST. The Revenue Codes listed in the All Other Outpatient Services section of BCBST's Commercial Provider Administration Manual will be considered for reimbursement unless performed with an all inclusive service.

OUTSIDE COUNSEL ONLY     NGH029572

29



# NGH Hospital Bill – NGH001232

## Def. Exhibit 1



636 Revenue Code

J1650 = Enoxaparin



# NGH Remittance – NGH001229

## Def. Exhibit 1



J1650 = Enoxaparin

OUTSIDE COUNSEL ONLY



# Summary of Conclusions

*Non-Retail:*

1.  **Overcharge.** Individualized inquiry of hospital data and supplier contracts is necessary to determine whether hospitals paid an overcharge. [Supp. Rpt. ¶ 23, JA-395]

2.  **Pass-through.** Individualized inquiry of hospital transactions is necessary to determine whether hospitals absorbed or passed on any overcharge to end payors. [Supp. Rpt. ¶¶ 29, 47, JA-398, JA-411]

*Retail:*

3.  **Pass-through.** Individualized analysis of transactions is necessary to determine whether pharmacies absorbed or passed on overcharges to end payors. [Supp. Rpt. ¶¶ 49, 52 JA-413, JA-414]



# Retail Distribution Channel

**Manufacturers** → Wholesalers

↓ ↓

**Retail**

Pharmacies

↓

Uninsured Patients     **Insurers**     **Insured Patients**

Cremieux Rpt. Fig. 1, Fig. 3, ¶ 42
JA-145, JA-151, JA-164

Case 3:15-cv-01100    Document 385-1    Filed 07/19/19    Page 34 of 41 PageID #: 17085

# *Passing on the Monopoly Overcharge* (Robert Harris)

## Def. Exhibit 10

VOLUME 128  DECEMBER 1979  No. 2

PASSING ON THE MONOPOLY OVERCHARGE:
A COMPREHENSIVE POLICY ANALYSIS

ROBERT G. HARRIS † AND LAWRENCE A. SULLIVAN ††

Technological development and increasing specialization in the American economy have fostered structural complexity. Consequently (and despite considerable vertical integration), most transformations from basic inp[...] transactions in a lengthy [...] power can be exercised a[...] farther down; indeed, it o[...] sale markets are generally [...] is created by restrictive di[...] chain, variations from th[...] encountered at the manu[...]

When monopolizatio[...] firms gain market power [...] competitive levels.³ The [...] and a competitive price [...] simply the "overcharge." [...]

Without the enrichment of an empirical analysis, even a sensitive theoretical analysis may provide a weak basis for inferences about real-world situations. Having concluded that, in theory,

† Assistant Professor of Busi[...] ley. B.A. 1965, M.A. 1973, M[...] California, Berkeley.

†† Earl Warren Professor of Public Law, University of California, Berkeley. A.B. 1948, University of California, Los Angeles; J.D. 1951, Harvard University. We wish to acknowledge the helpful comments of our colleagues, Professors Michael Conant, George Evans, and Thomas Jorde, on an earlier draft of this Article.

¹ See generally the brief studies of thirteen industries in W. ADAMS, THE STRUCTURE OF AMERICAN INDUSTRY (4th ed. 1971). See also F. SCHERER, INDUSTRIAL MARKET STRUCTURE AND ECONOMIC PERFORMANCE (1970) (see especially chapters 3, 4, & 9).

² Market power can be defined as "the power of a firm to affect the price which will prevail on the market in which the firm trades." L. SULLIVAN, HANDBOOK OF THE LAW OF ANTITRUST § 8 (1977).

³ A simple, theoretical description of the differences between competitive and monopoly pricing is found in Gellhorn, An Introduction to Antitrust Economics, 1975 DUKE L.J. 1, 33-35.

⁴ This terminology has become customary. See, e.g., HOUSE COMM. ON THE JUDICIARY, REPORT TO ACCOMPANY H.R. 11942, H.R. REP. No. 95-1397, pt. 1, 95th Cong., 2d Sess. 3 (1978) [hereinafter cited as 1978 HOUSE REPORT].

(269)

p. 274



# Retail Distribution Channel



Manufacturers → Wholesalers

IMS NSP Data

Retail
Pharmacies

OptumHealth Data

Uninsured Patients — Insurers — Insured Patients

Case 3:15-cv-01100   Document 385-1   Filed 07/19/19   Page 36 of 41 PageID #: 17087

Cremieux Rpt. Fig. 1, Fig. 3, ¶ 42
JA-145, JA-151, JA-164



# Exhibit 9.a.ii to Dr. Cremieux's Initial Expert Report

**Exhibit 9.a.ii**
**Difference in Average Employer Payment for Generic Enoxaparin**
**By Individual Employer in OptumHealth Pharmacy Claims**
**All Dosages - Scaled to 10mg Syringe**
**Pre-Amphastar Entry (February 2011 - July 2011) and Post-Amphastar Entry (February 2012- July 2012)**

*Each bar represents an individual employer*

34% of employers have a *higher* average payment
(>$0.05 difference)
following Amphastar entry
(n= 20)

14% of employers have a *similar* average payment
(-$0.05 to $0.05 difference)
following Amphastar entry
(n= 8)

53% of employers have a *lower* average payment
(<-$0.05 difference)
following Amphastar entry
(n= 31)

-$6    -$4    -$2    $0    $2    $4    $6

**Difference between average employer payment pre- and post-Amphastar**



# Retail Distribution Channel

**Manufacturers** → Wholesalers

**Retail**

Pharmacies

Uninsured Patients | Insurers | Insured Patients

Cremieux Rpt. Fig. 1, Fig. 3, ¶ 42
JA-145, JA-151, JA-164



# Exhibit 9.a.ii to Dr. Cremieux's Initial Expert Report



**Exhibit 9.a.ii**
**Difference in Average Employer Payment for Generic Enoxaparin**
**By Individual Employer in OptumHealth Pharmacy Claims**
**All Dosages - Scaled to 10mg Syringe**
**Pre-Amphastar Entry (February 2011 - July 2011) and Post-Amphastar Entry (February 2012- July 2012)**

*Each bar represents an individual employer*

34% of employers have a *higher* average payment
(>$0.05 difference)
following Amphastar entry
(n= 20)

14% of employers have a *similar* average payment
(-$0.05 to $0.05 difference)
following Amphastar entry
(n= 8)

53% of employers have a *lower* average payment
(<-$0.05 difference)
following Amphastar entry
(n= 31)

-$6     -$4     -$2     $0     $2     $4     $6

**Difference between average employer payment pre- and post-Amphastar**

Case 3:15-cv-01100   Document 385-1   Filed 07/19/19   Page 39 of 41 PageID #: 17090

# Exhibit 5 of Dr. Cremieux's Supplemental Expert Report







# Dr. Lamb Assumes Impact and Overstates Damages